# Exhibit 55

STATE OF NORTH DAKOTA                          IN DISTRICT COURT

COUNTY OF WARD                          NORTH CENTRAL JUDICIAL DISTRICT

STATE OF NORTH DAKOTA EX REL.
WAYNE STENEHJEM,                          Civil No. __51-2018-CV-01339__
ATTORNEY GENERAL,


                    Plaintiff,                          **COMPLAINT**


    -vs-
TERPSICHORE MARAS, AKA
TERPSICHORE MARIA HELEN
LINDEMAN, AKA TERPSICHORE
LINDEMAN, AKA TERPSICHOR MARAS-
LINDEMAN, AKA TERPSICHORE
MARAS-LINDEMAN, AKA TERPSICHOR
MARAS, AKA TERPSICHORE P
LINDEMAN, AKA TERPSECHORE
MARAS-LINDEMAN, AKA TORE MARAS-
LINDEMAN, AKA TERPSICHOR
LINDEMAN, AKA TERPSECHORE
MARAS-LINDEMAN, AKA TERPSEHORE
P MARAS-LINDEMAN, AKA
TERPSEHORE PETE MARAS-
LINDEMAN, AKA TERPSEHORE
MARAS-LINDEMAN, doing business as  A
MAGIC CITY CHRISTMAS and MLLABS
– EVENTS,

                    Defendant.                          CPAT 170233.001

[¶1]Plaintiff State of North Dakota on the relation of Wayne Stenehjem Attorney

General, by and through Assistant Attorney General Brian M. Card, Consumer

Protection and Antitrust Division, brings this equitable cause of action against

Defendant Terpsichore Lindeman, who also uses a large number of variations of her

name, see Paragraph 6, *infra*, doing business as A Magic City Christmas and MLLabs –

Events, and upon information and belief alleges as follows:

1

## I.   INTRODUCTION

[¶2]The State of North Dakota brings this action on the relation of Wayne Stenehjem, the Attorney General of the State of North Dakota, in the public interest pursuant to North Dakota Century Code (N.D.C.C.) ch. 51-15. This action seeks equitable relief, under N.D.C.C. §§ 50-22-05 and 51-15-07, to restrain and enjoin violations of N.D.C.C. chs. 50-22 and 51-15, and to recover property loss suffered by consumers as a result of such violations. Pursuant to N.D.C.C. §§ 50-22-06 and 51-15-10, this action also seeks equitable relief in the form of the recovery of costs, expenses, and attorney's fees incurred by the Attorney General in the investigation and prosecution of this action and, under N.D.C.C. §§ 50-22-05 and 51-15-11, to obtain civil penalties of not more than $5,000.00 for each violation of N.D.C.C. §§ 50-22-04.3 and 51-15-02. This action also seeks, pursuant to N.D.C.C. § 47-25-07, the cancellation of the trade name "MLLabs – Events" because the registration was obtained fraudulently and for Defendant's use of the trade name to engage in violations of N.D.C.C. chs. 50-22 and 51-15.

## II.   JURISDICTION AND VENUE

[¶3]Under N.D.C.C. §§ 51-15-07, 51-15-10 and 51-15-11 the district court has jurisdiction to enter appropriate orders.

[¶4]Venue in Ward County is proper under N.D.C.C. §§ 28-04-03 and 28-04-05 because Defendant Terpsichore Lindeman had or has a principal place of business in Ward County, Defendant has transacted business in Ward County, and all or part of the cause of action arose in Ward County.

[¶5]This Court has personal jurisdiction over Defendant. Defendant, either acting directly or by an agent, did one or more of the following: transacted business in North

Dakota; contracted to supply, or supplied, services, goods or other things in North Dakota; committed a tort within or outside North Dakota causing injury to another person or property within North Dakota; committed a tort within North Dakota causing an injury to another person or property within or outside North Dakota; engaged in any other activity within North Dakota; or violated North Dakota law.

## III.   **DEFENDANT**

[¶6]Defendant Terpsichore Lindeman ("Defendant" or "Lindeman") is an adult individual and, upon information and belief, is currently residing at, or has a last known address at, 415 11th St. NW, Minot, ND 58703. While principally identified as "Terpsichore Lindeman" by this Complaint and previous filings against Defendant, Defendant uses or has used a large number of aliases, and uses or has used at least three different social security numbers, including:

  a.   Terpsichore Maras

      i.   Used in connection with a probable cause affidavit filed by the City of Pittsburgh, Pennsylvania on March 2, 1998; social security number recorded at that time was **REDACTED**[1]; and

      ii.   Used by Defendant when she served in the United States Navy from December 1996 until August 1997.

  b.   Terpsichor Maras

      i.   Used in connection with a civil lawsuit filed on February 1, 2013 against Defendant in Oregon by Ali Shadbeh.

  c.   Terpischor Lindeman

      i.   Used in connection with a civil lawsuit filed on April 27, 2015

---

[1] *See* Confidential Information Form, Social Security Number 1.

against Defendant in Oregon by The Hertz Corporation.

d.   Terpsichore Maria Helen Lindeman

  i.   Used by Defendant to attend the University of Kentucky from 2009 – 2011; social security number used by Defendant at that time was **REDACTED**[2].

e.   Terpsichore Lindeman

  i.   Used by Defendant to establish a PayPal account on September 8, 2012; the account was opened jointly with Barry Lindeman, believed to be Defendant's husband; and

  ii.   Used by Defendant to establish a PayPal account on May 17, 2016.

f.   Terpsichore Maras Lindeman

  i.   Used in connection with a civil lawsuit filed on October 2, 2012 against Defendant in Oregon by Meadow Ridge.

g.   Terpsichore Maras-Lindeman

  i.   Used by Defendant to establish a GoFundMe fundraising account on February 1, 2013;

  ii.   Used by Defendant to establish the business Breaking Language Selvedge Solutions, LLC, doing business as BLS Solutions, LLC, filed with the Oregon Secretary of State by Defendant on April 4, 2013;

  iii.   Used by Defendant in 2013 when she enrolled in American Military University and attempted masters programs in business administration and psychology; Defendant used Social Security

---

[2] *See* Confidential Information Form, Social Security Number 1.

Number 1 (*see* Confidential Information Form) in connection with her enrollment;

iv. Used by Defendant in connection with fundraising on GoFundMe for the campaign "Impact Protesting," started January 28, 2017; and

v. Used by Defendant in connection with fundraising on GoFundMe for the campaign "Build That Wall," started May 2, 2017.

h.   Terpsichore Tore Maras Lindeman

i. Used in connection with a civil lawsuit filed on December 12, 2012 against Defendant in Oregon by Ali Shadbeh.

i.   Terpsichore P Lindeman

i. Used in connection with a criminal case brought against Defendant by the State of Oregon on June 10, 2013;

ii. Name used by Defendant to obtain an Oregon driver's license on July 8, 2013 (*see* Figure 1 below); and

iii. Used in connection with a civil lawsuit filed on October 29, 2014 against Defendant by Avid Acceptance, LLC.



**Figure 1**

  j. Terpsechore Maras-Lindeman

    i. Used by Defendant to obtain a Capital One checking account on or before August 22, 2014; Defendant used the social security number **REDACTED**[3];

    ii. Used by Defendant to establish a PayPal account on March 31, 2015; Defendant used the social security number **REDACTED**[4]; and

    iii. Used by Defendant on January 1, 2016 to execute a residential lease with Silver Springs Development, Inc.

  k. Terpsechore MarasLindeman

---

[3] *See* Confidential Information Form, Social Security Number 2.

[4] *See* Confidential Information Form, Social Security Number 2.

      i.  Used by Defendant to establish a PayPal account on October 16, 2015.

l.  Tore Maras-Lindeman

      i.  Used by Defendant to establish an Indiegogo fundraising account on February 26, 2015; and

     ii.  Used by Defendant to establish a PayPal account on November 27, 2017, in connection with her A Magic City Christmas event.

m.  Terpsechore Maras-Lindeman

      i.  Used by Defendant on December 28, 2015 to execute a personal guaranty in relation to a purchase agreement between Silver Springs Development, Inc., Defendant, and Barry Lindeman.

n.  Terpsehore P Maras Lindeman

      i.  Used by Defendant to establish a Gate City Bank personal checking account on October 4, 2016; Defendant used the social security number **REDACTED**[5];

     ii.  Used by Defendant to file lawsuits in North Dakota against Home Depot, General Electric, AT&T, and Target on December 1, 2016;

    iii.  Used by Defendant to establish a PayPal account on September 22, 2017 to receive proceeds for her A Magic City Christmas event; Defendant used social security number 3 (*see* Confidential Information Form);

    iv.  Used by Defendant to establish a Gate City Bank account for MLLabs on October 19, 2017 to receive funds received in

---

[5] *See* Confidential Information Form, Social Security Number 3.

connection with her A Magic City Christmas event; Defendant used social security number 3 (*see* Confidential Information Form); and

    v. Used by Defendant to register the trade name "MLLabs-Events" with the North Dakota Secretary of State on December 12, 2017; Defendant used the tax identification number **REDACTED**[6].

  o.   T Maras Lindeman

    i. Used by Defendant to establish a PayPal account on January 25, 2018.

[¶7]In addition to using a multitude of names and at least three different social security numbers, Defendant uses (or has used) a large number of e-mail addresses, including tmli222@uky.edu, dr.t.lindeman@gmail.com, tore@blanguagesolutions.com, terpsichore.lindeman@gmail.com, justtore@gmail.com, drlindeman@midco.net, barry.lindeman@gmail.com, tlindeman@cminterpreters.com, maraslindeman@gmail.com, terpse@mllaboratory.org, and info@magiccitychristmas.com. Defendant has also claimed to use ProtonMail for e-mail communications.

[¶8]Defendant, individually or in concert with others, formulated, directed, controlled, or participated in the acts and practices set forth herein.

## IV.   NATURE OF DEFENDANT'S BUSINESS

[¶9]Defendant, at all relevant times hereto, was engaged in the business of soliciting and selling merchandise, as that term is defined in N.D.C.C. § 51-15-01, in the State of North Dakota, namely soliciting and selling services, including, engaging in the solicitation of charitable contributions, as the terms "solicitation" and "contribution" are

---

[6] *See* Confidential Information Form, Tax Identification Number

defined in N.D.C.C. § 50-22-01.

## V.     ACTS OR PRACTICES ALLEGED

[¶10]In connection with the solicitation of charitable contributions in North Dakota, Defendant, prior to solicitation, solicited contributions from persons in North Dakota without registering as a charitable organization or professional fundraiser, in violation of N.D.C.C. §§ 50-22-02 or 50-22-02.1.

[¶11]In connection with the solicitation of charitable contributions in North Dakota, Defendant used deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation with the intent that others rely thereon in connection with the solicitation of a charitable contribution for or on behalf of a charitable organization, in violation of N.D.C.C. § 50-22-04.3.

[¶12]In connection with the solicitation of charitable contributions, or other merchandise as defined as N.D.C.C. § 51-15-01(3), Defendant through written and oral representations made by Defendant, her agents, employees, or representatives, has made untrue, deceptive, and misleading representations, or has engaged in deceptive acts or practices, with the intent that others rely thereon, in violation of N.D.C.C. § 51-15-02.

[¶13]Defendant's conduct in violation of N.D.C.C. §§ 50-22-02, 50-22-02.1, 50-22-04.3, and 15-15-02 includes the following acts and practices listed in paragraphs 14 through 92 of this Complaint:

**A.     COUNT 1: IN VIOLATION OF N.D.C.C. §§ 50-22-04.3 AND 51-15-02, DEFENDANT SOLICITED DONATIONS FOR THE VICTIMS OF AN APARTMENT FIRE IN HARVEY, ND AND DID NOT USE THE PROCEEDS FOR THIS PURPOSE**

[¶14]On or about February 26, 2015, Defendant created a fundraising campaign

on Indiegogo, located at https://www.indiegogo.com/projects/9-families-who-lost-everything-in-2-hrs-in-a-fire, ostensibly to raise funds for families that were displaced due to a fire that destroyed a building with apartments in it. Defendant sought to raise $9,000.00. Defendant organized the campaign using the name "Tore Maras-Lindeman" and the e-mail address justtore@gmail.com.

[¶15]On the campaign page, Defendant stated that the purpose of the campaign was to "raise money to be able to house them [the nine families] at an inn or motel until they can find something." Defendant received 20 donations for a total of $942.00, $75.00 of which came from Defendant and Barry Lindeman as three separate $25.00 donations. Defendant ran this campaign and collected funds to house the families notwithstanding that it was reported that the Artos Motel was making rooms available for the people who lived in the apartments.

[¶16]Despite collecting nearly $1,000.00, as late as January 22, 2018, Defendant did not disburse the funds to any of the victims of the Harvey fire to "house them at an inn or motel." Likewise, Defendant did not return the donated funds to any of the persons from whom she received donations.

[¶17]Also, as of January 18, 2018, it appeared that, though Defendant had yet to receive from Indiegogo the funds donated to her for the benefit of the Harvey fire victims, Defendant could do so at any time. After the date of January 18, 2018, and as of the date of this Complaint, it is unknown if Defendant received the funds from Indiegogo. Defendant, however, did attempt to collect the funds on at least two occasions prior to January 18, 2018. On May 5, 2015, Defendant sent an e-mail to Indiegogo, using the e-mail address dr.t.lindeman@gmail.com, wherein she stated: "I am super pissed. I log on and I can't find the campaign. I had set up the payment for

these families and nothing… was paid. I come back from my trip and still nothing. I try to log on and I have no campaign." On December 4, 2017, Defendant sent an e-mail to Indiegogo, using the e-mail address justtore@gmail.com, once again requesting the funds, stating: "Please explain where the monies for my closed campaign are. ?? I have emailed you a few times and have received nothing."

[¶18]On January 15, 2018, Defendant sent a third e-mail to Indiegogo, using the e-mail justtore@gmail.com, this time disclaiming a desire to collect the funds, but rather to confirm that the funds were never claimed. Subsequently, Defendant fabricated the entire e-mail below (*Figure 2*) and distributed it online:



Figure 2

[¶19]In violation of N.D.C.C. §§ 50-22-04.3 and 51-15-02, Defendant acted,

used, or employed deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, specifically the solicitation of donations to house the victims of a February 26, 2015 Harvey, ND fire, and then, as late as three years later, did not use the funds to house the victims of the Harvey fire and did not refund those who donated to her campaign. As late as December 4, 2017, Defendant, as a part of continuing fraud on her part, attempted to collect the funds from her Indiegogo campaign.

**B.   COUNT 2: IN VIOLATION OF N.D.C.C. § 50-22-02 OR 50-22-02.1, DEFENDANT FAILED TO REGISTER WITH THE SECRETARY OF STATE PRIOR TO SOLICITING CONTRIBUTIONS FOR A CHARITABLE PURPOSE IN NORTH DAKOTA**

*i.   Website solicitations*

[¶20]Beginning on an unknown date in mid to late 2017, Defendant began soliciting charitable contributions in connection with A Magic City Christmas, an event that Defendant described as "a benefit concert" that she purported to be organizing. According to Defendant's website and other advertisements, A Magic City Christmas was to be held on December 22, 2017 at 7:00 p.m. CST.

[¶21]On an unknown date before December 1, 2017, Defendant created a website advertising her A Magic City Christmas event located at www.magiccitychristmas.com. On her website, Defendant advertised that A Magic City Christmas was "A Benefit Christmas Concert."

[¶22]Using her website, Defendant solicited contributions, within the meaning of N.D.C.C. §§ 50-22-01(3), from consumers for a charitable purpose, within the meaning of N.D.C.C. § 50-22-01(4), by requesting that they "Donate to our Selected Causes."

Below this solicitation was a link to a PayPal account Defendant created to receive consumer donations located at www.paypal.me/MagicCityXmas. The link was labelled with the words "Donate Now."

[¶23]Defendant's website included a page titled "Charity." On the "Charity" page of her website, Defendant described the charitable purpose of her event to consumers by representing that the A Magic City Christmas event wasn't "just funding our local homeless shelters but the community too!" On that same page, Defendant represented the names and logos of three homeless shelters located in Minot, North Dakota, including the Men's and Veterans' Emergency Homeless Shelter, the Emergency Homeless Shelter, and the Men's Winter Refuge. A "Donate" link on the bottom of the "Charity" page of her website linked to Defendant's PayPal account, above the words, "Every dollar helps those charities keep their doors open." Below that representation, Defendant linked to a store located on her website. At the bottom of the "Charity" page, Defendant listed "Local Beneficiaries," including the Bishop Ryan Catholic School.

[¶24]On the "Store" page of her website, Defendant engaged in the sale of shirts and hats where she further described the charitable purpose of her A Magic City Christmas event and how the proceeds of merchandise sales would be used. Defendant represented that, "Remember proceeds go to the homeless shelters. That's what a great buy is about. Doing good and looking good. You can't beat that!"

[¶25]On the ticketing page of Defendant's website, Defendant further represented the charitable purpose of the A Magic City Christmas event and how ticket proceeds would be used. Defendant represented that, "All proceeds go to select organizations in Minot ND." Defendant further described her A Magic City Christmas event as "A Concert of Giving."

[¶26]At the time that Defendant solicited consumer contributions for a charitable purpose, as described in Paragraphs 20 through 25, *supra*, Defendant was not registered with the North Dakota Secretary of State as either a charitable organization or professional fundraiser and was not in compliance with N.D.C.C. §§ 50-22-02 or 50-22-02.1.

[¶27]On or about December 8, 2017, Defendant updated the "Our Mission" page of her website to state: "In addition, we all knew how the homeless shelter in Bismarck closed down – so we thought we would help support your local homeless shelter with things they need!!!;" "Let's be clear – this is an event to which WE ARE GIVING AWAY all our PROFITS. That means we are not a charity WE ARE SIMPLY spreading Christmas CHEER!!!;" and "Below are the 3 HOMELESS SHELTERS WE CHOSE TO DONATE OUR PROFITS," followed by the names of the three homeless shelters in Minot, North Dakota provided in Paragraph 23, *supra*. Defendant's updated representation further, and more emphatically, describes the charitable purpose of her A Magic City Christmas event. This representation is also starkly different from Defendant's initial representations that *all* proceeds were intended for homeless shelters and other beneficiaries.

[¶28]Sandwiched between the links to pages on her website where Defendant engaged in the sale of tickets and merchandise, on the "Our Mission" page of her website, Defendant represented that, "Every dollar helps these charities keep their doors open." Also on that page, Defendant represented that there were other additional intended recipients of proceeds from the A Magic City Christmas event, including the Bishop Ryan Catholic School.

[¶29]At the time that Defendant made the representations described in

14

Paragraphs 27 and 28, *supra*, Defendant was not registered with the North Dakota Secretary of State as either a charitable organization or professional fundraiser and was not in compliance with N.D.C.C. §§ 50-22-02 or 50-22-02.1.

[¶30]On or about December 6, 2017, Defendant updated the ticket sales page of her website to state that, "ALL PROCEEDS GO TO SELECT ORGANIZATIONS IN MINOT ND THAT THE PERFORMERS CHOSE." At the time that Defendant made this representation, Defendant was not registered with the North Dakota Secretary of State as either a charitable organization or professional fundraiser and was not in compliance with N.D.C.C. §§ 50-22-02 or 50-22-02.1.

### ii.    Facebook Solicitations

[¶31]On or about September 23, 2017, or on an unknown date prior, Defendant created a Facebook page advertising her A Magic City Christmas event located at www.facebook.com/MagicCityXmas.

[¶32]On or about November 19, 2017, Defendant posted an image to her Facebook page representing that a ticket purchased for the event is a donation. The image represented that, "Your ticket is also your donation."

[¶33]On November 28, 2017, Defendant repeated this representation, stating that a consumer's ticket purchase "for the concert is a donation to the homeless of Minot."

[¶34]At the time that Defendant made the representations described in Paragraphs 32 and 33, *supra*, Defendant was not registered with the North Dakota Secretary of State as either a charitable organization or professional fundraiser and was not in compliance with N.D.C.C. §§ 50-22-02 or 50-22-02.1.

    *iii.*    *Other Solicitations*

[¶35]On or about December 7, 2017, or an unknown date prior, Defendant advertised her A Magic City Christmas event at DakotaMarketplace.com. On Dakota Marketplace, Defendant represented that her event was a "Concert of Giving," and described the charitable purpose of her event in the following way: "The concert is raising funds for the Women's and Men's Homeless shelters and the city of Minot." Defendant similarly advertised her event, with a link to her website, on the Event Jams website. At the time that Defendant made these representations, Defendant was not registered with the North Dakota Secretary of State as either a charitable organization or professional fundraiser and was not in compliance with N.D.C.C. §§ 50-22-02 or 50-22-02.1.

    *iv.*    *Defendant admitted engaging in the solicitation of contributions for a charitable purpose*

[¶36]In a video posted to Facebook on January 6, 2018, Defendant admitted to the charitable purpose of her A Magic City Christmas event, stating, "No charity here. No charity. **Actually, our profits were going to charities**." Despite Defendant's admission that she was soliciting contributions for a charitable purpose, she failed to register as a charitable organization or professional fundraiser and was not in compliance with N.D.C.C. §§ 50-22-02 or 50-22-02.1.

    *v.*    *Defendant refused to properly register as charitable organization or professional fundraiser*

[¶37]Despite recommendations by the Attorney General that Defendant discontinue the solicitation of charitable contributions until she properly registered as a charitable organization or professional fundraiser, Defendant refused to register

appropriately. Defendant did not discontinue the solicitation of charitable contributions until approximately March 1, 2018 when an injunction was ordered pursuant to the Attorney General's Application for Inunction and Order to Compel in Case No. 51-2018-CV-00191. See, Case No. 51-2018-CV-00191, Index # 63.

[¶38]Defendant failed to properly register as a charitable organization or professional fundraiser prior to engaging in the solicitation of charitable contributions described in Paragraphs 20 through 37, *supra.* N.D.C.C. § 50-22-02 states that, "A charitable organization may not solicit contributions from persons in [North Dakota] by any means unless, prior to a solicitation, there is on file with the secretary of state upon forms prescribed by the secretary of state a registration statement ..." N.D.C.C. § 50-22-02.1 states that, "A person may not act as a professional fundraiser subject to [N.D.C.C. ch. 50-22] unless that person has registered with the secretary of state." While engaged in the solicitation of charitable contributions described *supra*, Defendant was not, at any point, in compliance with N.D.C.C. §§ 50-22-02 or 50-22-02.1.

**C.    COUNT 3: IN VIOLATION OF N.D.C.C. §§ 50-22-04.3 AND 51-15-02, DEFENDANT SOLICITED DONATIONS WHILE MISREPRESENTING ("PASSING OFF") SPONSORSHIP BY THE BANK OF NORTH DAKOTA**

[¶39]On or about November 19, 2017, Defendant, while engaged in the solicitation of charitable contributions, posted an image to the Facebook page for her A Magic City Christmas event, located at www.facebook.com/MagicCityXmas, wherein she represented that the Bank of North Dakota was a "local sponsor." The Bank of North Dakota had not agreed to sponsor Defendant's event on or before November 19, 2017. Defendant did not remove the November 19, 2017 representation from Facebook until Defendant deleted the entire Facebook page on or about March 1, 2018.

[¶40]On or about November 30, 2017, Defendant, while engaged in the solicitation of charitable contributions, represented that the Bank of North Dakota was a sponsor on the A Magic City Christmas website, located at www.magiccitychristmas.com. The logo of the Bank of North Dakota appeared under the words "Our Sponsors," and appeared among other sponsors' logos that cycled over time. The Bank of North Dakota had not agreed to sponsor Defendant's event on or before November 30, 2017. In fact, Defendant had been told by e-mail the day before, November 29, 2017, that the Bank of North Dakota had not consented to sponsor Defendant's A Magic City Christmas event. Defendant had to be told again, on November 30, 2017, that the Bank of North Dakota had not agreed to sponsor Defendant's event, after the Bank of North Dakota learned its logo was being used on Defendant's website.

[¶41]On or about December 7, 2017, Defendant, while engaged in the solicitation of charitable contributions, created a fundraising campaign on Fundly, located at www.fundly.com/magic-city-fund, seeking to raise $40,000.00 for a monument that she otherwise represented was being funded in other ways. See, ¶¶ 87-90, infra. On her Fundly campaign page, while engaged in making another misrepresentation, see Paragraphs 49-50, infra, Defendant continued to misrepresent that the Bank of North Dakota was a sponsor of her A Magic City Christmas event, stating, "**One sponsor the Bank of North Dakota** the ONLY state owned bank. [sic]" The Bank of North Dakota had not agreed to sponsor Defendant's event on or before December 7, 2017.

[¶42]In violation of N.D.C.C. §§ 50-22-04.3 and 51-15-02, Defendant acted, used, or employed deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or

advertisement of any merchandise, specifically the solicitation of donations for her A Magic City Christmas event, while falsely representing ("passing off") sponsorship by the Bank of North Dakota. Defendant misrepresented this sponsorship on Facebook, her website, and on her Fundly campaign page. Defendant continued to make the representations on Facebook on Fundly for months despite being explicitly told by the Bank of North Dakota that it had not agreed to sponsor her event.

**D.   COUNT 4: IN VIOLATION OF N.D.C.C. §§ 50-22-04.3 AND 51-15-02, DEFENDANT SOLICITED DONATIONS WHILE MISREPRESENTING ("PASSING OFF") AN ASSOCIATION WITH THE CITY OF MINOT**

[¶43]On or about September 23, 2017, Defendant, while engaged in the solicitation of charitable contributions, posted images to Facebook using the Coin of the City of Minot in the logo for Defendant's A Magic City Christmas event. The City of Minot had not given Defendant permission to use the Coin of the City of Minot, including as a part of the A Magic City Christmas logo. It was also reported that Defendant was verbally passing off an association with the City of Minot when soliciting sponsors and potential sponsors, including by representing that she was "with" the City of Minot (as opposed to merely *from* the City of Minot).

[¶44]On at least three occasions, on or about October 9, 2017, a representative of the City of Minot attempted to reach Defendant to request that she discontinue use of the Coin of the City of Minot because her use was causing confusion that her event was sanctioned by, or organized in association with, the City. After one voice mail was left regarding Defendant's use of the Coin of the City of Minot, Defendant sent a follow up text to a City representative stating that she was "on call." As a result of Defendant's refusal or failure to communicate with representatives of the City of Minot, and failure to

19

voluntarily discontinue use of the Coin of the City of Minot, on October 27, 2017, the City of Minot issued a press release disclaiming association with Defendant's A Magic City Christmas event.

[¶45]Well after the City of Minot's efforts to reach Defendant, and the City of Minot's press release, Defendant was still using the Coin of the City of Minot on her website, located at www.magiccitychristmas.com. The Coin of the City of Minot appeared on Defendant's website at least as late as December 5, 2017. Likewise, Defendant's use of the Coin of the City of Minot continued on Facebook until Defendant deleted the Facebook page on or about March 1, 2018.

[¶46]In violation of N.D.C.C. §§ 50-22-04.3 and 51-15-02, Defendant acted, used, or employed deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, specifically the solicitation of donations for her A Magic City Christmas event, while falsely representing ("passing off") an association with the City of Minot. Defendant misrepresented this association on Facebook and her website for months after Defendant initially made the misrepresentations.

**E.   COUNT 5: IN VIOLATION OF N.D.C.C. §§ 50-22-04.3 AND 51-15-02, DEFENDANT SOLICITED DONATIONS WHILE MISREPRESENTING RECEIPT OF AN E-MAIL FROM THE BANK OF NORTH DAKOTA THAT SHE FABRICATED OR FALSELY ATTRIBUTED TO THE BANK OF NORTH DAKOTA**

[¶47]On or about December 6, 2017, Defendant, while engaged in the solicitation of charitable contributions or sale or advertisement of merchandise, began soliciting funds on GoFundMe, at www.gofundme.com/a-magic-city-christmas, and Fundly, at www.fundly.com/magic-city-fund. Between the two fundraising campaigns, Defendant

sought a total of $90,000.00. Before being updated, Defendant's GoFundMe campaign sought donations for her A Magic City Christmas event that, as detailed above, was advertised by Defendant as a "benefit concert" to benefit homeless shelters and other beneficiaries. See, ¶¶ 20-36, supra. Defendant's Fundly campaign, meanwhile, was represented as a "Monument Fund," ostensibly for the purpose of funding a monument that Defendant represented was going to be donated to the City of Minot (notwithstanding Defendant's numerous contradictory representations regarding the monument).

[¶48]On or about December 13, 2017, Defendant updated her GoFundMe campaign, *after* receiving a number of donations, to represent that it was raising a "defense fund against [the Attorney General]."[7]

[¶49]In connection with her solicitations on GoFundMe and Fundly, ostensibly intended for her A Magic City Christmas event, legal fees, and to fund a monument, Defendant, in violation of N.D.C.C. §§ 50-22-04.3 and 51-15-02, acted, used, or employed deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, by falsely representing that she received an e-mail from the Bank of North Dakota. See, Exhibit 1. Based upon information and belief, Defendant entirely fabricated the e-mail or falsely attributed it to the Bank of North Dakota to induce others to donate to her A Magic City Christmas event, legal "defense fund," and to fund a monument. It is believed that Defendant fabricated the e-mail or falsely attributed it to the Bank of North Dakota in retaliation because the Bank of North

---

[7] It doesn't appear that Defendant ever spent the money she received on legal fees *or* for her A Magic City Christmas event.

Dakota sent an e-mail to Defendant, with other sponsors and potential sponsors courtesy copied on the e-mail, telling her the Bank of North Dakota had not agreed to sponsor her event.

[¶50]In addition to having fabricated the e-mail, or falsely attributing it to the Bank of North Dakota, Defendant claimed that the e-mail was "recalled" or that an attempt was made to "recall" it, falsely suggesting that the Bank of North Dakota made an attempt to "cover up" the e-mail. Defendant falsely claimed: First, "The e-mail was recalled – we have a snapshot …;" second, "The email was recalled but we've got a copy :) Printed PDF doc instant before it disappeared forever …;" and third, "The email was recalled but luckily with VPN apps – screen captures happen. Boom it got evil."

[¶51]As noted above, in Paragraph 18, *supra*, it is known that Defendant has fabricated at least one other e-mail in connection with her activities related to fundraising online. Defendant has also previously altered screenshots from a North Dakota government website and used that altered screenshot to attack the North Dakota Secretary of State. Defendant has also created Facebook pages to either support her claims or attack others,[8] including the Attorney General's Office.

[¶52]On or about September 28, 2016, Defendant entered her husband's information into the "My Polling Place" page of the North Dakota Secretary of State's website. Defendant then took a screenshot of the result (that provided the polling location associated with Defendant's husband's driver's license information), obscured the result using image editing software, and proceeded to attack the North Dakota Secretary of State on Facebook, claiming that her husband was improperly registered to

---

[8] *See* Paragraph 64, *infra*.

vote in North Dakota.[9] Apparently attempting to induce others to attack the North Dakota Secretary of State, Defendant, or another person to whom Defendant supplied the altered image, posted the altered image to Reddit.

[¶53]On an unknown date before June 5, 2018, Defendant created a Facebook page entitled "North Dakota Attorney General's Office." On or about June 5, 2018, Defendant posted a message wherein she made statements including: "We also got all the communication details we needed but still came up empty so she [Defendant] must hand over more information. We have to find something on her! How do we explain the tax money we've been spending on this rather than looking into Seminary's ACTUAL crimes or solve our CI murder of Alex Sadek (people might think we did it!)."

### F.    COUNT 6: IN VIOLATION OF N.D.C.C. §§ 50-22-04.3 AND 51-15-02, DEFENDANT USED "SOCKPUPPET" OR "ASTROTURFED" DONATIONS TO INDUCE OTHERS TO DONATE TO HER ONLINE CAMPAIGNS

[¶54]A "sockpuppet" (or "sock puppet") is "a fake persona used to discuss or comment on oneself or one's work, particularly in an online discussion group or the comments section of a blog."[10] "Astroturfing," meanwhile, is "designed to create the image of public consensus where there is none," and is used by individuals online to give the impression of widespread support.[11]

[¶55]Defendant, while engaged in the solicitation of charitable contributions or sale or advertisement of merchandise, and in violation of N.D.C.C. §§ 50-22-04.3 and

---

[9] Notwithstanding that North Dakota does not require voter registration.

[10] See, e.g., https://www.wordspy.com/index.php?word=sock-puppet

[11] See, e.g., Howard, Philip N. (2003). "Digitizing the Social Contract: Producing American Political Culture in the Age of New Media". The Communication Review. 6 (3): 213–45; Cory Doctorow, "HBGary's high-volume astroturfing technology and the Feds who requested it", boingboing, February 18, 2011; Peter Ludlow, "The Strange Case of Barrett Brown", The Nation, June 18, 2013

51-15-02, acted, used, or employed deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation with the intent that others rely thereon, made or reported donations to her own online campaigns in a manner that had the likelihood and capacity to deceive consumers by giving the impression that her campaigns had greater support than they actually did.

[¶56]On or about December 6, 2017 at 7:58 p.m., Defendant, using the donor name "Magic City Christmas," and the e-mail address info@magiccitychristmas.com, attempted to make a donation to her own GoFundMe campaign for $100.00. Four minutes later, at 8:02 p.m. on December 6, 2017, Defendant, using the e-mail address terpse@mllaboratory.org, recorded an offline donation in the amount of $500.00 to her own GoFundMe campaign.

[¶57]As noted above, Defendant gave three $25.00 amounts to herself in connection with her Harvey fire Indiegogo campaign, including 1) $25.00, on February 27, 2015, using the barry.lindeman@gmail.com e-mail address; 2) $25.00, on February 27, 2015, using the e-mail address tlindeman@cmiinterpreters.com; and 3) $25.00, on February 27, 2015, using the e-mail address dr.t.lindeman@gmail.com.

[¶58]Upon information and belief, Defendant donated to her own campaigns (or recorded offline donations from herself) to give the impression to consumers that she had greater support than she actually did to induce consumers to donate to her. Defendant's deceptive conduct had the likelihood and capacity to deceive anyone who viewed Defendant's fundraising campaigns, and is in violation of N.D.C.C. §§ 50-22-04.3 and 51-15-02.

G.    COUNT 7: IN VIOLATION OF N.D.C.C. §§ 50-22-04.3 AND 51-15-02,
      DEFENDANT SOLICITED DONATIONS WHILE MISREPRESENTING
      EDUCATION AND EXPERIENCE THAT SHE DOES NOT POSSESS

[¶59]Defendant, while engaged in the solicitation of charitable contributions or

the sale or advertisement of merchandise, and in violation of N.D.C.C. §§ 50-22-04.3

and 51-15-02, acted, used, or employed deceptive acts or practices, fraud, false

pretense, false promise, or misrepresentation with the intent that others rely thereon, by

misrepresenting education and experience that she does not possess, thereby giving

the impression to consumers that Defendant had or has the ability and knowledge to

organize the A Magic City Christmas event.

[¶60]Defendant has or had a large social media presence, and has created web

pages about herself, or added herself to existing webpages, on a large variety of

websites, including Wikipedia, Infogram, Voice123, and All Poetry. Almost invariably,

Defendant claims experience, education, or accomplishments that she does not

possess.

[¶61]On Twitter, Defendant used a Twitter profile with the username

"@drlindeman."[12] Defendant, using her @drlindeman Twitter profile, shared posts

("tweets") from a second Twitter account created specifically to advertise her A Magic

City Christmas event ("@MagicCityXmas"). Defendant used both Twitter profiles to

advertise her GoFundMe and Fundly fundraising campaigns.

[¶62]Based upon information and belief, Defendant is not a doctor and does not

possess a PhD from any institution, and Defendant's use of the @drlindeman username

in connection with her online fundraising activities has a likelihood or capacity to

---

[12] This account was suspended by Twitter in June, 2018 for violating Twitter's rules against abusive
behavior.

deceive consumers who view her profile and her "tweets" advertising her A Magic City Christmas event and online fundraising campaigns. Defendant also claims to be a member of Mensa International, a "high IQ society," on her Twitter profile. Mensa International has confirmed that Defendant is not a member of its organization.

[¶63]As suggested, Defendant's false and exaggerated claims about her education and experience pervade the internet, and represent a persistent effort on Defendant's part to deceive others.

[¶64]On her LinkedIn profile, that Defendant appears to have recently deleted or hidden from internet searches, Defendant claims[13]:

    a.   To be the President and Chair of the Oregon Diversity Council

           i.   The Oregon Diversity Council does not exist, but Defendant created a Facebook page, at www.facebook.com/OregonDiversityCouncil, to give the claim legitimacy. Defendant further claims that the Oregon Diversity Council is associated with the National Diversity Council, and used an altered version of the Pacific Northwest Diversity Council's logo in fashioning the logo for the supposed Oregon Diversity Council.[14]

          ii.   Defendant lists a telephone number for the organization, 503-430-0000, that Defendant answers as "ML Labs."

         iii.  On or about July 17, 2014, Defendant made a post to her Oregon Diversity Council Facebook page that "Tore Maras-Lindeman MBA, PhD has been appointed as the President and Chair of the Oregon

---

[13] The claims below are really only a small sampling of Defendant's misrepresentations about herself.

[14] As noted *supra*, this is yet another example of how Defendant alters images to engage in fraud.

Diversity Council."[15]

    iv. The Pacific Northwest Diversity Council confirmed to the Attorney General that they have no relationship with Defendant.

b.    To be currently serving as a Cultural Intelligence and Linguistics Officer with the Office of Naval Intelligence from August 1996 to the Present (a total of approximately 22 years)

    i. Within this span of time, Defendant also claims to have been an active reserve member of the U.S. Navy as an Intelligence Specialist in the Office of Naval Intelligence (August 2009 to June 2013).

    ii. According to the United States Department of Manpower Data Center, Defendant served in the Navy for approximately eight months, from December 17, 1996 to August 21, 1997.

    iii. Defendant also claims to have been awarded a Purple Heart, though this claim is dubious if she only served in the military for eight months.

    iv. Defendant also created a page for herself on the website Together We Served, located at navy.togetherweserved.com, where she claims to have served at a number of duty stations between 1997 and 2008, including serving in Iraq and Afghanistan. She also claims on this site to have attended Columbia University from 1998 – 2001, a claim she does not make elsewhere.

c.    To be doing confidential oncology work for "ML Labs."

---

[15] As noted below, Defendant does not possess an MBA or PhD.

    i.   ML Labs, or ML Laboratory, is an entity that Defendant claims to operate, while engaged in cancer research, though there is no indication that ML Laboratory or ML Labs exists as anything more than an internet website (previously located at www.mllaboratory.org) that Defendant created to, again, create legitimacy related to her claims of being a cancer researcher and doctor.

    ii.   Defendant similarly represented that she is a pediatric oncologist before the North Dakota Small Claims court in case numbers 51-2016-SC-00387, 51-2016-SC-00388, 51-2016-SC-00389, and 51-2016-SC-00390.

    iii.   Defendant has also claimed (albeit vaguely) to hold a patent for an invention used in hospitals. The Attorney General has been unable to locate any patent held in Defendant's name(s).

d.   To have been a Clinical Research Assistant at the University of Kentucky College of Medicine from May 2008 to July 2012.

    i.   Please note Paragraph 64(g)-(h), *infra*.

e.   To be certified by the American Translators Association ("ATA") as an interpreter and translator.

    i.   The ATA confirmed that Defendant is not certified as a translator or interpreter through their organization.

f.   To have earned a Masters of Business Administration from American Military University in 2014.

    i.   Though Defendant attempted an MBA program, she has not earned

an MBA from American Military University.

g.   To have earned a Master's of Science from the University of Kentucky College of Medicine.

    i.   Defendant did not complete a Master's of Science in Biology at the University of Kentucky; instead, she only earned a Bachelor's Degree in Biology.

h.   To have attended a number of other schools, including Harvard University, University of Indianapolis, London South Bank University, University of Maryland University College, University of East London, Defense Language Institute, and Yale School of Management.

    i.   The National Student Clearinghouse could only verify that Defendant attended the University of Kentucky, though University of Kentucky records reflect that Defendant attended at least some classes at the University of Indianapolis.

[¶65]On   Infogram,   located   at   https://infogram.com/Tore-Maras-Lindeman, Defendant makes a number of claims similar to those made by her on LinkedIn. Among many other claims, Defendant claims the following educational accomplishments: Bachelor of Laws (LLB), Electrical Engineering (NEETS or Naval Electrical Engineering Training Series), Associate of Arts in Linguistics, a Bachelor of Science in Psychology, an Associate of Science in Information Technology, a Bachelor of Science in Molecular Biology, a Human Resources certificate, a Doctorate in Cancer Biology, a Master of Science in Cancer Biology, a Master of Business Administration, a Master of Science in Pharmacology, a Graduate Diploma of Law, a Project Management certificate, a Doctorate of Medicine in Medical Science, and a Master of Arts in English. She claims

to have worked or lived in 28 countries, and claims to speak approximately 17 languages. Finally, she claims to have held such positions as a managing director, chief executive, lieutenant commander, consultant, medical student, and hedge fund auditor. As noted above, it appears that the only educational degree Defendant earned is a Bachelor's Degree in Biology, and it appears that Defendant only served approximately eight months in the Navy. Defendant's Infogram claims were linked to her "@drlindeman" Twitter profile when she engaged in the conduct described in Counts 2-9.

[¶66]Defendant, by misrepresenting education and experience that she does not possess, had the likelihood or capacity to deceive consumers, potential sponsors, or any other person from whom Defendant solicited charitable donations or to whom Defendant directed her advertisements or solicited the sale of merchandise. To perpetuate her exaggerated knowledge and experience, Defendant created websites and Facebook pages, and entered her information on a large variety of webpages on the internet. Defendant engaged in violations of N.D.C.C. §§ 50-22-04.3 and 51-15-02 by acting, using, or employing deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation with the intent that others rely thereon, by misrepresenting education and experience that she does not possess, thereby giving the impression to consumers that Defendant had or has the ability and knowledge to organize the A Magic City Christmas event and could be entrusted with the proceeds.

**H.   COUNT 8: IN VIOLATION OF N.D.C.C. §§ 50-22-04.3 AND 51-15-02, DEFENDANT SOLICITED CONTRIBUTIONS FOR A PURPORTED CHARITABLE PURPOSE AND THEN USED THE PROCEEDS FOR PERSONAL EXPENSES**

[¶67]Defendant, while engaged in the solicitation of charitable contributions or

sale or advertisement of merchandise, and in violation of N.D.C.C. §§ 50-22-04.3 and 51-15-02, acted, used, or employed deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation with the intent that others rely thereon, by soliciting contributions from sponsors and consumers while representing that all or some of the proceeds of A Magic City Christmas were intended for charitable purposes, including for homeless shelters[16], and then used the contributions she received for personal expenses.

[¶68]On November 21, 2017, Defendant received a check from KRJ Safety Solutions, LLC ("KRJ Safety Solutions") for $1,500.00. KRJ Safety Solutions specifically noted on the check that the amount was a "Donation." On that same date, Defendant deposited the $1,500.00 into the Gate City Bank account she established on October 19, 2017 in the name "ML Labs." Thereafter, and before receiving another check from a sponsor for her event, Defendant made purchases at McDonald's, at Cash Wise Foods, and online via PayPal.

[¶69]On November 22, 2017, Defendant received a $1,000.00 donation from Newkota Services and Rental, LLC. Defendant deposited the check into her ML Labs Gate City Bank account the same day.

[¶70]In total, as of November 22, 2017, Defendant received $2,500.00 from sponsors of A Magic City Christmas.

[¶71]Between November 21, 2017 and November 27, 2017, Defendant spent nearly all of this money on a variety of purchases, including purchases at Cash Wise Foods, Marketplace Foods, Wal-Mart, Target, and Facebook, leaving the account with a balance of $8.94. The only amounts Defendant appears to have actually spent toward

---

[16] *See, ¶¶ 20-35, supra.*

the A Magic City Christmas event are amounts paid to Crystal Neria (whose stage name is "Kaya Jones"), ranging from $25.00 to $750.00, and totaling $825.00. Therefore, it appears that Defendant spent at least approximately $1,675.00 of the $2,500.00 in donations on herself.

[¶72]On November 28, 2017, Defendant deposited a $1,000.00 donation received from Integrity Outdoor Living, LLC. Immediately afterwards, Defendant withdrew $500.00 from the account and paid $510.00 to Crystal Neria.

[¶73]On that same date, November 28, 2017, Defendant issued a check to Phil Shapiro for $5,000.00, apparently intended for Corey Feldman's appearance at the A Magic City Christmas event. Two days later, on November 29, 2017, this check was rejected by Gate City Bank for nonsufficient funds in the account. (Had the check been cleared, it would have left the account with a balance of -$4,135.52.)

[¶74]That same date, on November 29, 2017, a check written to Crystal Neria for $1,000.00 on November 21, 2017 cleared, bringing the account to -$167.52.

[¶75]On November 30, 2017, Defendant attempted a $299.02 payment to Progressive Lease that was rejected. This was apparently a personal expense.

[¶76]On November 30, 2017, another payment to Crystal Neria was made, this time for $500.00. This brought Defendant's ML Labs account to -$686.52.

[¶77]Defendant's ML Labs account was restored to a positive balance ($313.48), on November 30, 2017, after depositing a $1,000.00 donation from United Community Bank.

[¶78]Subsequently, though dated November 30, 2017, the Progressive Lease payment was cleared by Gate City Bank that, after Defendant made a $212.67 purchase at Target (apparently another personal expense), brought her account

balance down to -$230.21.

[¶79]On December 4, 2017, Defendant received a return payment of $500.00 from Crystal Neria that returned Defendant's account to a positive balance ($205.44), though the reversal of a Popmoney credit of $500.00 took the account negative once more (-$325.56).

[¶80]On December 5, 2017, the $5,000.00 payment to Corey Feldman was attempted again but rejected by Gate City Bank.

[¶81]Subsequently, between December 4, 2017 and January 30, 2018, Defendant's ML Labs account ran a negative balance of varying amounts. While negative, Defendant was charged negative balance fees and still made a handful of purchases for her own benefit, including from QVC.

[¶82]In addition to the deposits described above, and over the same period, Defendant also received various amounts from WePay, the third party processor for PayPal, totaling $2,608.94. These amounts are believed to be the proceeds of ticket and merchandise purchases by consumers from Defendant through her website. This is unconfirmed because, despite being ordered by the court in Case No. 51-2018-CV-00191, Defendant refused to comply with the court's orders that she fully comply with the Attorney General's subpoenas in the form of Orders to Produce Information which required Defendant to produce payment records related to Defendant's A Magic City Christmas event. As with the amounts received from sponsors, and described above, Defendant spent money received from WePay into her ML Labs account on herself.

[¶83]Beginning December 21, 2017, Defendant made attempts to return $2,608.94 through WePay. Each attempt between December 21, 2017 and January 30, 2017 was rejected by Gate City Bank due to the negative balance in Defendant's ML

Labs account.

[¶84]Review of Defendant's ML Labs account compared to Defendant's personal account suggests that, as Defendant depleted funds in her personal account, she turned to using funds from the ML Labs account for personal expenditures. Except for payments made to Crystal Neria, and the $5,000.00 amount that Defendant attempted to pay to Corey Feldman, it does not appear that Defendant ever made any other substantial purchases related to her A Magic City Christmas event. Furthermore, it does not appear that Defendant ever made a single donation to any of the homeless shelters or other beneficiaries that Defendant represented would receive *all* of the proceeds from ticket or merchandise purchases. In fact, Defendant admits the representations she made regarding use of the proceeds[17] were false. According to Defendant (with emphasis added): "The [A Magic City Christmas] event was **not** going to benefit local charities the performers taking part in the event were to benefit other charities and they stated themselves on local, national media and social media. The event's goal was to fund a commemorative monument to the 2011 flood."[18] [19]

[¶85]Defendant admitted to the Minot Daily News that she was using money for personal expenses. The Minot Daily News noted that Defendant said, "I might have been using my own account, but I was tracking every single penny," and Defendant "[said] money taken for personal use was reimbursement for personal funds spent to

---

[17] *See*, ¶¶ 20-36, *supra*.

[18] Defendant makes this admission in her Defamation Complaint. *See*, Case No. 51-2018-CV-00656, Index # 1, ¶ 5, p. 6. Defendant's admission is made as part of a claim that the Attorney General falsely stated, in an April 4, 2018 press release, that her A Magic City Christmas event was supposed to benefit "various charities." Defendant's claim , though not attested, is made under penalty of perjury and purports to be "true and correct" at ¶ 6.1, p. 11.

[19] But note ¶ 36, *supra*, where it is described that Defendant said in a video posted to Facebook that "*some* of [Defendant's] *profits*" were intended for production of the monument. *See also*, ¶ 90, *infra*, where Defendant's numerous contradictory statements regarding the monument are described.

front advertising expenses." Neither of Defendant's bank accounts reflects expenditures for advertising, and, as noted above, despite court orders that Defendant provide such records, Defendant has not produced records showing such expenditures.

I.   **COUNT 9: IN VIOLATION OF N.D.C.C. §§ 50-22-04.3 AND 51-15-02, DEFENDANT SOLICITED CONTRIBUTIONS FOR CHARITABLE PURPOSES AND ENGAGED IN THE ADVERTISEMENT AND SALE OF MERCHANDISE UNDER FALSE PRETENSES**

[¶86]Defendant, while engaged in the solicitation of charitable contributions or sale or advertisement of merchandise, and in violation of N.D.C.C. §§ 50-22-04.3 and 51-15-02, acted, used, or employed deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation with the intent that others rely thereon, by soliciting donations from sponsors and consumers while representing that she was going to put on a Christmas benefit concert and donate a "surprise" to the City of Minot, later revealed to be a "commemorative monument."

[¶87]Beginning on an unknown date before December 1, 2017, Defendant posted to her website, located on the page www.magiccitychristmas.com/charity.html, "Shhhh! It's a secret! We aren't just funding our local homeless shelters but the community too! A BIG SURPRISE FOR THE CITY OF MINOT." This representation was made on December 5, 2017 and December 6, 2017 as well.

[¶88]On December 8, 2017, Defendant updated her website and altered the representation regarding the monument. On the "mission" page of her website, located at www.magiccitychristmas.com/our-mission.html, Defendant represented that, "Cat's out of the BAG!!! We've been forced to spoil the secret!!!!! We are donating our profits not only to your charities BUT ... A BIG SURPRISE FOR THE CITY OF MINOT." Defendant also updated her website to include a drawing of the supposed monument,

with the following stated below (sic throughout):

> The performers decided to give the biggest gift of all to the people of Minot. This MONUMENT. A commemorative MONUMENT to the 2011 FLOOD. In addition, we all knew how the homeless shelter in Bismarck closed down – so we thought we would help support your local homeless shelter with things they need!!!
>
> Let's be clear – this is an event to which WE ARE GIVING AWAY all our PROFITS. That means we are not charity WE ARE SIMPLY spreading Christmas CHEER!!! We wanted to keep the MONUMENT a secret ... BUT we couldn't. Cat's out of the bag !!! What do you think about that???

[¶89]In a press release issued by Defendant, she represented that her A Magic City Christmas event "will be raising funds for a 'secret' project for the people of Minot, Homeless shelters and other organizations that didn't qualify for FEMA support due to status when flood of 2011 happened. [sic]"

[¶90]Defendant's representations regarding the monument are numerous and contradict the representations to consumers provided above. Defendant's contradictory representations include: 1) Defendant failed to secure even a fraction of the funding to construct the monument, let alone *donate* it to the City of Minot; 2) Defendant failed to secure the necessary approvals to have the monument donated to the City of Minot or have it placed on public lands; 3) Defendant proffered a contract to a City of Minot official that would have made the City liable for $200,000 of the $250,000 cost to have the monument constructed (therefore making it a purchase by the City of Minot, not a donation); 4) Defendant, on GoFundMe, represented that the A Magic City Christmas event was supposed to pay for the monument[20], while simultaneously representing; 5) also on GoFundMe, that the *performers* were going to donate the monument to the City of Minot, while; 6) Defendant, on Fundly, was simultaneously soliciting donations to

---

[20] This also contradicts Defendant's other representations that all proceeds were going to benefit homeless shelters, see Paragraph 23-24, *supra*, and, furthermore, Defendant was spending the proceeds on herself.

raise money for the monument, calling it a "Monument Fund;" and, finally, 7) in filings in Case No. 51-2018-CV-00191, Defendant admitted that she planned to have the monument placed on *private land*.

[¶91]Defendant engaged in the solicitations described throughout this Complaint, including in Counts 2 – 8, while representing that Defendant was organizing a benefit concert. In reality, Defendant, as late as December 7, 2017, and a mere two weeks from when the concert was supposed to occur, had not secured basic necessities to hold the benefit concert on December 22, 2017. It does not appear that Defendant ever executed and returned the contract for the venue, the Minot Municipal Auditorium. Also as late as December 7, 2017, Defendant failed to pay for, and failed to execute and return a contract for, sound production for the event. Defendant's failure to execute and return contracts for the benefit concert's most basic necessities suggests that Defendant never intended to hold the event, or was otherwise not competent to organize it. Despite her significant failures, Defendant engaged in solicitations related to the event, including soliciting donations from sponsors and engaging in the sale of tickets (that Defendant described as "donations") to North Dakota consumers. Each sponsorship, ticket, and merchandise sale by Defendants is an individual violation of N.D.C.C. §§ 50-22-04.3 and 51-15-02.

[¶92]Defendant's actions constituting violations of N.D.C.C. §§ 50-22-02, 50-22-02.1, 50-22-04.3, and 51-15-02 include the following:

a. Soliciting contributions as a charitable organization from persons in North Dakota by any means without, prior to a solicitation, registering as a charitable organization with the Secretary of State, in violation of N.D.C.C. § 50-22-02.

b.      Alternatively, soliciting contributions from persons in North Dakota by any means without, prior to acting as a professional fundraiser, registering as a professional fundraiser, in violation of N.D.C.C. § 50-22-02.1.

c.      Using deceptive acts or practices, false pretense, false promise, or misrepresentation with the intent that others rely thereon in connection with the solicitation of a contribution for or on behalf of a charitable organization, in violation of N.D.C.C. § 50-22-04.3

d.      Acting, using, or employing deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled or damaged thereby, including the solicitation of charitable contributions or the sale or advertisement of merchandise, in violation of N.D.C.C. § 51-15-02.

[¶93] Defendant's actions constitute consumer fraud under N.D.C.C. § 51-15-02.

## VI.    CONSUMER FRAUD LAW VIOLATIONS
### (N.D.C.C. § 51-15-01, et seq.)

[¶94] Plaintiff re-alleges paragraphs 1 through 93 of this Complaint.

[¶95] Defendant engaged in deceptive acts or practices in violation of N.D.C.C. chs. 50-22 and 51-15, for which North Dakota is entitled to relief, including injunctive relief, penalties, costs, expenses, and attorney fees.

[¶96] The deceptive acts or practices alleged in paragraphs 1 through 93 of this Complaint constitute violations of N.D.C.C. chs. 50-22 and 51-15 for which the Court:

a.      May order injunctive relief as provided in N.D.C.C. §§ 50-22-05 and

51-15-07 or as otherwise provided by law;

b.      May order Defendant to pay to the State of North Dakota a civil penalty of up to $5,000.00 for each violation as provided in N.D.C.C. §§ 50-22-05 and 51-15-11;

c.      Shall order Defendant to pay to the State of North Dakota the costs, expenses, and attorney's fees incurred by the Attorney General in the investigation and prosecution of this action as provided in N.D.C.C. §§ 50-22-06 and 51-15-10, if Defendants are adjudged in violation of N.D.C.C. chs. 50-22 and/or 51-15; and

d.      May order such relief as may be necessary to prevent the use or employment of deceptive acts or practices by Defendant or to restore any loss suffered by persons as a result of the deceptive acts or practices of Defendants as provided in N.D.C.C. §§ 50-22-05 and 51-15-07.

## VII.     CANCELLATION OF THE MLLABS – EVENTS TRADE NAME (N.D.C.C. § 47-25-07(3))

[¶97]Plaintiff re-alleges paragraphs 1 through 96 of this Complaint.

[¶98]Under N.D.C.C. § 47-25-07(3), "The secretary of state shall cancel from the register any registration that a district court cancels on any grounds."

[¶99]The Attorney General believes that Defendant's acts and practices, described in Paragraphs 1 through 96, *supra*, constitute grounds on which the Court should and may cancel Defendant's trade name, "MLLabs-Events" for her use of the trade name to engage in consumer fraud as alleged in this Complaint.

[¶100]Additionally, the Box 9 of the Trade Name Registration or Franchise Name Disclosure form requires the registrant to provide their name and social security

39

number, if an individual, or the business name and federal tax identification number, if a business. Defendant listed her name but, no doubt because of Defendant's use of multiple social security numbers, provided a federal tax identification number where she should have provided her (actual and correct) social security number.

### VIII.    REQUEST FOR RELIEF

[¶101]WHEREFORE, PLAINTIFF PRAYS for judgment against Defendant as follows:

a.    That Defendant be adjudged in violation of the consumer fraud law and N.D.C.C. §§ 50-22-04.3 and 51-15-02 for engaging in the deceptive acts and practices alleged in this Complaint.

b.    That Defendant, her agents, employees, representatives, assigns, and all other persons in active concert or participation with her, pursuant to N.D.C.C. §§ 50-22-05 and 51-15-07, be permanently enjoined and restrained from engaging in deceptive acts or practices and from directly or indirectly making false statements, false promises, or misrepresentations with the intent that others rely thereon, in violation of N.D.C.C. §§ 50-22-04.3 and 51-15-02, while engaging in the solicitation of charitable contributions or the advertisement or sale or merchandise, within the State of North Dakota.

c.    That Defendant, her agents, employees, representatives, assigns, and all other persons in active concert or participation with her, pursuant to N.D.C.C. §§ 50-22-05 and 51-15-07, be permanently enjoined and restrained from engaging in the sale of merchandise as defined by

40

N.D.C.C. § 51-15-01(3), including engaging in the solicitation of charitable contributions.

d.   That Defendant, her agents, employees, representatives, assigns, and all other persons in active concert or participation with her, pursuant to N.D.C.C. §§ 50-22-05 and 51-15-07, be permanently enjoined and restrained from soliciting charitable contributions within North Dakota.

e.   That, pursuant to N.D.C.C. §§ 50-22-05 and 51-15-11, Defendant be assessed a civil penalty of up to $5,000.00 for each violation of N.D.C.C. chs. 50-22 and 51-15.

f.   That, pursuant to N.D.C.C. §§ 50-22-06 and 51-15-10, the Attorney General be awarded and Defendant be ordered to pay all costs, expenses, and attorney's fees incurred by the Attorney General in the investigation and prosecution of this action.

g.   That, pursuant to N.D.C.C. § 51-15-07, Defendant be ordered to pay restitution to all consumers, which have suffered any ascertainable loss, and to restore to any person in interest any moneys or property, real or personal, which may have been acquired by Defendant by means of any practice declared to be unlawful under N.D.C.C. § 51-15-02.

h.   That, pursuant to N.D.C.C. § 47-25-07(3), the Court order the cancellation of the MLLabs-Events trade name for Defendant's use of the trade name to engage in consumer fraud.

i.   That Plaintiff be given such other and further relief as the nature of this

case may require and this court may determine to be fair, just, and

equitable.

Dated this 2nd day of July, 2018.

State of North Dakota
Wayne Stenehjem
Attorney General

BY:

Brian M. Card, ID No. 07917
Assistant Attorney General
Office of Attorney General
Consumer Protection & Antitrust Division
Gateway Professional Center
1050 East Interstate Ave., Ste. 200
Bismarck, ND 58503-5574
Telephone (701) 328-5570
bmcard@nd.gov

Attorneys for Plaintiff.