**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION,<br><br>        Plaintiffs,<br><br>        v.<br><br>SIDNEY POWELL, SIDNEY POWELL, P.C., and DEFENDING THE REPUBLIC, INC.,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:21-cv-00040-CJN |

**DOMINION'S OPPOSITION
<u>TO DEDENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.   Powell's defamatory falsehoods are actionable. ...................................................... 2

   A.   Powell's statements are actionable because they are susceptible of being proven true or false and are reasonably understood as assertions of fact. ............................... 2

   B.   Even if Powell's statements were "opinions," they would be actionable as defamation because they reasonably imply false facts and because Powell's disclosure of the facts was both incorrect and incomplete. ........................................................... 5

   C.   Attorneys do not have a license to lie. ................................................................. 10

II.   Powell made her false claims with actual malice. ................................................... 12

   A.   Powell intentionally lied and manufactured fake evidence. ................................ 12

   B.   The Complaint also pleads circumstantial evidence of actual malice ................. 17

III.   Defendants are subject to personal jurisdiction in the District of Columbia ........... 25

   A.   D.C.'s Long-Arm Statute confers jurisdiction over the Defendants ..................... 26

     1.   This Court has jurisdiction under D.C. Code § 13-423 (a)(1) because the Defendants transacted business in Washington, D.C. ................................................................. 26

     2.   This Court also has jurisdiction under D.C. Code § 13-423 (a)(3) because the Defendants caused tortious injury in Washington, D.C. by acts within the District. ............ 29

     3.   This Court has jurisdiction under D.C. Code § 13-423 (a)(4) because Defendants caused tortious injury in Washington, D.C. by additional acts outside the District, while engaging in a persistent course of conduct in D.C. ............................................... 31

   B.   Jurisdiction is proper under the Due Process Clause. ......................................... 33

   C.   This Court also has jurisdiction over Powell's law firm and fundraising website because they are Powell's alter egos. ....................................................................... 34

IV.   Venue is proper in this District, and the case should not be transferred. ................. 37

V.   The Complaint states a claim for defamation against Defending the Republic, Inc. .... 39

VI.   The Complaint states a claim for deceptive trade practices. ..................................... 41

   CERTIFICATE OF SERVICE ....................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3P-733, LLC v. Davis*,
 187 A.D.3d 626 (N.Y. App. Div. 2020)...................................................................................10

*Action Repair, Inc. v. Am. Broad. Cos.*, Inc.,
 776 F.2d 143 (7th Cir. 1985).................................................................................................8

*Allen v. Nelnet, Inc.*,
 No. 06-cv-00586, 2007 WL 2786432 (D. Colo. Sept. 24, 2007)...........................................15

*Ashhab-Jones v. Cherokee Nat'l Strategic Programs, LLC*,
 No. 19-00089, 2020 WL 6262090 (D.D.C. Oct. 23, 2020)....................................................29

*Blumenthal v. Drudge*,
 992 F. Supp. 44 (D.D.C. 1998)..............................................................................................30

*Bolinger v. First Multiple Listing Serv., Inc.*,
 838 F. Supp. 2d 1340 (N.D. Ga. 2012)..................................................................................41

*Burman v. Phoenix Worldwide Indus., Inc.*,
 437 F. Supp. 2d 142 (D.D.C. 2006).......................................................................................30

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
 404 U.S. 508 (1972) .............................................................................................................12

*Celle v. Filipino Reporter Enters. Inc.*,
 209 F.3d 163 (2d Cir. 2000) .................................................................................................17

*Cohane v. Arpeja-California, Inc.*,
 385 A.2d 153 (D.C.),
 *cert. denied*, 439 U.S. 980 (1978) .........................................................................................33

*Como v. Riley*,
 287 A.D.2d 416 (N.Y. App. Div. 2001) ..................................................................................6

*Competitive Enter. Inst. v. Mann*,
 150 A.3d 1213 (D.C. 2016).................................................................................16, 17, 24

*Corsi v. Caputo*,
 No. 19-cv-1573, 2020 WL 1703934 (D.D.C. Apr. 7, 2020) ...................................................29

*Corsi v. Info Wars, LLC*,
 No. 19-cv-656, 2020 WL 1156864 (D.D.C. Mar. 10, 2020)...................................................37

*Crane v. N.Y. Zoological Soc'y*,
    894 F.2d 454 (D.C. Cir. 1990) ............................................................................................ 31

*Dalbec v. Gentleman's Companion, Inc.*,
    828 F.2d 921 (2d Cir. 1987) ............................................................................................... 17

*Daley v. Alpha Kappa Alpha Sorority, Inc.*,
    26 A.3d 723 (D.C. 2011) ..................................................................................................... 33

*Davis v. Boeheim*,
    24 N.Y.3d 262 (2014) ............................................................................................................ 7

*Davita, Inc. v. Nephrology Assocs., P.C.*,
    253 F. Supp. 2d 1370 (S.D. Ga. 2003) ............................................................................... 41

*Di Bernardo v. Tonawanda Publ'g Corp.*,
    499 N.Y.S.2d 553 (1986) ....................................................................................................... 4

*Egiazaryan v. Zalmayev*,
    880 F. Supp. 2d 494 (S.D.N.Y 2012) .................................................................................... 6

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
    194 F. Supp. 3d 263 (S.D.N.Y. 2016) ............................................................................... 4, 7

*Eramo v. Rolling Stone, LLC*,
    209 F. Supp. 3d 862 (W.D. Va. 2016) ................................................................................. 17

*Exelon Generation Co. v. Grumbles*,
    380 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................................ 37

*Fisher v. Bander*,
    519 A.2d 162 (D.C. 1986) ................................................................................................... 26

*Flowers v. Carville*,
    310 F.3d 1118 (9th Cir. 2002) ............................................................................................. 14

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) ........................................................................................................ 11, 13

*Germain v. M&T Bank Corp.*,
    111 F. Supp. 3d 506, 536 (S.D.N.Y. 2015) .......................................................................... 4

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ...................................................................................................... 12, 18

*Good Gov't Grp. of Seal Beach v. Super. Ct. of L.A. Cty.*,
    22 Cal. 3d 672 (1978) ......................................................................................................... 12

*Gordon v. Boyles*,
   99 P.3d 75 (Colo. App. 2004)........................................................................8

*Grayson v. Ressler & Ressler*,
   271 F. Supp. 3d 501 (S.D.N.Y. 2017) ..........................................................6

*Greenberg v. Spitzer*,
   62 N.Y.S.3d 372 (2017) ................................................................................4

*Gross v. N.Y. Times Co.*,
   82 N.Y.2d 146 (1993)...........................................................................4, 5, 7

*GTE New Media v. BellSouth Corp.*,
   199 F.3d 1343 (D.C. Cir. 2000)..................................................................33

*H & R Indus., Inc. v. Kirshner*,
   899 F. Supp. 995 (E.D.N.Y. 1995)................................................................6

*Harris v. City of Seattle*,
   152 F. App'x 565 (9th Cir. 2005).........................................................17, 18

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989) ..........................................................................17, 19, 22

*Hartigan v. Maclean Hunter Publ'g Corp.*,
   457 N.E.2d 480 (Ill. App. 1983)..................................................................42

*Helmer v. Doletskaya*,
   393 F.3d 201 (D.D.C. 2004).........................................................................29

*Herbert v. Lando*,
   441 U.S. 153 (1979) .....................................................................................21

*Holder v. Haarman & Reimer Corp.*,
   779 A.2d 264 (D.C. 2001).............................................................................28

*Houlahan v. Freeman Wall Aiello*,
   15 F. Supp. 3d 77 (D.D.C. 2014)..................................................................19

*Hourani v. Psybersolutions, LLC*,
   164 F. Supp. 3d 128 (D.D.C. 2016)..............................................................29

*Howser v. Pearson*,
   95 F. Supp. 936 (D.D.C. 1951)....................................................................30

*Hutchinson v. Proxmire*,
   443 U.S. 111 (1979) .....................................................................................16

*IMAPizza, LLC v. At Pizza Ltd.*,
   334 F. Supp. 3d 95 (D.D.C. 2018).............................................................27, 28

*IMark Mktg. Servs., LLC v. Geoplast S.p.A.*,
   753 F. Supp. 2d 141 (D.D.C. 2010).................................................................35

*Int'l Brominated Solvents Ass'n v. Am. Conf. of Governmental Indus. Hygienists*,
   625 F. Supp. 2d 1310 (M.D. Ga. 2008)...........................................................42

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ........................................................................................33

*Johns v. Newsmax Media, Inc.*,
   887 F. Supp. 2d 90 (D.D.C. 2012)..................................................................37

*Kaelin v. Global Commc'ns Corp.*,
   162 F.3d 1036 (9th Cir. 1998)...................................................................17, 22

*Keeton v. Hustler*,
   465 U.S. 770 (1984) ........................................................................................30

*Kelleher v. Dream Catcher, L.L.C.*,
   263 F. Supp. 3d 322 (D.D.C. 2017)................................................................36

*Keohane v. Stewart*,
   882 P.2d 1293 (Colo. 1994) .....................................................................4, 8, 12

*Kuhn v. Trib.-Republican Publ'g Co.*,
   637 P.2d 315 (Colo. 1981) .........................................................................8, 22

*Lapointe v. Van Note*,
   No. 03-cv-2128, 2004 WL 3609346 (D.D.C. Nov. 9, 2004)...........................30

*Lawrence v. Bauer Publ'g & Printing Ltd.*,
   459 U.S. 999 (1982) ..................................................................................16, 45

*Lewy v. S. Poverty L. Ctr., Inc.*,
   723 F. Supp. 2d 116 (D.D.C. 2010)...........................................................31, 32

*Liberman v. Gelstein*,
   605 N.E.2d 344 (N.Y. 1992) ..........................................................................21

*Lopes v. JetsetDC, LLC*,
   994 F. Supp. 2d 135 (D.D.C. 2014)................................................................36

*Macaluso v. Jenkins*,
   95 Ill. App. 3d 461 (1981) ...............................................................................35

*Mangan v. Corp. Synergies Grp., Inc.*,
    834 F. Supp. 2d 199 (D.N.J. 2011) ...................................................................39, 40

*Masson v. New Yorker Mag., Inc.*,
    960 F.2d 896 (9th Cir. 1992) ................................................................................22

*McWilliams Ballard, Inc. v. Broadway Mgmt. Co., Inc.*,
    636 F. Supp. 2d 1 (D.D.C. 2009) .........................................................................35

*Members of City Council of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) .............................................................................................12

*Metabolife Int'l, Inc. v. Wornick*,
    264 F.3d 832 (9th Cir. 2001) ................................................................................20

*Milkovich v. Lorain J. Co.*,
    497 U.S. 1 (1990) ...........................................................................................4, 5, 6, 7

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .............................................................................................13

*NAACP v. Button*,
    371 U.S. 415 (1963) .............................................................................................12

*Nader v. Toledano*,
    408 A.2d 31 (D.C. 1979) ......................................................................................16

*Navab-Safavi v. Broad. Bd. of Governors*,
    650 F. Supp. 2d 40 (D.D.C. 2009) .......................................................................29

*NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*,
    879 P.2d 6 (Colo. 1994) .........................................................................................8

*Oetiker v. Jurid Werke, G.m.b.H.*,
    556 F.2d 1 (D.C. Cir. 1977) .................................................................................33

*Overstock.com, Inc. v. Gradient Analytics, Inc.*,
    151 Cal. App. 4th 688 (2007) ..............................................................................22

*Palin v. N.Y. Times Co.*,
    264 F. Supp. 3d 527 (S.D.N.Y. 2017) .................................................................11

*Palin v. N.Y. Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ...............................................11, 13, 17, 24, 39, 40

*Parsi v. Daioleslam*,
    595 F. Supp. 2d 99 (D.D.C. 2009) .......................................................................23

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. Of Life Activists*,
    244 F.3d 1007 (9th Cir. 2001) ........................................................................12

*Plesha v. Ferguson*,
    760 F. Supp. 2d 90 (D.D.C. 2011) ................................................................26

*Poling v. Farrah*,
    131 F. Supp. 2d 191 (D.D.C. 2001) ..............................................................33

*Quality Air Servs., L.L.C. v. Milwaukee Valve Co.*,
    567 F. Supp. 2d 96 (D.D.C. 2008) ................................................................27

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
    53 F. Supp. 3d 705 (S.D.N.Y. 2014) ....................................................4, 12, 40

*Reuber v. United States*,
    750 F.2d 1039 (D.C. Cir. 1984) ....................................................................30

*Sang v. Hai*,
    951 F. Supp. 2d 504 (S.D.N.Y. 2013) ..........................................................10

*Schiavone Constr. Co. v. Time, Inc.*,
    847 F.2d 1069 (3d Cir. 1988) ..................................................................15, 17

*Seidl v. Greentree Mortg. Co.*,
    30 F. Supp. 2d 1292 (D. Colo. 1998) ...........................................................11

*Shapiro, Lifschitz, & Schram, P.C. v. Hazard*,
    24 F. Supp. 2d 66 (D.D.C. 1998) ..................................................................38

*Shapiro, Lifschitz, & Schram, P.C. v. Hazard*,
    90 F. Supp. 2d 15 (D.D.C. 2000) ..................................................................34

*Sharon v. Time, Inc.*,
    599 F. Supp. 538 (S.D.N.Y. 1984) ..........................................................18, 20

*Sheraton Operating Corp. v. Just Corp. Travel*,
    984 F. Supp. 22 (D.D.C. 1997) .....................................................................39

*Shoppers Food Warehouse v. Moreno*,
    746 A.2d 320 (D.C. 2000) ...............................................................27, 33, 34

*Silsdorf v. Levine*,
    449 N.E.2d 716 (N.Y 1983) .......................................................................6, 12

*Slaughter v. Friedman*,
    32 Cal. 3d 149 (1982) .....................................................................................7

*Solano v. Playgirl, Inc.*,
  292 F.3d 1078 (9th Cir. 2002) ................................................................17, 22

*Solstein v. Mirra*,
  488 F. Supp. 3d 86 (S.D.N.Y. 2020) ................................................................4

*St. Amant v. Thompson*,
  390 U.S. 727 (1968) ................................................................16, 17, 18, 20

*Steinberg v. Int'l Crim. Police Org.*,
  672 F.2d 927 (D.C. Cir. 1981) ................................................................32, 33

*Steinhilber v. Alphonse*,
  68 N.Y.2d 283 (1986) ................................................................6

*Stewart v. Azar*,
  308 F. Supp. 3d 239 (D.D.C. 2018) ................................................................38

*StopLoss Specialists, LLC v. VeriClaim*, Inc.,
  340 F. Supp. 3d 1334 (N.D. Ga. 2018) ................................................................39, 40

*Suzuki Motor Corp. v. Consumers Union of U.S.,
  Inc.*, 330 F.3d 1110 (9th Cir. 2003) ................................................................14, 22

*Tah v. Glob. Witness Publ'g, Inc.*,
  No. 19-7132, 2021 WL 1045205 (D.C. Cir. Mar. 19, 2021) ................................................................17, 18

*Teilhaber Mfg. Co. v. Unarco Materials Storage, a Div. of Unarco Indus.*, Inc.,
  791 P.2d 1164 (Colo. App. 1989) ................................................................8

*Thayer/Patricof Educ. Funding v. Pryor Res.*,
  196 F. Supp. 2d 21 (D.D.C. 2002) ................................................................39

*Thompson v. Bosswick*,
  855 F. Supp. 2d 67 (S.D.N.Y. 2012) ................................................................4

*Tomblin v. WCHS-TV8*,
  434 F. App'x 205 (4th Cir. 2011) ................................................................15

*Trump v. Comm. on Ways and Means*,
  415 F. Supp. 3d 98 (D.D.C. 2019) ................................................................28

*United States v. TDC Mgmt. Corp.*,
  263 F. Supp. 3d 257 (D.D.C. 2017) ................................................................34

*Unker v. Joseph Markovits, Inc.*,
  643 F. Supp. 1043 (S.D.N.Y. 1986) ................................................................39, 40

*VECC, Inc. v. Bank of Nova Scotia,*
    296 F. Supp. 2d 617 (D.V.I. 2003) ...................................................................................39, 40

*Ventura v. Kyle,*
    63 F. Supp. 3d 1001 (D. Minn. 2014),
    *rev'd on other grounds*, 825 F. 3d 876 (8th Cir. 2016) ....................................................24

*Walden v. Fiore,*
    571 U.S. 277 (2014) ........................................................................................................33

*Watts v. United States,*
    394 U.S. 705 (1969) ........................................................................................................12

*White v. Fraternal Ord. of Police,*
    909 F.2d 512 (D.C. Cir. 1990) ...........................................................................................5

*Wilbanks v. Wolk,*
    121 Cal. App. 4th 883 (2004) ............................................................................................7

*Wilderness Soc'y v. Babbitt,*
    104 F. Supp. 2d 10 (D.D.C. 2000) ...................................................................................38

*Williams v. Burns,*
    540 F. Supp. 1243 (D. Col. 1982) ...................................................................................11

*World-Wide Volkswagen v. Woodson,*
    444 U.S. 286 (1980) ........................................................................................................34

*Wormley v. United States,*
    601 F. Supp. 2d 27 (D.D.C. 2009) ..................................................................................29

*Zerangue v. TSP Newspapers, Inc.,*
    814 F.2d 1066 (5th Cir. 1987) .........................................................................................24

*Zimmerman v. Al Jazeera Am., LLC,*
    246 F. Supp. 3d 257 (D.D.C. 2017) .................................................................................18

**Statutes**

28 U.S.C. § 1391 ....................................................................................................................37

D.C. Code § 13-423 ...............................................................................................26, 29, 31, 34

Ga. Code 10-1-372 .................................................................................................................41

**Rules**

Fed. R. Civ. P. 11...................................................................................................................24

**Other Authorities**

1 Rodney Smolla, Law of Defamation § 3:71 (2d ed.)...................................................................18

Restatement (Second) of Torts § 580 ..........................................................................................24

After proclaiming that "I can hardly wait to put forth all the evidence we've collected on Dominion, starting with the fact it was created to produce altered voting results in Venezuela for Hugo Chávez," that "votes were in fact altered and manipulated" "in the 2020 US General Election," and that "you would have to be a damn fool and abjectly stupid not to see what happened here, for anybody who's willing to look at the real evidence," Powell now claims that "no reasonable person would conclude that the statements were truly statements of fact."[1] At the same time, Powell asserts that ***she herself*** "believes them now." (*Id.* at 37.)

During a televised and online media campaign based in Washington, D.C., Powell made provably false defamatory statements, including, for example, that Dominion "used an algorithm to calculate the votes they would need to flip and they used the computers to flip those;" that Dominion "automatically flipped approximately 2.7% of the vote"; and that Dominion's algorithm made a Biden vote count 1.26 and a Trump vote count only .74. (Compl. ¶ 181.)

Even further illustrating that she was making statements of fact, Powell falsely claimed that evidence supported her claims. For example, she apparently doctored a government record, lied about having evidence of kickbacks and a video of Dominion's founder saying he could "change a million votes," and touted evidence on her fundraising website that had been intentionally manufactured, misrepresented, and cherry-picked. (*Id*. ¶¶ 181; 87, 89, 185.)

After lying about the evidence supporting her claims, Powell now asks this Court to create unprecedented immunity for attorneys to wage televised disinformation campaigns.

---

[1] Complaint (Jan. 8, 2021) [Dkt. 1]. ("Compl.") ¶ 181; Defs.' Mot. to Dismiss at 27-28 (Mar. 22, 2021) [Dkt. 22] ("Mem."). "Powell" refers collectively to the Defendants, Sidney Powell, Sidney Powell, P.C., and Defending the Republic, Inc. "Powell's fundraising website" refers to Defending the Republic, Inc. "Powell's law firm" refers to Sidney Powell, P.C. "Dominion" refers to US Dominion, Inc., Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation.

In ruling on Defendants' Motion, the Court faces four issues:

- **Actionability.**  Statements are actionable as defamation if they can be proven true or false and are reasonably understood as assertions of fact.  "Opinions" are actionable if they reasonably imply false facts or if the speaker's disclosure of the facts is incorrect or incomplete.  Attorneys may be sued for defamatory statements they make outside the courtroom, including when advocating on political issues.  Are Powell's statements actionable?

- **Actual malice.**  A complaint pleads actual malice when it plausibly alleges that the defendant knew or recklessly disregarded that her statements were false.   The Complaint alleges facts that courts have recognized as evidence of actual malice, including that Powell lied about having evidence; manufactured, misrepresented, and cherry-picked evidence; purposefully avoided or intentionally disregarded credible evidence; espoused inherently improbable accusations; formed and stuck to a false preconceived narrative; relied on facially unreliable sources; and refused to retract, all in furtherance of a plan to benefit herself.  Does the Complaint plead actual malice?

- **Personal jurisdiction, venue, and agency**.  This Court may exercise personal jurisdiction over persons who—directly *or by an agent*—transact business in D.C. or cause tortious injury in D.C. by acts inside or outside D.C.  Acting on behalf of her fundraising website (which has a D.C. mailing address), her law firm, and herself, Sidney Powell travelled to D.C., rented a hotel room, and waged a defamatory fundraising campaign against Dominion from within D.C.  Are jurisdiction and venue proper, and does the Complaint state a claim against Powell's fundraising website?

- **Deceptive trade practices.**  Georgia's deceptive trade practices act prohibits the dissemination of deceptive information in which the defendant has a financial interest, and does not require any competition between the parties.  The Complaint alleges that in the course of Powell's business as a media figure, author, and attorney, Defendants used defamatory falsehoods to solicit funds to Powell's fundraising website and to garner media attention and raise Sidney Powell's public profile, which sold additional copies of her book and drummed up additional potential clients for Sidney Powell and her law firm.  Does it state a claim for deceptive trade practices?

## ARGUMENT

### I.   Powell's defamatory falsehoods are actionable.

#### A.  Powell's statements are actionable because they are susceptible of being proven true or false and are reasonably understood as assertions of fact.

Seeking to evade liability for her false statements, Powell argues that "no reasonable person would conclude that the statements were truly statements of fact."  (Mem. 27-28.)  In advancing this argument, Powell studiously avoids putting her defamatory statements before the Court

because they are reasonably understood as assertions of fact that are capable of being proven true

or false, and because Powell herself repeatedly asserted they could be proven with evidence she

possessed or posted to her fundraising website.  For example, during her defamatory campaign,

Powell falsely claimed that:

- Dominion's founder admitted on video that "he can change a million votes, no problem at all." (Compl. ¶ 181(j).)

- She had collected "evidence" "on Dominion, starting with the fact it was created to produce altered voting results in Venezuela for Hugo Chávez and then shipped internationally to manipulate votes for purchase in other countries including this one." (*Id.* ¶ 181(e).)

- "We have mathematical evidence in a number of states of massive quantities of Trump votes being trashed." (*Id.* ¶ 181(k).)

- Dominion "weighted votes for President Trump at .77% and they awarded votes to Biden at something like 1.22%." (*Id.* ¶ 181(s).)

- Dominion "automatically flipped approximately 2.7% of the vote to Biden."  (*Id.*)

- Dominion's voting systems were "designed to enable those sorts of vote flipping and switching and the ability to trash votes in large numbers so that Mr. Biden would win without campaigning."  (*Id.*)

- Dominion switched "350,000" votes to Biden "all of a sudden at 3 o'clock in the morning." (*Id.* ¶ 181(v).)

- Dominion's algorithm made "a Biden vote count 1.26 and a Trump vote count only .74." (*Id.* ¶ 181(ii).)

- A hand recount confirmed that Dominion "weighted Biden votes at 1.52 and they weighted Trump votes at .48 when the votes went into the machine to change them." (*Id.* ¶ 181 (u).)

- "We're collecting evidence now from various whistleblowers that are aware of substantial sums of money being given to family members of state officials who bought this software."  (*Id.* ¶ 181 (g).)

Under Supreme Court precedent that Powell herself cites, Powell's statements are plainly

actionable because they are "susceptible of being proved true or false" and "a reasonable factfinder

could conclude" that they state or imply an assertion of fact.  *See Milkovich v. Lorain J. Co.*, 497

U.S. 1, 20-21 (1990); *Keohane v. Stewart*, 882 P.2d 1293, 1299 (Colo. 1994) (citing *Milkovich*); *see also Solstein v. Mirra*, 488 F. Supp. 3d 86 (S.D.N.Y. 2020) (defendant's "opinion was based on … a statement of fact that may be proven or disproven"); *Germain v. M&T Bank Corp*., 111 F. Supp. 3d 506 (S.D.N.Y. 2015). Indeed, Powell's statements are precisely the type of actionable statements that regularly give rise to valid defamation claims. *See, e.g., Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 722 (S.D.N.Y. 2014) (denying motion to dismiss defamation claim where the "accusations are grounded in assertions of fact about Plaintiffs' business activities and are not framed in hyperbole, but rather purport to rely on documents that establish the existence of Plaintiffs' 'scheme.'"); *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 284 (S.D.N.Y. 2016) (accusations that technology company was a "deliberate scam" because it intentionally designed "ineffective software" that "generates false positives" of viruses to fool customers into buying spyware); *Di Bernardo v. Tonawanda Publ'g Corp*., 499 N.Y.S.2d 553, 555 (1986) (accusations of "corruption" and "bribery"); *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 155 (1993) (accusation that plaintiff engaged in "corrupt" conduct "cannot be treated as a mere rhetorical flourish or the speculative accusation of an angry but ill-informed citizen" because it "was written only after what purported to be a thorough investigation."); *Greenberg v. Spitzer*, 62 N.Y.S.3d 372, 379 (2017) (accusation that plaintiff "defrauded the market" actionable); *Thompson v. Bosswick*, 855 F. Supp. 2d 67, 80 (S.D.N.Y. 2012) (accusation that plaintiff "had been taking kickbacks from vendors" actionable). Moreover, "it is unnecessary that every word and assertion in a disputed publication is false or defamatory; as long as a publication contains at least ***some*** assertions of objective fact that, if proven false, could form the predication for a maintainable libel action." *Enigma Software*, 194 F. Supp. 3d at 286 n.19.

Powell's statements are provably false.  She either has a video of Dominion's founder admitting that he can change a million votes or she does not (she does not).  Dominion was either created in Venezuela to rig elections or it was not (it was not).  Dominion either rigged the 2020 election by weighting, flipping, switching, and trashing votes or it did not (it did not).  Dominion either bribed officials or it did not (it did not).  Powell's own motion confirms that her statements are susceptible of being proven false by disputing that they are false.  (Mem. 37.)

### B. Even if Powell's statements were "opinions," they would be actionable as defamation because they reasonably imply false facts and because Powell's disclosure of the facts was both incorrect and incomplete.

In making the false out-of-court statements at issue, Powell did not even attempt to couch her accusations as "opinions."  Rather, she leveled the falsehoods as deadly serious assertions of fact backed by evidence that she claimed would prove that Dominion had in fact stolen the 2020 election.[2]  Even if Powell's statements could be read as expressing opinions, it is black-letter law that there is **no** "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich*, 497 U.S. at 18; *White v. Fraternal Ord. of Police*, 909 F.2d 512, 522 (D.C. Cir. 1990). Instead, the Supreme Court has made clear that even an "'opinion' on a matter of public concern" can be actionable where it "reasonably implies false and defamatory facts"—even if about a public figure.  *Milkovich*, 497 U.S. at 20.  When a "statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a 'mixed opinion' and is actionable. … The actionable element of a 'mixed opinion' is not the false opinion itself—

---

[2] Even if Powell had qualified her statements by saying "in my opinion" (she did not), "opinion" is not a magic word that can be invoked to ward off defamation liability.  "If a speaker says, 'In my opinion John Jones is a liar,' [s]he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. … Simply couching such statements in terms of opinion does **not** dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."  *Milkovich*, 497 U.S. at 18-19; *see also Gross*, 82 N.Y.2d at 155 (noting that the statement "I believe John is a thief" would not be materially different from the statement, "John is a thief").

it is the implication that the speaker knows certain facts, unknown to the audience, which support his opinion and are detrimental to the person about whom he is speaking." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289-90 (1986).  "The essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion."  *Id.* at 290; *see also Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 516 (S.D.N.Y. 2017) ("[M]ixed opinion, which is a statement of opinion which implies that it is based on facts that support the opinion unknown to the person hearing it, is actionable defamation."); *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 503 (S.D.N.Y 2012) ("When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable "mixed opinion.").

Powell argues that she cannot be held liable because she "disclosed the facts upon which her conclusions were based."  (Mem. 32.)  But the Supreme Court had held that "[e]ven if the speaker states the facts upon which [s]he bases h[er] opinion, ***if those facts are either incorrect or incomplete***, . . . ***the statement may still imply a false assertion of fact***" such that a defamation claim may proceed.  *Milkovich* 497 U.S. at 18-19; *see also Silsdorf v. Levine*, 449 N.E.2d 716, 720-21 (N.Y 1983) (reinstating defamation claim based on letter accusing former mayor of corruption because facts stated to demonstrate such corruption were allegedly false); *Como v. Riley*, 287 A.D.2d 416, 416 (N.Y. App. Div. 2001) (reinstating a defamation claim when the defendants' views of the plaintiff were premised on a false fact); *H & R Indus., Inc. v. Kirshner*, 899 F. Supp. 995, 1010 (E.D.N.Y. 1995) ("Where the facts [underlying an opinion] themselves are alleged to be false ... [the] plaintiff may be able to recover damages for defamatory opinions where [the] plaintiff demonstrates that the statements of fact are false and is able to convince the

triers of fact that that the factual disparities would affect the conclusions drawn by the average reader regarding the validity of the opinions expressed."); *Davis v. Boeheim*, 24 N.Y.3d 262, 269 (2014) (opinion was actionable where there was an "implication that the speaker knows certain facts, unknown to [the] audience, which support [the speaker's] opinion and are detrimental to the person being discussed.").

Powell's statements are actionable because her disclosure of facts was both "incorrect [and] incomplete." *Milkovich*, 497 U.S. at 18-19.  As alleged in the Complaint, Powell deceived millions of people into believing that Dominion had committed the "greatest crime of the century if not the life of the world" by lying about having a video of Dominion's founder and evidence of kickbacks (which she ***never*** disclosed to her viewers or posted to her fundraising website because they do not exist) and by touting evidence that Powell knew was false and misleading.  (Compl. ¶¶ 7, 70, 87-109, 111, 181 (bb), 188.)

Finally, Powell further underscored that her accusations were assertions of fact by holding herself out as an attorney and former federal prosecutor who had conducted a thorough investigation and could prove her accusations in court, saying, for example, "There's thousands of people in federal prison on far less evidence of criminal conduct than we already have against Smartmatic and Dominion Systems companies."  Especially in light of this context, Powell's statements are actionable.  *See Enigma Software*, 194 F. Supp. 3d at 285-86 (rejecting "opinion" defense where defendant held itself out as an expert); *Gross*, 82 N.Y.2d at 156 (statement was actionable where it was made after "what purported to be a thorough investigation"); *see also Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 904 (2004) ("An accusation that, if made by a layperson might constitute opinion may be understood as being based on fact if made by someone with specialized knowledge of the industry"); *Slaughter v. Friedman*, 32 Cal. 3d 149, 154 (1982)

(statements "carry a ring of authenticity and reasonably might be understood as being based on fact" if made by someone with specialized knowledge).

Although Powell argues (at 20) that this Court should apply the law of Colorado, the Court need not resolve that question today because Powell's statements are actionable regardless of which state's law applies, as confirmed by multiple cases cited in Powell's Motion. *See, e.g., Keohane*, 882 P.2d at 1296, 1306 (affirming defamation verdict for judge and finding that city councilman's remark that judge was "the best judge money can buy" was not protected because "a reasonable person could conclude" that the city councilman "was implicitly asserting as actual fact that [the judge] had accepted a bribe based upon undisclosed facts known to him as a city councilman"); *NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 9 (Colo. 1994) ("opinions which imply the existence of an undisclosed defamatory factual predicate may support a cause of action in defamation.... when the average reader or listener or viewer perceives the comment as essentially an assertion of fact") (citation omitted); *Kuhn v. Trib.-Republican Publ'g Co.*, 637 P.2d 315, 319 (Colo. 1981) (newspaper forfeited protection because its reporting invited a factual inference that it had uncovered corruption and bribery); *Teilhaber Mfg. Co. v. Unarco Materials Storage, a Div. of Unarco Indus.*, Inc., 791 P.2d 1164, 1167 (Colo. App. 1989) (report was not protected because it omitted pivotal underlying facts); *Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004) (statements accusing a police officer of wrongdoing in the midst of a public internal affairs investigation were not protected); *Action Repair, Inc. v. Am. Broad. Cos.*, Inc., 776 F.2d 143, 147 (7th Cir. 1985) (judge's statement that someone had a "good case" for fraud against a defendant was actionable because a reasonable audience could have concluded that the judge was making a statement of fact based on his expertise and inside knowledge of the case).

Powell's statements are plainly actionable because even if falsely accusing someone of fraud and bribery were "opinions" (they are not), Powell repeatedly claimed those accusations were rooted in *facts*—namely the false and misleading evidence she put forward or—in the case of the non-existent video of Dominion's founder and the non-existent evidence of kickbacks—did not disclose. Just recently, Powell appeared on the *Dinesh D'Souza Podcast*, during which she again doubled down and made clear that her accusations were to be understood as assertions of *fact*, which D'Souza expressly acknowledged:

> D'Souza: The Left is now jubilantly claiming – I just saw Jake Tapper on CNN – that after insisting for weeks that there was widespread fraud in the election, in fact that Trump won the election and won it decisively, now in the context of the most recent case, your attorneys have filed a brief that says, quote, 'No reasonable person would conclude that the statements' – statements made by you – 'were truly statements of fact.' So the argument is – and Jake Tapper acted like this was a big win for his side, that you're now saying this was mere opinion, while ***many people, for a long time, thought you were saying it was a matter of fact that there was in fact widespread fraud and enough fraud to make the difference in the 2020 election***. So are you backtracking from what you said before?

> Powell: ***Oh no, I am not backtracking a bit.*** What they are misquoting from and taking out of context is the statement from a new decision out of the D.C. Circuit that is binding in my case. And it's not what I said at all. ***I firmly believe everything I said was true. It was based on thousands of pages of affidavits, expert reports, mathematical analysis that cannot be challenged, statistical work that cannot be challenged. I mean, the data does not lie. And there was, <u>in fact</u>, massive widespread fraud through this election and Donald Trump should be president right now. In fact, if the law were applied correctly, he is.***

> D'Souza: So you're not taking any of it back. You're not taking refuge in the distinction between fact and opinion. ***It seems to me what you're saying is, "Yes, I have the opinion that there was widespread fraud, but this is not an opinion free floating in the ether. It's an opinion anchored in a whole bunch of testimonies, affidavits, all types of evidence, statistical evidence, and so on. <u>It's opinion that is rooted in fact.</u>*** …

> Powell: I'm not backing up one inch. ***Everything I said about Dominion, I had a factual basis for. Any reasonable person looking at the evidence I've seen would have to come to the same conclusion.*** And I would encourage people to go to my website sidneypowell.com and look at that evidence themselves. We uploaded it, all the pleadings to the website and people can read it themselves, or at defendingtherepublic.org. … ***We have done the math and more math is coming.***

*…   They not only ran an algorithm in the machine to shave votes, which their own manual admits they can do, so they weighted Biden votes at say 1.26 and they weighted Trump votes at .74.  So a Trump vote only counted ¾ and a Biden vote counted 1 ¼.  That ran standard across the country as best we can tell from the evidence we're collecting.  And then there was specific flipping of votes in any number of key states and cities.*  In fact, if you think about it, they only really had to take over six key cities, all of which happen to be Democratic strongholds, to flip this election for Biden.  *And we're gathering more evidence every day of how the votes were flipped and where and how many.*[3]

In sum, after representing to this Court that "***no reasonable person*** would conclude that [her] statements were truly statements of fact," Powell went on television the following week to tell viewers "there was, ***in fact***, widespread fraud through this election."  *Id.*; Mem. 27-28.  Powell's lies are plainly actionable and she should be held accountable.

### C.  Attorneys do not have a license to lie.

Although statements made ***inside*** the courtroom are subject to certain privileges that are not appliable to the out-of-court statements at issue in this case, Powell asks this Court to manufacture a sweeping and unprecedented immunity for "attorney advocates" who knowingly or recklessly spread defamatory falsehoods during televised disinformation campaigns involving advocacy for their "preferred candidate" (Mem. 29-35)—*i.e.*, to create a propaganda exception to defamation liability.  No such immunity has ever been recognized and settled law forecloses this argument.

***First***, a law license is not a license to lie, and courts routinely permit defamation actions to proceed against attorneys based on statements made outside the courtroom—even when those statements relate to litigation.  *See, e.g., Sang v. Hai*, 951 F. Supp. 2d 504 (S.D.N.Y. 2013) (lawyer's statements at a press conference and on his blog were not privileged); *3P-733, LLC v. Davis*, 187 A.D.3d 626, 629 (N.Y. App. Div. 2020) (reversing dismissal of defamation claims

---

[3] *Part 1: Sidney Powell is NOT Backing Down*, Dinesh D'Souza Podcast (Apr. 3, 2021), https://rumble.com/vfbwwh-part-1-sidney-powell-is-not-backing-down.html.

based on pre-litigation letter because the letter was disseminated to a third party that was not directly involved in the underlying dispute); *Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1315 (D. Colo. 1998) ("an attorney who wishes to litigate her case in the press and via the Internet does so at her own risk.  There is no absolute privilege under Colorado law for statements by an attorney or by a party made to the press or gratuitous statements posted on the Internet for the purpose of publicizing the case to persons who have no connection to the proceeding except as potentially interested observers."); *Williams v. Burns*, 540 F. Supp. 1243, 1247 (D. Col. 1982) (denying motion for summary judgment as to defamation claim against lawyer who made disparaging comments while representing client during business transaction).  Dominion's defamation claims are not based on the statements Powell made in court, but on Powell's months-long, sustained defamatory campaign that she peddled in D.C. and broadcast on television and over the internet.  Such out-of-court statements are not privileged.

*Second*, the law does not confer immunity from defamation liability simply because speech could be characterized as "political" or as involving "advocacy."  (Mem. 29-31).  This is abundantly clear from cases that Powell herself cites.  In *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964), the Supreme Court explained that just because "speech is used as a tool for political ends does ***not*** automatically bring it under the protective mantle of the Constitution."  *Id.*  And although Powell cites *Palin v. New York Times Co.*, 264 F. Supp. 3d 527, 533 (S.D.N.Y. 2017) for the proposition that "early resolution of defamation cases" is appropriate, that dismissal was ***vacated,*** and the case confirms that defamation cases ***can*** arise out of advocacy on political matters.  *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 816 (2d Cir. 2019) (vacating dismissal of former Governor Sarah Palin's defamation complaint based on an editorial about how charged political speech had allegedly led to gun violence).  Indeed, courts across the country have repeatedly held that

defamation claims based on political speech could proceed.  *See, e.g., Silsdorf*, 449 N.E.2d at 720-21  (reinstating libel claims arising from statements about mayor's performance); *Keohane*, 882 P.2d at 1296, 1306 (affirming defamation verdict for judge who lost re-election following defamatory remarks by a city councilman); *Good Gov't Grp. of Seal Beach v. Super. Ct. of L.A. Cty.*, 22 Cal. 3d 672, 682-83 (1978) (denying motion to dismiss defamation claims involving a "tense political situation").

In arguing that she is immune from defamation liability because she was engaged in "advocacy," Powell relies on cases that are ***not*** defamation cases.  *See, e.g., NAACP v. Button*, 371 U.S. 415 (1963); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 509 (1972); *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. Of Life Activists*, 244 F.3d 1007, 1009 (9th Cir. 2001); *Watts v. United States*, 394 U.S. 705, 708 (1969); *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984).  (Mem. 21, 32, 34.)  But the question is not whether the First Amendment protects "advocacy," but whether people enjoy constitutional immunity to publish defamatory falsehoods.  The answer, under settled precedent, is no.  Powell's statements are actionable because, as the Supreme Court has explained, "there is no constitutional value in false statements of fact."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974).  Engaging in "advocacy" does not change that.  *See Restis*, 53 F. Supp. 3d at 722 ("the mere fact that Defendants engage in advocacy does ***not*** give them blanket immunity to make false accusations").

## II.     Powell made her false claims with actual malice.

### A.  Powell intentionally lied and manufactured fake evidence.

As Defendants acknowledge (Mem. 36), the "actual malice" standard does ***not*** require complaints to cite evidence proving that a defendant knew her statements were false; rather, a complaint pleads actual malice where it alleges facts giving rise to a plausible inference that the defendant knew ***or recklessly disregarded*** that her statements were false.  *See N.Y. Times Co. v.*

*Sullivan*, 376 U.S. 254, 280 (1964) (statement is made with "actual malice" when made "with knowledge that it was false or with reckless disregard of whether it was false or not."); *Palin*, 940 F.3d at 814-16 (vacating dismissal of complaint that plausibly alleged actual malice). The Complaint clears this hurdle by a mile. It not only alleges that Powell recklessly disregarded the truth; it goes above and beyond what is necessary by citing reams of evidence proving that Powell intentionally lied throughout the defamatory campaign.

Repeatedly over a period of months, Powell published false statements about Dominion, knowing or recklessly disregarding that they are false, including by intentionally lying about having evidence that does not exist; manufacturing, misrepresenting, and cherry-picking evidence; purposefully avoiding or intentionally disregarding abundant and publicly available evidence, facts, and reliable sources rebutting and disproving her false claims; espousing inherently improbable accusations; forming and sticking to a false preconceived narrative in spite of the facts; relying on and putting forward facially unreliable sources; and—when specifically put on notice of the truth and asked to retract—doubling down on and republishing the false accusations. (Compl. ¶¶ 9, 87-89, 147-156, 185.) Powell's falsehoods were in furtherance of her plan to financially enrich herself, to raise her public profile, and to ingratiate herself to Donald Trump for benefits she expected to receive. (Compl. ¶ 185.) The allegations against Powell present one of the clearest and most convincing cases of actual malice imaginable.

According to Powell, the Complaint fails to plead actual malice because, she claims, public statements based on sworn declarations cannot, "as a matter of law" support a finding of actual malice. (Mem. 36.) In support of this argument, Powell cites only the Supreme Court's decision in *Garrison v. Louisiana*, 379 U.S. 64 (1964)—a case that does not involve reliance on declarations, let alone support Powell's assertion that such reliance would defeat allegations of

actual malice at the pleadings stage "as a matter of law."  But even if it were true that there could

be no actual malice where someone had relied upon declarations (it is not), the Complaint alleges

both that Powell put forward evidence and declarations that were deliberately misrepresented,

doctored, manufactured, and cherry-picked, and that Powell repeatedly and deliberately lied about

matters that were ***not*** the subject of declarations.  The law is clear: "if someone knows that the

news story is false, he can't sanitize his republication by purporting to rely on the news source.

Nor can he claim immunity if he has conflicting information from another source and recklessly

disregards it."  *Flowers v. Carville*, 310 F.3d 1118, 1130 (9th Cir. 2002).

For example, Powell, her co-counsel L. Lin Wood, or a member of their team apparently

downloaded a government record and doctored it before filing it in court and uploading it to

Powell's fundraising website in support of the defamatory campaign.  (Compl. ¶¶ 91-92.)  Standing

alone, this is sufficient to show actual malice.  *Suzuki Motor Corp. v. Consumers Union of U.S.,

Inc.*, 330 F.3d 1110, 1135 (9th Cir. 2003) (evidence that the defendant "rigged" its test to conclude

plaintiff's vehicle rolled over too easily was sufficient to prove malice).  Powell also deliberately

lied about having a video of Dominion's founder saying he could "change a million votes."

(Compl. ¶ 7.)  This lie was not based on a sworn declaration, and Powell has never produced such

a recording because no such recording exists.  (*Id.*)  Similarly, while Powell claimed to have

evidence of Dominion paying kickbacks to Georgia Republicans, she never filed any such

evidence in court, posted it to her fundraising website, or otherwise disclosed it—because Powell

was lying about that too.  (*Id.* ¶ 4.)

Powell also intentionally misled people by cherry-picking statements from a professor

about a decades-old machine not designed by Dominion, while omitting the material fact that the

professor forcefully rebutted Powell's claims, explaining that he has "never claimed that technical

vulnerabilities have actually been exploited to alter the outcome of any US election" and that "no credible evidence has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise." (*Id.* ¶ 89.) Powell's deliberate lies and material omissions are clear evidence of actual malice. *See Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1092 (3d Cir. 1988) (omission of exculpatory information was evidence of actual malice); *Tomblin v. WCHS-TV8*, 434 F. App'x 205, 211 (4th Cir. 2011) (omission of material information was evidence of actual malice); *Allen v. Nelnet, Inc.*, No. 06-cv-00586, 2007 WL 2786432, at *5 (D. Colo. Sept. 24, 2007) ("a defendant's substantial truth defense to a defamation claim may be defeated where… defendant omitted material facts.")

Powell also lied when she claimed that a declaration from a "military intelligence expert" supported her accusations. (Compl. ¶¶ 5, 88.) That witness admitted that he never actually worked in military intelligence—and that ***the declaration that Powell's team wrote for him to sign is "misleading" and he "was trying to backtrack" on it***. (*Id*.) Then, after he was discredited, Powell pivoted by presenting his declaration as though it had been written by a different anonymous source. (*Id.*) Powell seeks to excuse her involvement in manufacturing false and misleading declarations—such as the declaration by the fake "military intelligence analyst" and two declarations containing ***near-verbatim*** conspiratorial explanations for why two Venezuelan witnesses purportedly came forward—by citing dicta that "we know of no court that refuses to consider an affidavit simply because it is not personally written by the witness." (Mem. 40.) Plaintiffs do not ask the Court to disregard those false declarations, but to consider them and the allegations that Powell did not, as she suggests, simply rely on declarations, but was involved in manufacturing them to support her false claims. (Compl. ¶ 90.)

Above and beyond Powell's involvement in manufacturing her evidence, Powell **deliberately** embellished what the declaration of the anonymous purported Venezuelan military officer said.   (Compl. ¶ 101.)   Similarly, during a media appearance, Powell deliberately misrepresented the contents of letters from Congresswoman Maloney, Senator Klobuchar, and Senator Warren—the true contents of which Powell was certainly aware because she and her law firm had attached them to the court filings in sham election litigation and uploaded them to her fundraising website.  (Compl. ¶ 102-103.)

In seeking to evade liability, Powell claims that she "believed the allegations then and she believes them now."  (Mem. 37.)  This is a common refrain for defamation defendants facing economic consequences for their false statements.  That is why it is black-letter law that Powell "cannot [] automatically insure a favorable verdict by testifying that [s]he published with a belief that the statements were true." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *see also Nader v. Toledano*, 408 A.2d 31, 53 (D.C. 1979) (denying motion for summary judgment even though journalist claimed he believed in the truth of his statement when he published it).  Powell's self-serving assertion does not entitle her to dismissal; it must be pressure tested with discovery and resolved by a jury.  *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1258 (D.C. 2016), *as amended* (Dec. 13, 2018) (denying motion to dismiss and explaining that whether defendants held an honest belief in the truth of their statements was a question of fact properly resolved by the jury).

As the Supreme Court has repeatedly admonished, because "proof of 'actual malice' calls a defendant's state of mind into question," this element "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979); *Lawrence v. Bauer Publ'g & Printing Ltd.*, 459 U.S. 999, 1003-04 (1982).  Rather, "[t]he finder of fact must determine

whether the publication was indeed made in good faith." *St. Amant*, 390 U.S. at 732; *see also Kaelin v. Global Commc'ns Corp.*, 162 F.3d 1036, 1042 (9th Cir. 1998) ("[S]tatements of [] subjective intention are matters of credibility for a jury.").

### B.  The Complaint also pleads circumstantial evidence of actual malice.

In addition to the evidence showing that Powell intentionally lied, the Complaint also pleads numerous facts constituting circumstantial evidence of actual malice. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) (defamation plaintiffs are "entitled to prove the defendant's state of mind through circumstantial evidence."); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) ("'Malice may be proved inferentially[.]'" (quoting *Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921, 927 (2d Cir. 1987))); *Harris v. City of Seattle*, 152 F. App'x 565, 567-68 (9th Cir. 2005); *Palin*, 940 F.3d at 815; *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 871 (W.D. Va. 2016)); *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1087 (9th Cir. 2002); *Schiavone Constr. Co.*, 847 F.2d at 1090.

Although Powell advocates for a piece-by-piece approach under which she argues that various pieces of evidence are each individually insufficient to establish actual malice, the Court is required to take a holistic approach that examines the totality of the allegations to determine whether, ***collectively***, they are capable of giving rise to a plausible inference of actual malice. *Mann*, 150 A.3d at 1258 (explaining that a "constellation of facts," many of which are inferential and circumstantial, taken together, can establish actual malice); *Celle*, 209 F.3d at 183.

Defendants rely heavily on *Tah v. Global Witness Publishing, Inc.*, No. 19-7132, 2021 WL 1045205 (D.C. Cir. Mar. 19, 2021).  (Mem. 38-40.)  But *Tah* is easily distinguished and confirms that Dominion has more than alleged actual malice here.  In *Tah*, the majority held that "a generic statement accusing someone of acting with reckless regard … cannot be read to shoehorn in every conceivable actual malice theory." *Id.* at *6.  Importantly, the plaintiffs "had not argued that

"Global Witness had no evidence that Exxon was the briber…." *Id.* In contrast, and as set forth in detail above, Dominion has alleged numerous facts showing that Powell "published with a high degree of awareness of probable falsity." *Id* at *7. Here, the additional indicia of malice alleged only bolster Dominion's plausible allegations discussed above that Powell in fact knew that her statements were false and were based on manufactured or non-existent evidence.

**Preconceived Narrative.** Taken together with the other facts alleged in the Complaint regarding Powell's involvement in manufacturing and misrepresenting evidence to support her preconceived narrative, "'evidence that [Powell] conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and" in this case, is "quite powerful evidence.'" *Harris*, 152 F. App'x at 568 (quoting 1 Rodney Smolla, Law of Defamation § 3:71 (2d ed.)); *accord Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982); *Sharon v. Time, Inc.*, 599 F. Supp. 538, 576 (S.D.N.Y. 1984). The Complaint alleges facts showing that Powell decided on a preconceived narrative by Election Day in order to excuse Trump's impending loss: "during a televised interview with One America News Network ("OAN") on Election Day, she claimed that Democrats were trying to "steal the vote" from Trump and that "they ha[d] developed a computer system to alter votes electronically." (Compl. ¶ 52.)

**Reliance on Facially Unreliable Sources**. Powell's reliance on facially unreliable sources is additional evidence that she acted with actual malice. *See St. Amant*, 390 U.S. at 732 ("recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."); *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 281-83 (D.D.C. 2017) ("evidence establishing obvious reasons to doubt the veracity of a defendant's source can support a finding of reckless disregard on its own"); *Houlahan v. Freeman Wall Aiello*,

15 F. Supp. 3d 77, 81 (D.D.C. 2014) (relying on a "source that the defendant had obvious reasons to doubt" supports a finding of actual malice) (*citing Connaughton*, 491 U.S. at 666)).

As the Complaint alleges, in Powell's efforts to make the evidence conform to her false preconceived narrative, Powell found an ally in Patrick Byrne—a former CEO who resigned after it was discovered that he had been romantically involved with the now-notorious Russian agent, Maria Butina, who was sentenced to 18 months in prison after being indicted by federal prosecutors for trying to infiltrate powerful political circles in the United States at the direction of the Russian government.  (Compl. ¶ 53.)  Suffice it to say, there are obvious reasons to doubt the veracity of outlandish claims that undermine American democracy, particularly when those claims are sourced from people with romantic connections to foreign nationals that are hostile to the United States and have an interest in undermining American democracy.  Likewise, the Complaint alleges (and common sense supports) reason to doubt the anonymous Venezuelan military officer who— even if he is who he purports to be—worked for a Venezuelan dictator.  (*Id.* ¶¶ 97-100.)  To the extent that Powell touted evidence sourced from L. Lin Wood—her co-counsel in sham election litigation—there are likewise obvious reasons to doubt the veracity of someone who uses social media to falsely accuse Chief Justice John G. Roberts of being a child-murdering pedophile and to call for Vice President Mike Pence to be executed by "firing squad" for "treason."  (*Id.* ¶ 75.)

In addition, Powell's evidence included declarations from purported experts who were ***judicially determined*** to be "wholly unreliable," including a con artist and "Deep State" conspiracy theorist.  (*Id.* ¶¶ 5, 82, 105, 106.)  And the Complaint alleges plenty of obvious reasons—supported by publicly available documents—to doubt the veracity of the sources Powell touted, and alleges that Powell knew that her purported experts were unreliable from information she possessed or purposefully avoided, from her training as an attorney, and from her experience as a former federal

prosecutor.  (*Id.* ¶¶ 104-109.)  It is plausible to infer from Powell's training and experience that she knew her anonymous purported Venezuelan military officer had no credentials, expertise, or factual basis whatsoever from which he could possibly determine what is "in the DNA" of proprietary software he never even claims to have had access to, which is operated by multiple voting machine companies he never even claims to have worked for.  (*Id.* ¶ 98.)

Powell gets it backwards when she attempts to insulate her defamatory statements by saying they were based on declarations.  Where, as here, the speaker has attempted to bolster the credibility of her false claims by falsely passing off unreliable sources as reliable ones, that is evidence of actual malice—it does not exculpate the speaker.  *See Sharon*, 599 F. Supp. at 582 (finding evidence of actual malice sufficient to raise a material question of fact where, "[b]y [wrongly] attributing its version of the Bikfaya meeting to the Commission's appendix, Time qualitatively transformed it from a news magazine's view of the facts into a finding by a widely respected, quasi-judicial body."); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 848 (9th Cir. 2001) (defendant's statement that "every expert" agreed with the false statement "implies consensus in the scientific community" and "the issue of 'actual malice' … cannot be properly disposed of by a motion to dismiss in this case, where there has been no discovery).

**Inherent Improbability of the Accusations**.  The Supreme Court has explained that a defamation defendant is not likely to prevail when her "allegations are so inherently improbable that only a reckless [person] would have put them in circulation."  *See St. Amant*, 390 U.S. at 732. Powell cannot argue with this clear precedent, so she argues that there is nothing inherently improbable about the possibility that vote counting machines could be hacked.  (Mem. 38.)  But the false statements at issue in this case are not whether there are potential vulnerabilities in voting technology, but whether Dominion in fact ***rigged*** the 2020 U.S. Presidential Election with

algorithms designed to rig elections for a now-deceased Venezuelan dictator, as part of a sweeping international conspiracy involving thousands of bipartisan local election volunteers and Republican elected officials, Trump appointees, the Department of Justice, and the FBI.  (Compl. ¶¶ 110-116.)  Those accusations are inherently improbable on their face.

But the Complaint goes even farther, alleging (based on widely known facts) that even the Trump Campaign recognized that Powell's accusations were inherently improbable, deciding not to present them in court because there was no evidence to support them, and then publicly disavowing Powell because her claims were so ridiculous that prominent Republicans concluded she was a "national embarrassment" and "seemed unhinged."  (*Id.* ¶¶ 53-56, 65, 70, 72.)  Indeed, Patrick Byrne himself acknowledged that while Powell "was totally super receptive" to the idea that the election had been stolen—because, as the Complaint alleges, it conformed to her preconceived narrative—that claim was "a little ***farfetched*** for other people in Washington."  (*Id.* ¶ 53.)

Finally, Powell's inherently improbable accusations were rendered not only improbable, but impossible, when the hand recounts of paper ballots confirmed the vote counts in Dominion machines. (*Id.* ¶¶ 110, 183.)  Powell's motion to dismiss is silent on this point.  Nor can Powell's inherently improbable accusations be squared with the fact that that Trump won the 2016 election when Dominion machines were used in over 1,600 jurisdictions, undercutting any claim that Dominion was willing and able to commit fraud to deprive Trump of the presidency.  (*Id.* ¶ 116.)

**Financial Motive and Ill Will.**  The Supreme Court has explained that "[t]he existence of actual malice may be shown in many ways" including through "circumstances indicating the existence of rivalry, ill will, or hostility between the parties."  *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979)); *see also Liberman v. Gelstein*, 605 N.E.2d 344, 352 (N.Y. 1992) (evidence of motive,

ill will, or spite can support a finding of actual malice).  Moreover, "circumstantial evidence of a financial motive to [defame] support[s] the ultimate conclusion of actual malice."  *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1136 (9th Cir. 2003); *see also Connaughton*, 491 U.S. at 668 (financial motive was supportive of the court's ultimate conclusion of actual malice); *Solano*, 292 F.3d at 1086 (evidence defendant defamed plaintiff "to promote [] sales" of its products "is sufficient to satisfy the actual malice standard"); *Kaelin*, 162 F.3d at 1042 ("pecuniary motive" is evidence of actual malice).

The Complaint alleges numerous facts giving rise to a plausible inference that Powell lied about Dominion ***not*** because she believed her lies but to raise funds for and direct traffic to her fundraising website, to sell books and t-shirts, to raise her public profile as an attorney, "media figure," and possibly a presidential candidate, to curry favor with then-President Donald Trump for benefits she expected to receive as a result of that association, such as a pardon for her client Michael Flynn.  (Compl. ¶¶ 15-21, 57-58, 64, 71, 78, 80.)  Such evidence "of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of [Powell's] recklessness or of [her] knowledge of falsity."  *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 709-10 (2007) (alterations omitted).

**Purposeful Avoidance and Intentional Disregard of the Truth.**  While "failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category" that ***will*** support such a finding.  *Connaughton*, 491 U.S. at 692; *Suzuki*, 330 F.3d at 1134; *Masson v. New Yorker Mag., Inc.*, 960 F.2d 896, 900 (9th Cir. 1992); *Kuhn v. Tribune-Republican Publ'g Co.*, 637 P.2d 315, 319 (Colo. 1981) ("failure to pursue the most obvious available sources of possible corroboration or refutation may clearly and convincingly evidence a reckless disregard for the truth."); *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 107-08

(D.D.C. 2009) ("A failure to investigate adequately could not alone amount to actual malice, but purposeful avoidance of the truth could.  Discovery is needed, then, to determine what defendant knew at the time he made the contested statements.") (citations omitted).

Here, the Complaint alleges that Powell either actually knew about or purposefully avoided: (1) government records showing that Dominion and Smartmatic are separate companies and that there was a competitive bid process for the Georgia contract, which are available for download on the very same webpage where Powell, her co-counsel, or a member of their team downloaded a government record before doctoring it, filing it in court, and uploading it to her fundraising website in support of the defamatory campaign (Compl. ¶¶ 91-95); (2) a court order that is publicly available online and shows that one of Powell's declarants is a con artist (*id.* ¶ 105); and (3) publicly available evidence, facts, and reliable sources rebutting and disproving the false claims (*id.* ¶ 185), such as records discrediting and debunking the claims of the "Deep State" conspiracy theorist Russell Ramsland (*id.* ¶ 106).

In addition, as the Complaint alleges, "Powell intentionally disregarded the truth and continued to promote inherently improbable falsehoods about Dominion" "[e]ven after Powell's false claims about Dominion had been repeatedly, forcefully, and publicly rebutted and disproven by the hard evidence of independent audits and hand recounts of paper ballots and by reliable sources like Trump appointees, Republican elected officials, federal judges, and election security experts.  (Compl. ¶¶ 110, 41-51, 68, 77.)  Powell cannot simply claim ignorance of readily available public information bearing directly on her claims: As a licensed attorney—Powell was

*obligated* to investigate the factual basis for her claims before making them in court.[4]  (Compl. ¶ 76; Fed. R. Civ. P. 11.)

**Refusal to Retract.**  As the Complaint alleges, Dominion sent Powell a retraction demand letter that laid out the facts, with citations to independent sources confirming them.  (Compl. ¶ 145 & Ex. 3.)  Powell responded by tweeting that she "retract[ed] nothing" about Dominion because she "had #evidence" that they are "fraudmasters."  (Compl. ¶¶ 146-147 & Ex. 4.)  Five days later, Powell published a binder repackaging disproven and discredited evidence, and continued knowingly repeating her lies about Dominion.  (Compl. ¶¶ 149-158.)  Even after Dominion filed this action, Powell repeatedly doubled down in interviews and on Parler (having been banned from Twitter), including by bragging—two days after filing her Motion to Dismiss—that she would "take Dominion to the mat."[5]  Powell's refusal to retract is additional evidence of actual malice. *See Mann*, 150 A.3d at 1258; *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987); Restatement (Second) of Torts § 580A cmt. d; *Ventura v. Kyle*, 63 F. Supp. 3d 1001, 1014 (D. Minn. 2014), *rev'd on other grounds*, 825 F. 3d 876 (8th Cir. 2016).

As set forth above, the Complaint alleges facts that are more than sufficient to give rise to the plausible inference that Powell acted with actual malice.  *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 814-15 (2d Cir. 2019) (vacating dismissal of former Governor Sarah Palin's defamation complaint where—notwithstanding that the *New York Times* made a correction within one day of publication of the defamatory editorial—the complaint pled that the author had a predetermined

---

[4] As Plaintiffs explain in their Complaint, although "Dominion is not currently suing Powell based on the false statements in Powell's sham litigations, the manipulation of the judicial process apparent in Powell's court filings is additional evidence that Powell knew the statements she made about Dominion—during her defamatory press conference in Washington, D.C., "Stop the Steal" rally, and media campaign—were false. (Compl. ¶ 87).

[5] Sidney Powell (@SidneyPowell), Parler (Mar. 23, 2021), https://parler.com/post/1d261ddf-d212-4241-b3b0-903245cc998a.

argument that he wanted to make based on his personal connection to the story and his personal bias against Palin's political positions, and the complaint alleged that the reporter had previously reviewed, edited, and approved articles rebutting the false claim about Palin).

**III.    Defendants are subject to personal jurisdiction in the District of Columbia.**

On behalf of her fundraising website, her law firm, and herself, Sidney Powell travelled to Washington, D.C. to launch a defamatory campaign against Dominion, (Compl. ¶¶ 1, 24-27, 54, 61-63, 80, 181(k)), and on at least six separate occasions made defamatory statements about Dominion from within Washington, D.C. to (at least in part) people in Washington, D.C. (Compl. ¶¶ 181(b), (e), (g), (z), (aa), (ff).)  Ensuring that the defamatory campaign would reach the broadest possible audience and inflict maximum harm on Dominion, Powell secured ***in-person*** audiences at the White House and the Republican National Committee headquarters to peddle her defamatory falsehoods to then-President Trump and other influential ***Washington, D.C.*** audiences.  Bolstered by Trump's endorsement, Powell published the defamatory falsehoods from within Washington, D.C. to worldwide audiences over television, her fundraising website, and social media.  (Compl. ¶¶ 24-27, 59, 61-63, 80, 172, 181(k).)

In furtherance of and arising out of that Washington, D.C.-based defamatory campaign, Powell also transacted business within Washington, D.C., including by, among other things, staying at and using the Trump International Hotel for defamatory broadcasts, exploiting the defamatory campaign to secure a presidential pardon for her client Michael Flynn, and soliciting residents of Washington, D.C. for donations, t-shirt sales, and book sales.  (Compl. ¶¶ 24-26, 80, 169, 181(z), (aa), (ff).)  In addition to these contacts—which are alone more than sufficient to establish jurisdiction in D.C.—Powell's law firm employs at least two attorneys who are members of the D.C. Bar and Powell's fundraising website maintains a mailing address in D.C. and employs attorneys engaged in the practice of law in D.C.  (Compl. ¶¶ 25-26, 166-68.)  These contacts—and

others alleged in the Complaint—demonstrate that Defendants purposefully availed themselves of numerous privileges in the District of Columbia and that jurisdiction is proper here. *See Fisher v. Bander*, 519 A.2d 162, 164 (D.C. 1986) ("when out-of-state actors avail themselves of the benefits of contact within the forum state, fairness requires that they be held accountable therein for the consequences of such activities.").

### A. D.C.'s Long-Arm Statute confers jurisdiction over the Defendants.

Defendants are subject to this Court's jurisdiction under the D.C. long-arm statute because they transacted business in D.C., D.C. Code § 13-423 (a)(1), because they caused tortious injury in D.C. by acts inside the District, *id.* § 13-423(a)(3), and because they caused tortious injury in D.C. by acts outside the District while engaged in a persistent course of conduct—the defamation campaign against Dominion and related business conduct—in the District, *id.* § 13-423(a)(4). The D.C. statute explicitly authorizes jurisdiction "over a person, who acts directly ***or by an agent***," *id.*, such that this Court has jurisdiction over Powell's fundraising website and law firm, not only because of their own direct actions in D.C. (such as maintaining a mailing address and providing legal services here), but because Powell, while acting as their agent, travelled to Washington, D.C. where she caused tortious injury and transacted business. *See also Plesha v. Ferguson*, 760 F. Supp. 2d 90, 93 (D.D.C. 2011).

### 1. This Court has jurisdiction under D.C. Code § 13-423 (a)(1) because the Defendants transacted business in Washington, D.C.

Defendants are subject to this Court's jurisdiction because they transacted business in the District. *See* D.C. Code § 13-423 (a)(1). This subsection "permits the exercise of personal jurisdiction to the full extent authorized by the Due Process Clause of the Constitution" and "a single act may be sufficient to constitute transacting business, so long as that contact is voluntary and deliberate, rather than fortuitous." *Quality Air Servs., L.L.C. v. Milwaukee Valve Co.*, 567 F.

Supp. 2d 96, 100 (D.D.C. 2008) (internal citations and quotations omitted); *see also Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 331 (D.C. 2000) ("Even a small amount of in-jurisdiction business activity is generally enough to permit the conclusion that a nonresident defendant has transacted business here.") (internal citation and quotation omitted).

The Complaint alleges that Defendants purposefully engaged in multiple business transactions in the District, including: (i) Powell and her fundraising website defamed Dominion while advertising and soliciting donations from residents in D.C. in support of the defamatory campaign (Compl. ¶¶ 24, 26, 58, 80); (ii) while in the District, Powell promoted her website where she sells books and t-shirts, boosting sales (Compl. ¶ 80, 181); (iii) Powell and her law firm engaged in the legal representation of Michael Flynn—resulting in Flynn's pardon after Defendants launched the defamatory campaign (Compl. ¶¶ 24, 25, 80); (iv) Powell's law firm and fundraising website employed two members of the D.C. Bar to work within the District and held Powell's fundraising website out as being located in D.C., including by listing a D.C. address on court filings filed by Powell and her law firm (Compl. ¶¶ 25, 26, 166-68); (v) Powell, individually and acting as an agent for her law firm and fundraising website, engaged in traditional transactions, including travelling to and renting office space and hotel rooms in Washington, D.C., which enabled Defendants to wage the defamatory campaign in D.C. and raised Powell's public profile as an attorney, author, and media figure (Compl. ¶¶ 24-27, 87, 181(a), 185).

In sum, Defendants engaged in precisely the types of business transactions that support the exercise of jurisdiction over out-of-state defendants.  *See IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 110 (D.D.C. 2018) (collecting cases) ("business transactions" include "advertising in the District … operating an office in the District … holding a board meeting in the District," and engaging in legal representation in the District).  Even a transaction as minimal as travelling to

D.C. and making a purchase at a restaurant has been held to constitute a transaction for jurisdictional purposes.  *Id.* at 112.

Defendants' cases do not suggest otherwise, but address situations where—unlike here— neither the defendant nor its agent had travelled to D.C. or engaged in commercial or business transactions in D.C.  *See* Mem. 9; *Holder v. Haarman & Reimer Corp.*, 779 A.2d 264, 270-71 (D.C. 2001) (no jurisdiction where "no citric acid produced by [defendant] was ever sold directly to, or purchased by, the plaintiff or any other member of the alleged class.  Rather, [defendant] sold citric acid to other manufacturers who, somewhere along the chain of manufacture and distribution, incorporated the citric acid into end products which were allegedly sold in the District.") (citations omitted); *Trump v. Comm. on Ways and Means*, 415 F. Supp. 3d 98, 107 (D.D.C. 2019) ("Mr. Trump has not pointed to any decision holding that corresponding with a congressional committee and sending it information (or any similar act) would constitute a commercial or business activity.")  Defendants argue that they "were not involved in any business transactions with ***Plaintiffs*** from which their injuries allegedly rose."  (Mem. 10.)  But the law does not require privity or a contractual relationship between a plaintiff and defendant for a court to exercise personal jurisdiction under Section 13-423(a)(1).  *See IMAPizza*, 334 F. Supp. 3d at 113 ("It is not necessary, where jurisdiction is based on § 13-423(a)(1), that the claim be contractual in nature.").  It is enough that, as here, "defendant has purposefully engaged in some type of commercial or business-related activity directed at District residents." *Trump*, 415 F. Supp. 3d at 107.  That is the end of the inquiry.

2.  **This Court also has jurisdiction under D.C. Code § 13-423 (a)(3) because the Defendants caused tortious injury in Washington, D.C. by acts within the District.**

The Defendants are also subject to this Court's jurisdiction for the additional and independently sufficient reason that they caused tortious injury in Washington, D.C. by actions taken inside Washington, D.C.  *See* D.C. Code Section 13-423 (a)(3).

After having travelled to Washington, D.C. and availed themselves of the people, institutions, and influence available in D.C. to launch a devastating worldwide defamatory campaign against Dominion from within Washington, D.C., Defendants now argue that they cannot be haled back to D.C. because, they claim, Dominion was not injured here.  Defendants are mistaken, both legally and factually.

*First*, to satisfy the "act or omission in the District of Columbia" element of Section 13-423(a)(3), "it is enough that defendants were physically within the District when they took the alleged actions giving rise to" Plaintiffs' claims.  *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 52 (D.D.C. 2009); *see also Wormley v. United States*, 601 F. Supp. 2d 27, 33 (D.D.C. 2009) (finding jurisdiction under Section 13-423(a)(3) and the due process clause satisfied where defendants "were physically within the District when they took the alleged actions"). Indeed, Defendants fail to cite any cases in which a D.C. court held that it lacked jurisdiction over a defendant who committed a tort while physically present in D.C.; instead, Defendants rely on cases where—unlike here—the tort was committed outside D.C.  *See Helmer v. Doletskaya*, 393 F.3d 201 (D.D.C. 2004) (conduct occurred in Russia); *Ashhab-Jones v. Cherokee Nat'l Strategic Programs, LLC*, No. 19-00089, 2020 WL 6262090 (D.D.C. Oct. 23, 2020) (conducted occurred in Iraq and any conduct within D.C. was subject to "government contacts" exception); *Hourani v. Psybersolutions, LLC*, 164 F. Supp. 3d 128 (D.D.C. 2016) (conduct occurred in London); *Corsi v. Caputo*, No. 19-cv-1573, 2020 WL 1703934 (D.D.C. Apr. 7, 2020) (conduct occurred in New

York); *Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998) (conduct occurred in California); *Burman v. Phoenix Worldwide Indus., Inc.*, 437 F. Supp. 2d 142 (D.D.C. 2006) (conduct occurred in Florida).  (Mem. 12-13.)

**Second**, while Dominion was harmed worldwide, Dominion was certainly injured in Washington, D.C., including when Powell's influential **in-person** Washington, D.C.-based audiences heard Powell spew defamatory falsehoods at the White House, at the Republican National Committee headquarters, and at Trump International Hotel.  (Compl. ¶¶ 24, 62-63, 80, 181(a), (z), (aa), (ff).)  It is axiomatic that defamatory statements cause injury where they are published, even if the injury is not restricted to that jurisdiction.  *See, e.g.*, *Howser v. Pearson*, 95 F. Supp. 936, 938 (D.D.C. 1951) ("Libel and slander take place where the defamatory statement is communicated"); *Lapointe v. Van Note*, No. 03-cv-2128, 2004 WL 3609346, at *6 (D.D.C. Nov. 9, 2004) ("An injury by libel occurs at the site of publication"); *Reuber v. United States*, 750 F.2d 1039, 1049 n.12 (D.C. Cir. 1984) ("The reputation of the libel victim may suffer harm even in a state in which he has hitherto been anonymous.") (quoting *Keeton v. Hustler*, 465 U.S. 770, 777 (1984)).

Dominion's injuries are not restricted to New York simply because it is majority-owned there, nor are its injuries restricted to Colorado simply because it has headquarters there.  It was harmed nationwide, including in Washington, D.C.  As the Complaint alleges,

> Dominion has been unfairly subjected to the hatred, contempt, and distrust of tens of millions of American voters, and the elected officials who are Dominion's actual and potential customers have received emails, letters, and calls from their constituents demanding that they avoid contracting with Dominion or using Dominion machines. As a result, elected officials, insurers, and potential investors have been deterred from dealing with Dominion, putting Dominion's contracts in more than two dozen states and hundreds of counties and municipalities in jeopardy and significantly hampering Dominion's ability to win new contracts.

(Compl. ¶ 144.)

3. **This Court has jurisdiction under D.C. Code § 13-423 (a)(4) because Defendants caused tortious injury in Washington, D.C. by additional acts outside the District, while engaging in a persistent course of conduct in D.C.**

Even if Defendants' extensive tortious conduct within D.C. was somehow insufficient to establish jurisdiction (it is not), this Court has jurisdiction under D.C. Code § 13-423 (a)(4), which provides specific jurisdiction over non-resident defendants whose tortious acts outside Washington, D.C. cause injury in the District if defendants also "regularly do or solicit business, engage in any other persistent course of conduct, or derive substantial revenue from … services rendered, in the District of Columbia." *Lewy v. S. Poverty L. Ctr., Inc*., 723 F. Supp. 2d 116, 123 (D.D.C. 2010).  This test is met here.  After a slew of Washington, D.C. meetings and appearances during which Powell (acting on behalf of herself, her law firm, and her fundraising website) promoted the defamatory falsehoods to influential audiences in Washington, D.C., Powell took the show on the road and continued to harm Dominion in D.C. by continuing to target those same influential D.C.-based audiences, such as by "tagging" Trump—then a resident of the District of Columbia—in her defamatory posts and by appearing on the televised shows he and his allies watch.  (Compl. ¶¶ 61, 83, 86, 147, 181(b), (c), (d), (g), (y), (dd).)

All this was in addition to the business Defendants transacted in the District, as set forth in Part II.B.1, *supra*, and Powell's repeated D.C.-based tortious conduct against Dominion set forth in Part II.B.2, *supra*.  As with the harm caused to Dominion from the defamatory statements made in the District, Dominion was similarly injured nationwide—including in the District—by Powell's defamatory statements made outside of the District.  *See Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 457 (D.C. Cir. 1990) ("libel occurs in the place where published, but the injuries that may flow from libel are not necessarily restricted to the place of publication."); Compl. ¶ 144.

Importantly, to satisfy subsection (a)(4)'s requirement of persistent course of conduct within the District, "a defendant's contacts need not be great," and it need not even be "related to

the tortious act outside the forum that causes the injury." *Lewy*, 723 F. Supp. 2d at 124. Defendants' D.C.-based defamatory campaign and related (and unrelated) business transactions in the District are more than sufficient to establish jurisdiction under subsection (a)(4).

The D.C. Circuit previously reversed a dismissal for lack of personal jurisdiction in a defamation case where the out-of-state defendant had far fewer contacts with D.C. than the Defendants in this case. *See Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 932 (D.C. Cir. 1981). In that case, Interpol—acting from France—allegedly defamed a Florida resident by publishing a single document in the United States and in 125 other countries, harming the Florida resident in D.C. and elsewhere. *Id.* at 931. After the district court dismissed the case for lack of personal jurisdiction, the D.C. Circuit reversed, holding that the district court could exercise personal jurisdiction over Interpol pursuant to subsection (a)(4) because, in addition to publishing defamatory material from France to a global audience, Interpol regularly sent information to and received information from a liaison in D.C. *Id.* Notably, the "'persistent course of conduct' need not be related to the act that caused the injury," and "all that is required is 'some other reasonable connection' between the defendant and the forum." *Id.* That requirement is more than satisfied in this case where, in addition to having a mailing address and attorneys in D.C., Powell (acting on behalf of herself, her law firm, and her fundraising website) travelled to Washington, D.C. multiple times, launched the defamatory campaign at issue, and conducted numerous business transactions in furtherance of that campaign, such as renting a room at Trump International Hotel in D.C.

Finally, even if the Court did not have jurisdiction over Defendants' out-of-district statements pursuant to subsection (a)(4), it would have jurisdiction over those statements because it has jurisdiction over the Defendants' in-District statements. D.C.'s long-arm statute, once satisfied, "does not require that the scope of the claim be limited to activity within this

jurisdiction." *Cohane v. Arpeja-California, Inc.*, 385 A.2d 153, 159 (D.C.), *cert. denied*, 439 U.S. 980 (1978); *see also Steinberg*, 672 F.2d at 931 n.8 ("The District of Columbia Court of Appeals, however, has noted that the concept of cause of action or claim for relief (in [§ 13-423](b)) should be broadly construed to cover an entire transaction so that, when possible, the entire dispute may be settled in a single litigation."); *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 728 (D.C. 2011) (quoting *Shoppers Food Warehouse*, 746 A.2d at 326) ("'[o]nce ... the claim is related to acts in the District, § 13–423 does not require that the scope of the claim be limited to activity within this jurisdiction.'"). Furthermore, the Court can also exercise jurisdiction as to the claims because they all arise from the same core operative facts—namely, Defendants' defamatory campaign. *See Poling v. Farrah*, 131 F. Supp. 2d 191, 194 (D.D.C. 2001) (citing *Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1, 4-5 (D.C. Cir. 1977)).

### B. Jurisdiction is proper under the Due Process Clause.

The exercise of jurisdiction over the Defendants is proper under the Due Process Clause because Defendants' travel to and repeated contacts with D.C. more than satisfy the "minimum contacts" requirement such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *GTE New Media v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In particular, Defendants' "physical entry into the [jurisdiction]—***either by the defendant in person or through an agent***, goods, ***mail***, or some other means—is certainly a relevant contact." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

Especially together with the fact that Powell's fundraising website maintains a mailing address in Washington, D.C. and that Powell's law firm employs D.C.-barred attorneys who practice law in D.C., Powell's travel to and physical presence in D.C.—during which she promoted falsehoods about Dominion and sought to exploit those falsehoods to secure a pardon for her client,

33

to sell t-shirts and books, to raise funds, and to raise her public profile as a media figure, author, and attorney—Defendants' contacts were not "random, fortuitous, accidental, or attenuated," but were "of such quality and nature that they manifest a deliberate and voluntary association with" the District. *Shoppers Food Warehouse*, 746 A.2d at 331 (internal citation omitted).  Defendants "purposefully availed [themselves] of the privilege of conducting activities within the District and should reasonably have anticipated being haled into court in the District."  *Id.* (citing *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)).  In other words, Defendants came to D.C. to engage in acts giving rise to this case and should not be heard to complain about being haled ***back*** to D.C. to answer for what they did while they were here.

### C. This Court also has jurisdiction over Powell's law firm and fundraising website because they are Powell's alter egos.

As already stated, the D.C. long-arm statute authorizes jurisdiction over a person, based on the acts of its "agent." D.C. Code § 13-423 (a).  Powell's arguments about alter-ego liability and piercing the corporate veil are, therefore, beside the point when it comes to the jurisdictional analysis.  (Mem. 13-14.)  But in addition to having jurisdiction over Powell's law firm and fundraising website for the reasons set forth above, the Court also has jurisdiction over them for the additional reason that they are Powell's alter egos.  Alter ego jurisdiction exists "where affiliated parties are alter egos of a corporation over which the Court has personal jurisdiction." *Shapiro, Lifschitz, & Schram, P.C. v. Hazard*, 90 F. Supp. 2d 15, 22 (D.D.C. 2000).  Here, Sidney Powell's law firm and fundraising website are her alter egos and her contacts may be attributed to them based on "reverse veil-piercing," a theory under which "the traditional veil-piercing doctrine is applied in reverse, such that a corporation's assets are held accountable for the liabilities of an individual who treated the corporation as his or her alter ego." *United States v. TDC Mgmt. Corp.*, 263 F. Supp. 3d 257, 266 (D.D.C. 2017).

34

As the Complaint alleges, Powell used funds contributed to her fundraising website to pay for: (1) sham election litigations brought by herself and her law firm; (2) her own *personal* defense; and (3) trips to D.C., where she waged the defamatory campaign against Dominion and used the defamatory campaign to raise more funds.  (Compl. ¶¶ 26, 57, 175, 179, 185.)  Now, Powell seeks to abuse the corporate forms she created for her law firm and fundraising website to hide funds that she raised through her defamatory campaign, shielding those funds from the very company that was harmed by the defamatory campaign.   The veil should be pierced where, as here, "considerations of justice and equity" justify ensuring that the corporate shield is not used to perpetrate an injustice or fraud.  *McWilliams Ballard, Inc. v. Broadway Mgmt. Co., Inc.*, 636 F. Supp. 2d 1, 8 (D.D.C. 2009); *see also IMark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 152 (D.D.C. 2010) (internal citation omitted) ("The essence of the fairness test is simply that an individual businessman cannot hide from the normal consequences of carefree entrepreneuring by doing so through a corporate shell.").  It is "inequitable" to treat two entities as separate where the first entity is "completely owned, governed and financed by" the second entity. *IMark Mktg. Servs.*, 753 F. Supp. 2d at 152.  It is likewise appropriate to pierce the corporate veil when someone uses the funds of a nonprofit corporation for herself.  *See Macaluso v. Jenkins*, 95 Ill. App. 3d 461, 462-63 (1981).

While using her law firm and fundraising website to wage a defamatory campaign against Dominion and fund her own personal legal defense, Sidney Powell did not respect corporate formalities.  As a sole proprietor, Sidney Powell also controls and dominates her law firm and there is no distinction between the person and the corporate form.  (Compl. ¶¶ 16, 165.)  In addition, she solicited donations to her fundraising website, defendingtherepublic.org, *before she had even incorporated Defending the Republic, Inc. as a corporate entity*. (Compl. ¶ 17.)  Funds

contributed to defendingtherepublic.org could not have been maintained separately in a bank account for Defending the Republic, Inc. before that corporate entity was formed; rather, those funds would have necessarily been comingled in bank accounts controlled by Sidney Powell, whether directly or through the law firm she controls and dominates.  (Compl. ¶¶ 16-17, 57, 165, 179.)  As the person holding the purse strings for Defending the Republic, Inc., Sidney Powell treated the entity's funds as her personal funds, redirecting them to the law firm she controls and dominates (Compl. ¶¶ 24, 176), and raiding them to pay for her ***personal*** legal defense.  (Compl. ¶ 169.)   That is not surprising, given the general disregard of corporate formalities by the Defendants, including that: (1) Sidney Powell and her law firm maintain the same address and Powell's law firm and fundraising website share an office (Compl. ¶¶ 16, 21); (2) the Defendants have interconnected websites that seek donations for Powell's fundraising website, republish defamatory media appearances and legal filings by Sidney Powell and her law firm, and prominently feature a biography and headshot of Sidney Powell (Compl. ¶¶ 170-75); and (3) attorneys who are "Of Counsel" at Powell's law firm sign pleadings under both Powell's law firm and fundraising website (Compl. ¶¶ 166-68).

At the pleadings stage, a plaintiff's burden is low and courts have repeatedly found that alter ego was sufficiently alleged in complaints containing far fewer and less detailed allegations of alter ego than those alleged here.  *See, e.g., Kelleher v. Dream Catcher, L.L.C.*, 263 F. Supp. 3d 322, 324-25 (D.D.C. 2017) (complaint alleged a plausible alter ego theory of liability on facts similar to those alleged here, namely that the corporation and individual defendant comingled funds, used funds for reasons other than they were designated, and shared an address); *Lopes v. JetsetDC, LLC*, 994 F. Supp. 2d 135, 146 (D.D.C. 2014) (complaint alleged alter ego merely by pleading that individual defendants are the "owners and operators of JetSet, and are alter egos of

this corporation" and that "substantial ownership of corporate stock is concentrated in one person or a few persons, corporate formalities have been disregarded, and other factors support disregarding the corporate entity.").  Therefore, in addition to all of the bases for jurisdiction set forth above, the corporate defendants are also subject to this Court's jurisdiction because they are alter egos of Sidney Powell.

## IV.   Venue is proper in this District, and the case should not be transferred.

In arguing that venue is improper, Defendants rely on a single unpublished opinion, *Corsi v. Info Wars, LLC*, No. 19-cv-656, 2020 WL 1156864, at *2 (D.D.C. Mar. 10, 2020), in which "none of the alleged events, let alone a substantial part, occurred in the District of Columbia."  *Id.* That is obviously not the case here.  As discussed in detail above and alleged in the Complaint, Defendants launched and waged their defamatory campaign in the District of Columbia and boosted its impact through in-person meetings with influential D.C. audiences.  Venue is therefore proper in the District of Columbia under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events … giving rise to the claim occurred" here.  *Id.*

Defendants also argue that venue is improper in this district because none of the parties reside in D.C. and evidence and witnesses are scattered across the country.  (Mem. 16-18.)  But under 28 U.S.C. § 1391 "the question is not which district is the 'best' venue" or which "has the most significant connection," the question is "whether the district the plaintiff chose had a substantial connection to the claim."  *Exelon Generation Co. v. Grumbles*, 380 F. Supp. 3d 1, 11 (D.D.C. 2019); *Johns v. Newsmax Media, Inc.*, 887 F. Supp. 2d 90, 96 (D.D.C. 2012).  Because a significant and substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia, venue is proper.

Defendants' motion to transfer should likewise be denied because all the relevant factors weigh against it.  ***First***, Plaintiffs' choice of forum is to be accorded deference because there is a

substantial "nexus" between the claims and the District of Columbia and none of the events giving rise to Plaintiffs' claims originated in the Northern District of Texas. *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 13 (D.D.C. 2000). **Second**, it is no more convenient for the parties and witnesses to litigate in the Northern District of Texas than in Washington, D.C. As Powell acknowledges, key witnesses are scattered across the country, not clustered in the Northern District of Texas. And Powell has made clear that she has no difficulty whatsoever travelling to D.C. and does so routinely. (*See* Compl. ¶ 24.) **Third**, Texas law does not govern the case, so the Northern District of Texas will have no more familiarity with the governing law than this Court.

**Fourth**, although Defendants argue that this Court's docket has been overcrowded due to the criminal prosecutions following the attempted insurrection on January 6, 2021, the Court should disregard their argument because they "have provided the Court with no information regarding the level of congestion of the transferee court." *Shapiro, Lifschitz, & Schram, P.C. v. Hazard*, 24 F. Supp. 2d 66, 72 (D.D.C. 1998). Moreover, while the median time between filing and trial is somewhat faster in the Northern District of Texas, the median time from filing to disposition is much faster in the District of Columbia (5.8 months) than in Northern District of Texas (13.3 months), further weighing against transfer.[6]

**Fifth**, because none of the events giving rise to the Complaint occurred in Texas, the Northern District of Texas has no "local interest in having [this non-]local controvers[y] decided at home" in Texas. *Stewart v. Azar*, 308 F. Supp. 3d 239, 249 (D.D.C. 2018). To the contrary, because Defendants launched and waged a defamatory campaign **in Washington D.C.**, Washington, D.C. is the district with the "local interest" in deciding this case. *Id.*

---

[6] *United States District Courts – National Judicial Caseload Profile*, U.S. Courts https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf (last visited Apr. 7, 2021).

Having travelled to Washington, D.C. to conduct business and wage the defamatory campaign giving rise to this case, Defendants should not be heard to complain that they cannot return to Washington, D.C. to litigate the consequences of their conduct.  Their motion to transfer venue should be denied.  *See Thayer/Patricof Educ. Funding v. Pryor Res.*, 196 F. Supp. 2d 21, 35 (D.D.C. 2002) (defendant's choice to travel to D.C. weighed against transfer); *Sheraton Operating Corp. v. Just Corp. Travel*, 984 F. Supp. 22, 27 (D.D.C. 1997) (defendant's choice to do business in D.C. weighed against transfer).

**V.      The Complaint states a claim for defamation against Defending the Republic, Inc.**

It is well-settled that corporations act through their human agents and can be held liable for defamation where, as here, their agents publish defamatory falsehoods with actual malice.  *See Palin*, 940 F.3d at 815 (complaint stated a claim for defamation against *The New York Times* where complaint alleged facts giving rise to a plausible inference that the paper's agents recklessly disregarded the truth); *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 199, 202-04 (D.N.J. 2011) (complaint stated a claim for defamation against corporation where new CEO made allegedly defamatory statements against former CEO); *StopLoss Specialists, LLC v. VeriClaim*, Inc., 340 F. Supp. 3d 1334, 1356 (N.D. Ga. 2018) (finding that corporation could be liable for defamatory email sent by its agent); *Unker v. Joseph Markovits, Inc.*, 643 F. Supp. 1043, 1049 (S.D.N.Y. 1986) ("A corporation may be held liable for defamatory utterances made by its officer or agent, acting within the scope of his authority."); *VECC, Inc. v. Bank of Nova Scotia*, 296 F. Supp. 2d 617, 622 (D.V.I. 2003) (complaint stated a claim for defamation against corporation where complaint alleged that corporation's agent made defamatory remarks).

Because Powell acted not only on behalf of herself but also on behalf of her law firm and her fundraising website, the Complaint defines "Powell" to include all three Defendants in this case—*i.e.* Sidney Powell, her law firm (Sidney Powell, P.C.), and her fundraising website

(Defending the Republic, Inc.).   (Compl. ¶ 2 n.1; *see also* Compl. ¶¶ 26, 126 (alleging that Defending the Republic, Inc. acted through Sidney Powell as she solicited donations for it during defamatory appearances, and that Defending the Republic, Inc. is an alter ego of Sidney Powell).) The Complaint likewise alleges that "Powell"—*i.e.*, all three Defendants—acted with actual malice in making false and defamatory statements about Dominion to members of the Trump Campaign, Donald Trump, and numerous reporters, media outlets, and global audiences.   (Compl. ¶¶ 181, 185.)   Standing alone and without more, these allegations are more than sufficient to state a claim of defamation against Powell's fundraising website.   *See Palin*, 940 F.3d at 815; *Mangan*, 834 F. Supp. at 202-04; *StopLoss Specialists*, 340 F. Supp. 3d at 1356; *Unker*, 643 F. Supp. at 1049; *VECC*, 296 F. Supp. 2d at 622.

But the Complaint goes even farther than necessary, alleging additional facts that further bolster the defamation claim against Powell's fundraising website, including that the site solicited contributions to fund the defamatory campaign and hired attorneys to further the defamatory campaign.   (Compl. ¶¶ 17-21, 175-77, 166-168.)   In addition to the fact that Powell's fundraising website published false statements through Sidney Powell during her in-person meetings and media appearances, Defending the Republic, Inc. also *re*-published false statements about Dominion when Sidney Powell's defamatory media appearances were uploaded to the company website, defendingtherepublic.org.   (Compl. ¶¶ 52, 58, 75, 87, 169, 181(b), (x), (z), (aa).)   It is also a "well-accepted principle" that those re-publications of defamatory falsehoods are themselves actionable as defamation.   *See Restis v. Am. Coalition Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 724 n.10 (S.D.N.Y. 2014).   It must also be noted that Defending the Republic, Inc.'s Chairman and CEO Patrick Byrne has been intimately involved in the defamatory campaign from the beginning; indeed, Byrne met with Powell at Trump Campaign headquarters the day after the

election and told her that he had known "goons" were going to steal the election.  (Compl. ¶ 53; Byrne Decl. ¶ 4.)  Even though Byrne knew his claims—including that voting machines stole the election—were "a little far-fetched," Powell "was totally super receptive to what he had to say." (Compl. ¶ 53.)  From that point forward, Byrne—now Chairman and CEO of Defending the Republic, Inc.—allied and collaborated with Powell to further the defamatory campaign, including during meetings at Trump International Hotel in Washington, D.C.

## VI.     The Complaint states a claim for deceptive trade practices.

Defendants argue that the deceptive trade practices act claim under Georgia Code Section 10-1-372 (a)(8) ("DTPA") "fails on its face" because the Complaint does not allege that Defendants "were engaged in trade and commerce of goods, such as election voting systems." (Mem. 42.). Defendants are mistaken.  As an initial matter, it is irrelevant whether Defendants provide "election voting systems" because the statute is clear that a plaintiff "need *not* prove competition between the parties." Ga. Code § 10-1-372 (b).  More broadly, there is no requirement that the Defendants be engaged in the trade and commerce of goods.  *See Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1365 (N.D. Ga. 2012) (denying a motion to dismiss where plaintiffs brought a DTPA claim against defendants comprised of realtors, brokers, and real estate agents—undoubtably not providers of goods).  Indeed, no court interpreting the statute has required that the defendants be engaged in the trade and commerce of goods.  *See Davita, Inc. v. Nephrology Assocs., P.C.*, 253 F. Supp. 2d 1370, 1379-80 (S.D. Ga. 2003) (complaint stated a DTPA claim where (i) the "Plaintiffs state that the disparaging comments [by a group of doctors] were false and misleading;" (ii) "the allegation states that Defendants disparaged the services and business" of Plaintiffs "by making false and misleading representations;" and (iii) "the element of maliciousness is ascertainable from the complaint.").

In suggesting otherwise, Defendants cherry-pick quotes from *Int'l Brominated Solvents Ass'n v. Am. Conf. of Governmental Indus. Hygienists*, 625 F. Supp. 2d 1310, 1318 (M.D. Ga. 2008).  (Mem. 42.)  But that court recognized that where (as here) there is a "financial interest," in the dissemination of ideas, the dissemination of misleading information **could** constitute an unfair or deceptive trade practice.  *Int'l Brominated Solvents*, 625 F. Supp. 2d at 1318 (citing *Hartigan v. Maclean Hunter Publ'g Corp.*, 457 N.E.2d 480, 485-86 (Ill. App. 1983)).  However, the court found that circumstance inapplicable because the *Int'l Brominated Solvents* defendants were **not** attempting to "derive a financial benefit" from their dissemination of information.  *Id.* Unlike the defendant in that case, Defendants in this case had a financial interest in making deceptive statements about Dominion.  As the Complaint alleges, in the course of Powell's business as a media figure, author, and attorney, Defendants used the defamatory falsehoods about Dominion to solicit funds to Powell's fundraising website and to garner media attention and raise Sidney Powell's public profile, which sold additional copies of her book and drummed up additional potential clients for Sidney Powell and her law firm.  (Compl. ¶¶ 80, 193.)

Finally, Defendants argue that they cannot be liable under the DTPA because their statements are protected opinion and not actionable.  As discussed in detail above, Defendants' statements are actionable because they contain assertions of fact that are provably false.

## CONCLUSION

Acting on behalf of her fundraising website, her law firm, and herself, Sidney Powell went to D.C. and helped launch one of the most damaging disinformation campaigns in American history, fooling millions of people into believing that Dominion had stolen the 2020 election. (Compl. ¶¶ 24- 27, 52, 62.)  Now that Dominion seeks to hold Powell accountable in the city where Powell waged that campaign, Powell asks the Court to dismiss this case for lack of personal jurisdiction or to transfer the case to Texas.  The only connection that Texas has to this case is that

Powell may have *left* Texas to come to D.C. to transact the business and utter many of the falsehoods giving rise to this case.  For weeks, a process server saw no sign of Powell at her asserted residence in Texas.  Powell was ultimately served outside her house in North Carolina—another state having no meaningful connection to this case.  This case arises out of a D.C.-based defamatory campaign, which had serious repercussions for Dominion and the public in D.C.

Countless people took the lies so seriously that they demanded their elected officials not use Dominion machines.  Dominion tried to set the record straight, disseminating the facts as part of what Powell recognizes as a campaign "to save their business."  (Mem. 1.)  As Dominion scrambled, Powell bragged that she welcomed Dominion suing her because she would "love to have civil discovery."  (Compl., Ex. 5 at 10:23.)  Then, after Dominion put Powell on formal written notice of the facts, Powell tweeted that she was "retracting nothing" because "[w]e have the #evidence" and "[t]hey are #fraud masters," and published a binder of known falsehoods about Dominion from within Washington, D.C.  (Compl. ¶¶ 9; 181(ff).)

Powell's Motion should be denied it its entirety and the discovery she claimed she would "love to have" should proceed without delay.

Dated:  May 3, 2021

Respectfully submitted,

By:   */s/ Megan L. Meier*

Justin A. Nelson (D.C. Bar No. 490347)
SUSMAN GODFREY LLP
1000 Louisiana Street, #5100
Houston, Texas 77002
(713) 651-9366
jnelson@susmangodfrey.com

Stephen Shackelford, Jr. (NY Bar No. 5393657)
Elisha Barron (NY Bar No. 5036850)

Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Megan L. Meier (D.C. Bar No. 985553)
Dustin A. Pusch (D.C. Bar No. 1015069)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
(202) 628-7400
tom@clarelocke.com
megan@clarelocke.com
dustin@clarelocke.com

SUSMAN GODFREY LLP
1301 6th Avenue                                    *Attorneys for Plaintiffs*
New York, NY 10019
(212) 336-8330
sshackelford@susmangodfrey.com
ebarron@susmangodfrey.com

Davida Brook (CA Bar No. 275370)
Emily Cronin (CA Bar No. 322683)
Brittany Fowler (CA Bar No. 332375)
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 789-3100
dbrook@susmangodfrey.com
ecronin@susmangodfrey.com
bfowler@susmangodfrey.com

Stephen E. Morrissey (WA Bar No. 44710)
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA  98101
(206) 516-3880
smorrissey@susmangodfrey.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document will be filed with

the Clerk of Court using the CM/ECF system on May 3, 2021, which will send notification of such

filing to the following:

Lawrence J. Joseph
1250 Connecticut Ave., NW, Suite 700-1A
Washington, DC 20036
*Attorney for Defendants Sidney Powell,*
*Sidney Powell, P.C., and Defending the Republic, Inc.*

Howard Kleinhendler
369 Lexington Avenue, 13th Floor
New York, NY 10017
*Attorney for Defendants Sidney Powell and Sidney Powell, P.C.*

Jesse Binnall
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
*Attorney for Defendant Defending the Republic, Inc.*

*/s/ Megan L. Meier*
Megan L. Meier

45