**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | )<br>)<br>)<br>) |
| Plaintiffs/Counter-Defendants, | ) |
| v. | )<br>) |
| SIDNEY POWELL, SIDNEY POWELL, P.C., and DEFENDING THE REPUBLIC, INC., | )<br>)<br>) |
| Defendants/Counter-Plaintiffs. | )<br>)<br>) |

Civil Action No. 1:21-cv-0040-CJN

## ANSWER AND COUNTERCLAIM OF DEFENDANTS SIDNEY POWELL, SIDNEY POWELL, P.C. AND DEFENDING THE REPUBLIC

Pursuant to FED. R. CIV. P. 8 and 12, Sidney Powell, Sidney Powell, P.C. and Defending the Republic, Inc. (collectively, "Defendants" or "Counterclaim Plaintiffs") respectfully submit this answer to the Complaint filed by US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (collectively, "Plaintiffs," or "Counterclaim Defendants," or "Dominion"). While continuing to challenge personal jurisdiction and without waiving their challenge to personal jurisdiction or conceding that venue is proper here for Dominion's claims, Defendants assert a counterclaim in the alternative.

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses to Dominions' claims.

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiffs' claims are barred in whole or in part by the doctrine of estoppel.

### Third Affirmative Defense

Plaintiffs' claims are barred in whole or in part by waiver.

**Fourth Affirmative Defense**

Plaintiffs' claims are barred in whole or in part by Plaintiffs' own fraud.

**Fifth Affirmative Defense**

Plaintiffs' claims are barred in whole or in part by illegality.

**Sixth Affirmative Defense**

Plaintiffs have failed to mitigate their damages.

**Seventh Affirmative Defense**

Plaintiffs' claims are barred by Plaintiffs' unclean hands.

**Eighth Affirmative Defense**

Plaintiffs' claims fail because the allegedly defamatory statements are truthful.

**Ninth Affirmative Defense**

Plaintiffs' claims fail because the allegedly defamatory statements are statements of opinion.

**Tenth Affirmative Defense**

Plaintiffs' claims fail because of the absence of malice.

**Eleventh Affirmative Defense**

Plaintiffs' claims fail because Defendants' statements are absolutely and/or qualifiedly privileged and immune from litigation.

**Twelfth Affirmative Defense**

Plaintiffs have failed to name and to join necessary parties who are responsible for any alleged damages.

**Thirteenth Affirmative Defense**

Plaintiffs' claims fail due to the lack of causation.

**Fourteenth Affirmative Defense**

Plaintiffs' claims are barred by the First Amendment to the United States Constitution.

**Fifteenth Affirmative Defense**

Plaintiffs' claims are barred by and by Article II, § 10 of the Constitution of the State of Colorado or like provisions of the state constitution for the state law that applies to Plaintiffs' claims.

**Sixteenth Affirmative Defense**

As to each Defendant and each count, the court lacks personal jurisdiction.

**Seventeenth Affirmative Defense**

As to each Defendant and each count, venue is improper.

**Eighteenth Affirmative Defense**

By entering the public arena in an area as sensitive as free and fair elections in a democracy, Plaintiffs assumed the risk of unfair and even false criticism.

**Nineteenth Affirmative Defense**

Plaintiffs' claims are barred by the doctrine of *res judicata*.

**Twentieth Affirmative Defense**

Plaintiffs' claims are barred by Plaintiffs' contributory negligence in failing to secure Plaintiffs' voting systems from hacking after becoming aware of the voting systems' vulnerability to hacking.

**Twenty-First Affirmative Defense**

Plaintiffs lack Article III standing to assert some of the allegations Plaintiffs make and prudential standing to assert the alleged injuries of third parties, including other Plaintiffs.

**Twenty-Second Affirmative Defense**

Plaintiffs' damages claims are barred because Plaintiffs fail to plead special damages such

as lost profits under the heightened pleading requirements of FED. R. CIV. P. 9(g).

### Twenty-Third Affirmative Defense

Plaintiffs' claims are barred in whole or in part because some or all of the alleged damages Plaintiffs claim to have suffered were not caused by Defendants but, if the alleged damages exist at all, were caused by other parties and/or intervening or supervening causes independent of any conduct undertaken by Defendants.

### Twenty-Fourth Affirmative Defense

Plaintiffs' claims are barred in whole or in part by the applicable statute of limitations (the single publication rule).

### Twenty-Fifth Affirmative Defense

Plaintiffs' claims are barred in whole or in part because the statements complained of are of and concerning Plaintiffs in their roles as governmental actors, which deprives them of standing to sue and/or creates an absolute privilege for Defendants.

### <u>RESPONSES TO THE NUMBERED PARAGRAPHS</u>

Unless otherwise expressly admitted, Defendants deny each and every allegation in the Complaint, including without limitation, any allegations in the headings, subheadings, preamble, exhibits, relief sought, and general and specific prayers. Defendant further responds to the numbered paragraphs of Plaintiffs' amended complaint as follows:

1.      The allegations of paragraph 1 are nothing more than a hyperbolic, narrative summary of portions of the 124 pages of Plaintiffs' complaint. As such, no response to these allegations is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

2.      The allegations of paragraph 2 are nothing more than a hyperbolic, narrative summary of portions of the 124 pages of Plaintiffs' complaint. As such, no response to these

allegations is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof. The allegation in paragraph 2, note 1, that all references to "Powell" refer equally to "her alter egos Sidney Powell, P.C. and Defending the Republic, Inc." is premised on a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegation and demand strict proof thereof. Except as expressly stated otherwise herein, Defendants deny each and every allegation referring to "Powell" as applying to defendants Sidney Powell, P.C. and Defending the Republic, Inc. and "Ms. Powell" refers only to defendant Sidney Powell.

3.     The allegations of paragraph 3 are nothing more than a hyperbolic, narrative summary of portions of the 124 pages of Plaintiffs' complaint. As such, no response to these allegations is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

4.     The allegations of paragraph 4 are nothing more than a hyperbolic, narrative summary of portions of the 124 pages of Plaintiffs' complaint. As such, no response to these allegations is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

5.     The allegations of paragraph 5 are nothing more than a hyperbolic, narrative summary of portions of the 124 pages of Plaintiffs' complaint. As such, no response to these allegations is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

6.     The allegations of paragraph 6 are nothing more than a hyperbolic, narrative summary of portions of the 124 pages of Plaintiffs' complaint. As such, no response to these allegations is required. To the extent a response is required, Defendants deny the allegations and

demand strict proof thereof.

7.    The allegations of paragraph 7 are nothing more than a hyperbolic, narrative summary of portions of the 124 pages of Plaintiffs' complaint. As such, no response to these allegations is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

8.    The allegations of paragraph 8 are nothing more than a hyperbolic, narrative summary of portions of the 124 pages of Plaintiffs' complaint. As such, no response to these allegations is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

9.    The allegations of paragraph 9 are nothing more than a hyperbolic, narrative summary of portions of the 124 pages of Plaintiffs' complaint. As such, no response to these allegations is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

10.    The allegations of paragraph 10 are nothing more than a hyperbolic, narrative summary of portions of the 124 pages of Plaintiffs' complaint. As such, no response to these allegations is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

11.    The allegations of paragraph 11 are nothing more than a hyperbolic, narrative summary of portions of the 124 pages of Plaintiffs' complaint. As such, no response to these allegations is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

## **PARTIES**

12.    Defendants lack information sufficient to form a belief as to the truth of the allegations of paragraph 12 and accordingly deny the allegations and demand strict proof thereof.

13.     Defendants lack information sufficient to form a belief as to truth of the allegations of paragraph 13 and accordingly deny the allegations and demand strict proof thereof.

14.     Defendants lack information sufficient to form a belief as to the truth of the allegations of paragraph 14 and accordingly deny the allegations and demand strict proof thereof.

15.     Defendants admit that Ms. Powell is a published author, a licensed attorney, and a member of the State Bar of Texas, that she practices law as Sidney Powell P.C., and that she is domiciled in Texas. All other allegations in paragraph 15 are denied and Defendants demand strict proof thereof.

16.     Defendants admit the first and third sentences of paragraph 16. The second sentence states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

17.     Defendants admit that Defending the Republic is a corporation and that its incorporation documents were filed after December 1, 2020. The rest of paragraph 17 consists of characterizations or legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

18.     Defendants admit that for a short period of time Defending the Republic's website referred to a 501(c)(3) rather than a 501(c)(4) corporation.

19.     The allegations of paragraph 19 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

20.     Defendants lack information sufficient to form a belief as to the allegations of paragraph 20 and accordingly deny the allegations and demand strict proof thereof. Defendants note, however, that new corporations can apply for such status up to 27 months after formation.

21.    Defendants admit that Defending the Republic has three directors, one of whom is Ms. Powell, and that Defending the Republic is a Texas corporation with the same mailing address as Sidney Powell, P.C. Defendants deny that Messrs. Wood and Castleberry are directors.

## JURISDICTION AND VENUE

22.    The allegations of paragraph 22 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

23.    The allegations of paragraph 23 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

24.    The allegations of paragraph 24 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

25.    The allegations of paragraph 25 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

26.    The allegations of paragraph 26 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

27.    The allegations of paragraph 27 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

28.    The allegations of paragraph 28 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict

proof thereof.

## FACTUAL ALLEGATIONS

29.     Defendants lack information sufficient to form a belief as to the truth of the allegations of paragraph 29 and accordingly deny the allegations and demand strict proof thereof.

30.     Defendants lack information sufficient to form a belief as to the truth of the allegations of paragraph 30 and accordingly deny the allegations and demand strict proof thereof.

31.     Defendants lack information sufficient to form a belief as to the allegations of paragraph 31 and accordingly deny the allegations and demand strict proof thereof.

32.     Defendants lack information sufficient to form a belief as to the truth of the allegations of paragraph 32 and accordingly deny the allegations and demand strict proof thereof.

33.     Defendants lack information sufficient to form a belief as to the allegations of paragraph 33 and accordingly deny the allegations and demand strict proof thereof.

34.     Defendants lack information sufficient to form a belief as to the truth of the allegations of paragraph 34 and accordingly deny the allegations and demand strict proof thereof.

35.     Defendants lack information sufficient to form a belief as to the truth of the allegations of paragraph 35 and accordingly deny the allegations and demand strict proof thereof.

36.     Defendants lack information sufficient to form a belief as to the truth of the allegations of paragraph 36 and accordingly deny the allegations and demand strict proof thereof.

37.     The allegations in paragraph 37 refer to documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

38.     The allegations in paragraph 38 refer to documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

39.     The allegations in paragraph 39 refer to documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

40.     Defendants lack information sufficient to form a belief as to the truth of the allegations of paragraph 38 and accordingly deny the allegations and demand strict proof thereof.

41.     Defendants deny the allegations in paragraph 41 and demand strict proof thereof.

42.     Defendants lack information sufficient to form a belief as to the truth of the allegations of paragraph 42 and accordingly deny the allegations and demand strict proof thereof.

43.     Defendants lack information sufficient to form a belief as to the truth of the allegations of paragraph 43 and accordingly deny the allegations and demand strict proof thereof.

44.     The allegations in paragraph 44 refer to documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

45.     The allegations in paragraph 45 refer to documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

46.     The allegations in paragraph 46 refer to documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

47.     The allegations in paragraph 47 refer to documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

48.     The allegations in paragraph 48 refer to documents that speak for themselves and

therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

49.     The allegations in paragraph 49 refer to documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

50.     The allegations in paragraph 50 refer to documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

51.     The allegations in paragraph 51 refer to documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

52.     Defendants deny the allegations preceding the colon in the first two lines of paragraph 52 and demand strict proof thereof. The remainder of paragraph 52 refers to a document which speaks for itself and therefore does not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

53.     Defendants lack information sufficient to form a belief as to the allegations of the second sentence of paragraph 53 and accordingly deny the allegations and demand strict proof thereof. Defendants deny the remaining allegations of paragraph 53 and demand strict proof thereof.

54.     Defendants deny the allegations in paragraph 54 and demand strict proof thereof.

55.     Defendants lack information sufficient to form a belief as to the allegations of the second sentence of paragraph 55 and accordingly deny the allegations and demand strict proof thereof. Defendants deny the remaining allegations of paragraph 55 and demand strict proof

thereof.

56.     Defendants lack information sufficient to form a belief as to the allegations of paragraph 56 and accordingly deny the allegations and demand strict proof thereof.

57.     Defendants admit that the domain name "defendingtherepublic.org" was registered on November 6, 2020, but Defendants deny all other allegations of paragraph 57. Specifically, Defendants deny that Ms. Powell registered the domain name or controlled the website (*i.e.*, the website was never "her fundraising website").

58.     Defendants admit that Ms. Powell has made the media appearances listed in paragraph 58 but deny the remaining allegations of paragraph 58.

59.     The allegations in the first sentence of paragraph 59 refer to a document which speaks for itself and therefore does not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof. In addition, Defendants lack information sufficient to form a belief as to the allegations of the second sentence of paragraph 59 and accordingly deny the allegations and demand strict proof thereof.

60.     Defendants deny the allegations in paragraph 60 and demand strict proof thereof, except to state that when referencing the video Ms. Powell intended to reference a video of a press statement by Antonio Mugica—founder of Smartmatic—rather than a video of Dominion's founder.

61.     Paragraph 61 largely consists of argument which does not require a response, and to the extent a response is required Defendants accordingly deny the allegations and demand strict proof thereof, except to state that the alleged tweets of Donald Trump speak for themselves.

62.     Defendants admit Ms. Powell attended and spoke at the news conference alleged in paragraph 62. Defendants state that the video or an accurate transcript of that news conference is

the best evidence of Ms. Powell's statements and deny any allegations inconsistent with any such video or transcript.

63.     Defendants admit Ms. Powell attended and spoke at the news conference alleged in paragraph 63. Defendants state that the video or an accurate transcript of that news conference is the best evidence of Ms. Powell's statements and deny any allegations inconsistent with any such video or transcript.

64.     Defendants lack information sufficient to form a belief as to the allegations of paragraph 64 and accordingly deny the allegations and demand strict proof thereof.

65.     The allegations in paragraph 65 refer to statements allegedly made by Tucker Carlson on a television program. Defendants deny any allegations that are inconsistent with any statements so made.

66.     Defendants deny the allegations in paragraph 66 and demand strict proof thereof, except to state that the alleged tweets of Donald Trump speak for themselves. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

67.     Defendants deny the allegations in paragraph 67 and demand strict proof thereof.

68.     Defendants deny the allegations in paragraph 68 and demand strict proof thereof, except to admit that Georgia officials certified Georgia 's election results.

69.     Defendants deny the allegations in paragraph 69 and demand strict proof thereof, except to admit that Ms. Powell conducted a telephonic interview with Newsmax. Defendants state that the video or an accurate transcript of that interview is the best evidence of Ms. Powell's statements and deny any allegations inconsistent with any such video or transcript.

70.     The allegations in paragraph 70 refer to a document which speaks for itself and does not require a response. To the extent a response is required, Defendants deny the allegations

and demand strict proof thereof.

71.     Defendants lack information sufficient to form a belief as to the allegations of paragraph 71 and accordingly deny the allegations and demand strict proof thereof.

72.     Defendants lack information sufficient to form a belief as to the allegations of paragraph 72 and accordingly deny the allegations and demand strict proof thereof.

73.     The allegations in paragraph 73 refer to a document which speaks for itself and does not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

74.     Defendants deny the allegations in paragraph 74 and demand strict proof thereof, except to admit that Ms. Powell was interviewed on the Lou Dobbs television show. Defendants state that the video or an accurate transcript of that interview is the best evidence of Ms. Powell's statements and deny any allegations inconsistent with any such video or transcript.

75.     Defendants admit that Ms. Powell and co-counsel filed lawsuits in federal courts in Georgia and Michigan on or about November 25, 2020, and that Ms. Powell and co-counsel filed suits in Wisconsin and Arizona federal courts on or about December 1 and December 2, 2020, respectively, the contents of which filings speak for themselves. All other allegations in paragraph 75 are denied.

76.     The first sentence of paragraph 76 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof. Defendants deny all other allegations in paragraph 76.

77.     The allegations in paragraph 77 refer to a document which speaks for itself and does not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

78.     Defendants admit that Ms. Powell attended a rally with Mr. Wood on December 2, 2020. Defendants state that the video or an accurate transcript of that rally is the best evidence of Ms. Powell's statements and deny any allegations inconsistent with any such video or transcript.

79.     The first sentence of paragraph 76 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof. Defendants deny all other allegations in paragraph 79 and demand strict proof thereof.

80.     Defendants deny the allegations in paragraph 80 and demand strict proof thereof.

81.     Defendants deny the allegations in the first sentence of paragraph 81. The remainder of the paragraph refers to a document which speaks for itself and does not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

82.     The allegations in paragraph 82 refer to a document which speaks for itself and does not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

83.     Defendants deny the allegations in the first phrase of paragraph 83. The remaining allegations in paragraph 83 refer to a document which speaks for itself and does not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

84.     Defendants deny the allegations in paragraph 84 and demand strict proof thereof, except to admit that she appeared on various television shows.

85.     Defendants deny the allegations in paragraph 85 and demand strict proof thereof.

86.     The allegations in paragraph 86 refer to a document which speaks for itself and

does not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

87.     Defendants deny the allegations in paragraph 87 and demand strict proof thereof.

88.     Defendants deny the allegations in paragraph 88 and demand strict proof thereof.

89.     Defendants deny the allegations in paragraph 89 and demand strict proof thereof. With respect to the quotes from documents referenced in paragraph 89, such documents speak for themselves, and no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

90.     Defendants deny the allegations in paragraph 90 and demand strict proof thereof. With respect to the quotes from documents referenced in paragraph 90, such documents speak for themselves, and no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

91.     Defendants deny the allegations in paragraph 91 and demand strict proof thereof. With respect to the quotes from documents referenced in paragraph 91, such documents speak for themselves, and no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

92.     Defendants deny the allegations in paragraph 92 and demand strict proof thereof.

93.     The allegations of paragraph 93 refer to a document which speaks for itself, and no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

94.     The allegations in paragraph 94 are sheer speculation and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

95.     Defendants deny the allegations in paragraph 95 and demand strict proof thereof.

96.     Defendants deny the allegations in paragraph 96 and demand strict proof thereof.

97.     Defendants deny the allegations in paragraph 97 and demand strict proof thereof.

98.     Defendants deny the allegations in the last sentence of paragraph 98 and demand strict proof thereof. The remainder of the paragraph refers to a document which speaks for itself and therefore no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

99.     The allegations in the last sentence of paragraph 99 refer to a document which speaks for itself and therefore no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof. The remaining allegations in paragraph 99 are based on sheer speculation and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

100.    Defendants deny the allegations in the last sentence of paragraph 100 and demand strict proof thereof. The remainder of paragraph 100 consists of rhetorical questions, rather than allegations, to which no response is required. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

101.    Defendants deny the allegations in paragraph 101 and demand strict proof thereof.

102.    Defendants deny the allegations in paragraph 102 and demand strict proof thereof.

103.    Defendants deny the allegations in paragraph 103 and demand strict proof thereof.

104.    Defendants deny the allegations in paragraph 104 and demand strict proof thereof.

105.    Defendants deny the allegations in the last two sentences of paragraph 105 and demand strict proof thereof. The remaining allegations in Paragraph 105 reference documents that speak for themselves and do not require a response. To the extent a response is required,

Defendants deny the allegations and demand strict proof thereof.

106.    Defendants deny the allegations in sentences 4, 5 and 11 of paragraph 106. Defendants lack information sufficient to form a belief as to the allegations in sentences 1, 2 and 3 of paragraph 106 and accordingly deny the allegations and demand strict proof thereof. As for the remaining allegations, they are based on documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

107.    Defendants deny the allegations in paragraph 107 and demand strict proof thereof.

108.    The allegations in paragraph 108 are based on documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof, except to admit that Michigan does not have an Edison County (*i.e.*, the declaration appears to contain a typographical error for the name of the county or the name of the state).

109.    Defendants deny the allegations in paragraph 109 and demand strict proof thereof.

110.    Defendants deny the allegations in paragraph 110 and demand strict proof thereof.

111.    Defendants deny the allegations in paragraph 111 and demand strict proof thereof.

112.    Defendants deny the allegations in paragraph 112 and demand strict proof thereof.

113.    Defendants deny the allegations in paragraph 113 and demand strict proof thereof.

114.    Defendants deny the allegations in paragraph 114 and demand strict proof thereof.

115.    Defendants deny the allegations in paragraph 115 and demand strict proof thereof.

116.    Defendants deny the allegations in paragraph 116 and demand strict proof thereof.

117.    Defendants deny the allegations in paragraph 117 and demand strict proof thereof.

118.    Defendants deny the allegations of paragraph 118 and demand strict proof thereof.

119.    Defendants lack information sufficient to form a belief as to the allegations in paragraph 119 and demand strict proof thereof.

120.    Defendants lack information sufficient to form a belief as to the allegations in paragraph 120 and accordingly deny the allegations and demand strict proof thereof.

121.    Defendants lack information sufficient to form a belief as to the allegations in the first sentence of paragraph 121 and accordingly deny the allegations and demand strict proof thereof. As for the remaining allegations, they are based on documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

122.    Defendants lack information sufficient to form a belief as to the allegations in the first phrase of paragraph 122 and accordingly deny the allegations and demand strict proof thereof. As for the remaining allegations, they are based on documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

123.    Defendants lack information sufficient to form a belief as to the allegations in the first phrase of paragraph 123 and accordingly deny the allegations and demand strict proof thereof. As for the remaining allegations, they are based on documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

124.    The allegations in paragraph 124 are based on documents that speak for themselves and therefore do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

125.    Defendants deny the allegations in the first phrase of paragraph 125 and demand

strict proof thereof. The remaining allegations in paragraph 125 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

126.    Defendants deny the allegations in the first phrase of paragraph 126 and demand strict proof thereof. The remaining allegations in paragraph 126 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

127.    The allegations in paragraph 127 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

128.    Defendants deny the allegations in the first sentence of paragraph 128 and demand strict proof thereof. The remaining allegations in paragraph 128 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

129.    The allegations in paragraph 129 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

130.    Defendants lack information sufficient to form a belief as to the allegations in the paragraph 130 and accordingly deny the allegations and demand strict proof thereof.

131.    Defendants deny the allegations in paragraph 131 and demand strict proof thereof.

132.    The allegations in paragraph 132 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

133.    The allegations in paragraph 133 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

134.    Defendants lack information sufficient to form a belief as to the allegations in the paragraph 134 and accordingly deny the allegations and demand strict proof thereof.

135.    Defendants lack information sufficient to form a belief as to the allegations in the paragraph 135 and accordingly deny the allegations and demand strict proof thereof.

136.    Defendants lack information sufficient to form a belief as to the allegations in the paragraph 136 and accordingly deny the allegations and demand strict proof thereof.

137.    Defendants lack information sufficient to form a belief as to the allegations in the paragraph 137 and accordingly deny the allegations and demand strict proof thereof.

138.    Defendants lack information sufficient to form a belief as to the allegations in the paragraph 138 and accordingly deny the allegations and demand strict proof thereof.

139.    Defendants deny the existence of a "viral disinformation campaign" as alleged in paragraph 139. As for the remaining allegations in paragraph 139, Defendants lack information sufficient to form a belief and accordingly deny the allegations and demand strict proof thereof.

140.    Defendants lack information sufficient to form a belief as to the allegations in paragraph 140 and accordingly deny the allegations and demand strict proof thereof.

141.    The allegations in paragraph 141 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

142.    Defendants lack information sufficient to form a belief as to the allegations in paragraph 142 and accordingly deny the allegations and demand strict proof thereof.

143.     Defendants deny the allegations in paragraph 143 and demand strict proof thereof.

144.     Defendants deny the existence of the "viral disinformation campaign" alleged in paragraph 144. The last sentence ins paragraph 144 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegation and demand strict proof thereof. As to the balance of paragraph 144, Defendants lack information sufficient to form a belief as to the allegations and accordingly deny the allegations and demand strict proof thereof.

145.     The allegations in paragraph 145 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

146.     The allegations in paragraph 146 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

147.     The allegations in paragraph 147 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

148.     Defendants deny the allegations in the first sentence of paragraph 148 and Defendants lack information sufficient to form a belief as to the remaining allegations in paragraph 148 and accordingly deny the allegations and demand strict proof thereof.

149.     Defendants admit that Zenger News published a PDF linked from its online article entitled "Sidney Powell's Legal Team Has Binder of Documents She Says Establish the 2020 Election was a Fraud," both of which—the PDF and the article—are documents that speak for themselves and do not require a response. Defendants further admit that Zenger News published a subsequent online article entitled "VIDEO: Sidney Powell Wants to Fight for Donald Trump – But

His Aides Won't Let Her, She Says," which is a document that speaks for itself and does not require a response. Defendants lack information sufficient to form a belief as to whether the Zenger News website was linked from the Kraken-Wood.com website with the caption "READ IT: SIDNEY POWELL PUBLISHED BINDER OF ELECTION FRAUD EVIDENCE" and accordingly deny the allegation and demand strict proof thereof. Defendants deny all other allegations in paragraph 149—including the suggestion that Ms. Powell controlled the Kraken-Wood.com website website—and demand strict proof thereof.

150.    Defendants deny the allegations in paragraph 150 and demand strict proof thereof.

151.    Defendants deny the allegations in paragraph 151 and demand strict proof thereof.

152.    Defendants deny the allegations in paragraph 152 and demand strict proof thereof.

153.    Defendants admit that Ms. Powell posted to sidneypowell.com a webpage titled "Evidence of Foreign Interference in the 2020 Election," which is a document that speaks for itself and does not require a response and which contains documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations in paragraph 153 and demand strict proof thereof.

154.    Defendants deny the allegations in paragraph 154 and demand strict proof thereof.

155.    Defendants deny the allegations in paragraph 155 and demand strict proof thereof.

156.    Defendants deny the allegations in the first sentence of paragraph156 and demand strict proof thereof. The remaining allegations in paragraph 156 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

157.    The allegations in the first sentence of paragraph 157 reference documents that speak for themselves and do not require a response. To the extent a response is required,

Defendants deny the allegations and demand strict proof thereof. Defendants lack information sufficient to form a belief as to the allegations in the second sentence of paragraph 157 and demand strict proof thereof.

158.    Defendants deny the allegations in paragraph 158 and demand strict proof thereof.

159.    Defendants Admit the allegations in paragraph 159.

160.    The allegations in paragraph 160 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

161.    Defendants deny the allegations in paragraph 161 and demand strict proof thereof.

162.    Defendants lack information sufficient to form a belief as to the allegations in paragraph 162 and accordingly deny the allegations and demand strict proof thereof.

163.    The allegations in paragraph 163 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

164.    Paragraph 164 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 164 and demand strict proof thereof.

165.    Paragraph 165 states a legal conclusion to which no response is required although Defendants deny the existence of any "sham litigations." To the extent a response is required, Defendants deny the allegations in paragraph 165 and demand strict proof thereof.

166.    Paragraph 166 states legal conclusions to which no response is required and refers to court filings, which are documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations in paragraph 166 and demand

strict proof thereof.

167.    Paragraph 167 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 167 and demand strict proof thereof.

168.    Paragraph 168 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 164 and demand strict proof thereof.

169.    Defendants deny the allegations in paragraph 169 and demand strict proof thereof.

170.    Defendants deny the allegations in paragraph 170 and demand strict proof thereof.

171.    Defendants admit the allegations in the first sentence of paragraph 171 but deny the remaining allegations and demand strict proof thereof.

172.    Defendants deny the allegations in paragraph 172 and demand strict proof thereof.

173.    The allegations in paragraph 173 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

174.    The allegations in paragraph 174 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

175.    The allegations of paragraph 175 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

176.    The allegations of paragraph 176 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations

and demand strict proof thereof.

177.    The allegations in paragraph 177 reference documents that speak for themselves and do not require a response. To the extent a response is required, Defendants deny the allegations and demand strict proof thereof.

178.    Defendants lack information sufficient to form a belief as to the allegations in paragraph 178 and demand strict proof thereof.

179.    Defendants deny the allegations in paragraph 179 and demand strict proof thereof.

### COUNT ONE- DEFAMATION *PER SE*

180.    Defendants repeat and reassert each of the foregoing paragraphs as if fully set forth herein.

181.    Paragraph 181 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 181 and demand strict proof thereof.

182.    Paragraph 182 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 182 and demand strict proof thereof.

183.    Defendants deny the allegations in paragraph 183 and demand strict proof thereof, except to state that when referencing the video Ms. Powell intended to reference a video of a press statement by Antonio Mugica—founder of Smartmatic—rather than a video of Dominion's founder.

184.    Paragraph 184 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 184 and demand strict proof thereof.

185.    Paragraph 185 states a legal conclusion to which no response is required. To the

extent a response is required, Defendants deny the allegations in paragraph 185 and demand strict proof thereof.

186.    Paragraph 186 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 186 and demand strict proof thereof.

187.    Paragraph 187 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 187 and demand strict proof thereof.

188.    Paragraph 188 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 188 and demand strict proof thereof.

189.    Paragraph 189 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 189 and demand strict proof thereof.

190.    Paragraph 190 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 190 and demand strict proof thereof.

## COUNT TWO - DECEPTIVE TRADE PRACTICES

191.    Defendants repeat and reassert each of the foregoing paragraphs as if set forth fully herein.

192.    Paragraph 192 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 192 and demand strict proof thereof.

193.    Paragraph 193 states a legal conclusion to which no response is required. To the

extent a response is required, Defendants deny the allegations in paragraph 193 and demand strict proof thereof.

194.    Paragraph 194 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 194 and demand strict proof thereof.

195.    Paragraph 195 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 195 and demand strict proof thereof.

196.    Paragraph 196 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 196 and demand strict proof thereof.

WHEREFORE, having fully answered, Defendants respectfully request that the Complaint be dismissed with prejudice, and that Defendants be awarded their costs, attorney fees and such other and further relief as this Court deems appropriate.

## COUNTERCLAIM

Counterclaim Plaintiffs allege on knowledge as to themselves and upon information and belief as to all other matters as follows:

## NATURE OF ACTION

1.    Dominion brought this case to punish and make an example of Sidney Powell—a former federal prosecutor who prosecuted 300 appeals on behalf of the United States—for speaking out and drawing attention to the vulnerabilities in Dominion's election machines and software. Dominion did not bring this litigation with the primary purpose of winning, much less of recovering money damages. Dominion's entire annual revenue is not even 10% of the $1.3 billion Dominion seeks from Defendants here and less than 1% of the $10.6 billion Dominion

seeks in its array of similar litigation against others who questioned or reported on Dominion's practices.

2.    Continued focus on the vulnerabilities of Dominion's voting systems would not only hurt its business but also open up its executives—who swore before legislative committees and assured countless state election officials that Dominion's systems were stand alone, impenetrable and fail safe—to civil and likely criminal prosecutions.

3.    Contrary to those sworn statements and assurances, Dominion's own patents and instruction manuals expressly provide for remote access to real-time election results; remote access to adjudicate votes or to *flip* votes; deletion of audit logs and votes; and other vulnerabilities. All of these vulnerabilities were present in Dominion voting equipment and software in the 2020 Presidential election.

4.    To avoid having these underlying facts surface in public, Dominion developed this litigation and the related cases as a public-relations campaign to change the narrative, to hide the truth, and to discourage future challenges and negative reporting. As part of this campaign, Dominion filed seriatim billion-dollar-plus lawsuits in 2021 against separate defendants starting with Ms. Powell on January 8, to Mr. Giuliani on January 25, to Mr. Lindell in February, to Fox News in March and its most recent flurry on August 10, against Newsmax, OAN and Patrick Byrne. Combined, these lawsuits seek nearly $10.6 billion in damages against Dominion's annual revenue of between $36 and $100 million. Adam Andrzejewski, *Dominion Voting Systems Received $120 Million From 19 States And 133 Local Governments To Provide Election Services*

*(2017-2019)* FORBES (Dec. 8, 2020).[1] For every separate lawsuit, Dominion generated national press coverage with the intent of perpetuating its false narrative concerning its voting systems.

5.     But Dominion did not stop at filing seven separate lawsuits, all of which could have been brough in a single proceeding in this court under Dominion's flawed theories of personal jurisdiction and venue. Dominion also sent out over 150 vicious and threatening cease-and-desist letters to non-public figures who merely tweeted their opinion online and to witnesses, parties, attorneys and experts who came forward to help shine light on the flaws of Dominion's voting systems.

6.     Dominion's conduct is an abuse of process. Counterclaim Plaintiffs seek not less than $10 million in damages, plus punitive damages in an amount to be determined by a jury.

## **PARTIES**

7.     Counterclaim plaintiff Sidney Powell is an individual domiciled in the State of Texas.

8.     Counterclaim plaintiff Sidney Powell, P.C. is a Texas professional corporation with its principal place of business in Texas.

9.     Counterclaim plaintiff Defending the Republic, Inc., is a Texas nonprofit corporation with its principal place of business in Texas.

10.     Counterclaim defendant US Dominion, Inc. is a for-profit Delaware corporation with its principal place of business in Denver, Colorado.

11.     Counterclaim defendant Dominion Voting Systems, Inc. is a for-profit Delaware

---

[1]     Available at https://www.forbes.com/sites/adamandrzejewski/2020/12/08/dominion-voting-systems-received-120-million-from-19-states-and-133-local-governments-to-provide-election-services-2017-2019/ (last visited Sept. 24, 2021).

corporation with its principal place of business in Denver, Colorado.

12.     Counterclaim defendant Dominion Voting Systems Corporation is a for-profit Ontario corporation with its principal place of business in Toronto, Ontario.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this Counterclaim pursuant to 28 U.S.C. §§ 1332(a), 1367(a), in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and the matter is between citizens of different states, with supplemental jurisdiction over any claims arising from the same Dominion conduct but falling outside diversity jurisdiction.

14.     Venue is proper for the counterclaim in this District pursuant to 28 U.S.C. § 1391(b)(2)-(3) based on Dominion's abuse of process in this Court.

## FACTUAL ALLEGATIONS

15.     Dominion "contracts with state and local governments to provide its voting systems and services in a majority of states in the country." *See* Dominion's Complaint ("Comp."), ECF No. 1 at ¶ 33.

16.     According to Dominion, its voting systems were used in 1,635 jurisdictions in the 2016 United States Presidential election, and in 2020 it had contracts in 28 states and Puerto Rico. *Id.* at ¶¶ 33, 36.

### Dominion's History of Vulnerable Voting Systems

17.     Following the 2020 presidential election, Dominion's voting systems were publicly criticized for their vulnerability to hacking and for other flaws in their performance. Dominion has tried to deflect such criticism by characterizing it as partisan complaints from disgruntled voters, media, and organizations whose candidates lost. But the truth is that Dominion's voting systems have been scrutinized and publicly labeled as deficient for many years prior to the 2020 election.

The negative publicity Dominion faces today, and the diminution of its reputation, is nothing new.

18.     For example, in 2016, a citizen's rights organization and several individual voters filed a lawsuit in the United States District Court for the Northern District of Georgia alleging, *inter alia,* that "sophisticated hackers – whether Russian or otherwise – had the capability and intent to manipulate elections in the United States. *See Curling v. Raffensperger*, No. 1:17-cv-2989-AT, (N.D. Ga.), Amended Complaint at 4, ECF No. 15.

19.     In August of 2020, the plaintiffs in *Curling* filed a motion for a preliminary injunction claiming that Dominion's voting system (which the State of Georgia had contracted for use in the 2020 elections) was unconstitutionally insecure and deficient, and asking the Court, *inter alia,* to enjoin the proposed use of Dominion's ballot marking devices and to require additional protections to prevent inaccurate and unverifiable vote tabulations. *See generally Curling v. Raffensperger,* Coalition Plaintiffs' Brief in Support of Motion for Preliminary Injunction, *id.* at ECF No. 809-1.

20.     In October 2020, Judge Amy Totenberg of the United States District Court for the Northern District of Georgia issued a decision on the plaintiffs' request for injunctive relief. Although she did not grant the relief—in part due to the closeness in time of the impending election—she did find a "huge volume of significant evidence" regarding security risks in Dominion's systems. *See Curling v. Raffensperger,* 493 F. Supp. 3d 1264, 1278 (N.D. Ga. 2020). She further observed, *inter alia,* that

> [t]he insularity of ... Dominion's stance here in evaluation and management of the security and vulnerability of the [Ballot Marking Device] system does not benefit the public or citizens' confident exercise of the franchise ...The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implemented....

> The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of "might this actually ever happen?" – but "when it will happen," especially if further protective measures are not taken.

*Id.* at 1341.

21.     Specifically, upon evaluating "the declarations and testimony of the proffered national cybersecurity experts in this case," she acknowledged that a "broad consensus now exists among the nation's cybersecurity experts recognizing the capacity for the unobserved injection of malware into computer systems to circumvent and access key codes and hash values to generate fraudulent codes and data." *Id.* at 1280. She noted that "in these experts' views, these risk issues are in play in the operation of Dominion's Democracy Suite 5.5-A GA and take on greater significance because the system is one that does not provide a verifiable and auditable ballot record because it relies on the QR code for vote tabulation and that code itself cannot be read and verified by the voter." *Id.*

22.     Moreover, Judge Totenberg raised issues regarding the adjudication features of the Dominion system, stating. "[t]here is no question that the default scanner settings used in elections conducted to date on the Dominion system caused certain voter marks to register as blank and therefore prevented some valid votes on hand-marked ballots from being counted." *Id*. at 1332. She concludes that "[u]nder the current procedures used with the Dominion system, these votes escape any review before being rejected—resulting in irreversible voter disenfranchisement." *Id.*

23.     While the court did not grant the requested relief "based on pragmatic timing considerations where absentee voting ha[d] already begun," *id.,* the court's opinion highlighted the many insecurities of the Dominion system, including many issues which were questioned and highlighted surrounding the 2020 election.

24.     While in litigation in Georgia, Dominion sought to have its Democracy Suite 5.5-

A voting system certified for use in the State of Texas.

25.     Texas refused to certify Dominion's system on or about on January 24, 2020. The state-appointed examiners of Dominion's system concluded that "the examiner reports raise concerns about whether the Democracy Suite 5.5-A system is suitable for its intended purpose; operates efficiently and accurately; and is safe from fraudulent or unauthorized manipulation." State of Texas, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A at 2.[2] Indeed, of the examiners appointed to analyze the system concluded that "[t]here was not a single component examined that I would recommend for use in elections in the State of Texas." Brian Mechler, Technical Examiner, *Voting System Examination of Dominion Voting Systems Democracy Suite 5.5*, Section 9. (February 15, 2019) ("Voting System Examination" or "VSE").[3] Among the deficiencies found by the State of Texas were the following:

- Dominion's Election Management System has two different hardware configurations—the Express Configuration, used in smaller jurisdictions, and the Standard Configuration, used in larger jurisdictions. The VSE did not recommend the use of either configuration in the State of Texas because of the "complexity of configuration and the inability to recover adjudication decisions after a crash of the adjudication services." *VSE*, Section 2.12. See also *VSE* Sections 2.13, 2.22 and 2.2.3.

- Regarding the Image Cast Precinct ("ICP"), which is the voting system's optical scan ballot counter, the VSE found that the ICP did "not sufficiently preserve the secrecy of the ballot"

---

[2]     Available at https://www.sos.texas.gov/elections/forms/sysexam/dominion-d-suite-5.5-a.pdf (last visited Sept. 24, 2021).

[3]     Available at  https://www.sos.texas.gov/elections/forms/sysexam/jan2019-mechler.pdf (last visited Sept. 24, 2021).

nor did it "keep the system safe from fraud or unauthorized manipulation." *VSE*, Section 4.3.

- Image Cast X refers generically to the set of tablets Dominion uses as a platform for its Prime Direct-Recording Electronic ("DRE") Voting Machine and for its Prime Ballot Marking Device ("BMD"). The VSE found that the DRE, when connected to Dominion's VVPAT, which prints ballots in the order cast, "is not safe from fraudulent or unauthorized manipulation due to insufficiently secured data ports in combination with the inability to detect hardware changes under certain circumstances. *VSE*, Section 5.2. For the same reasons, the VSE also found that the BMD was 'not safe from fraudulent or unauthorized manipulations." *VSE*, Section 6.3.

Dominion had a full and fair opportunity not only to present its positions to the State of Texas but also to challenge any adverse findings about the technical deficiencies of Dominion's voting systems. Dominion did not challenge the State of Texas's findings.

26.     Separately, for years, Congressional leaders have expressed serious concerns about the threats to our democracy posed by electronic voting systems such as those marketed by Dominion. Democratic Senators Elizabeth Warren (D-MA) and Amy Klobuchar (D-MN) have been particularly notable voices in the effort to expose electronic voting system vulnerabilities and to improve voting security. Indeed, on March 27, 2019, Sen. Klobuchar along with Senators Mark Warner (D-VA), Jack Reed (D-RI), and Gary Peters (D-MI) penned a letter to the Chief Executive Officers of the three largest election equipment vendors—including Dominion Voting Systems—expressing their concerns about voting machine vulnerabilities:

> The integrity of our elections remains under serious threat. Our nation's intelligence agencies continue to raise the alarm that foreign adversaries are actively trying to undermine our system of

democracy, and will target the 2020 elections as they did the 2016 and 2018 elections....

Despite the progress that has been made, election security experts and federal and state government officials continue to warn that more must be done to fortify our election systems. Of particular concern is the fact that many of the machines that Americans use to vote have not been meaningfully updated in nearly two decades. Although each of your companies has a combination of older legacy machines and newer systems, vulnerabilities in each present a problem for the security of our democracy and they must be addressed....

The integrity of our elections is directly tied to the machines we vote on – the products that you make. Despite shouldering such a massive responsibility, there has been a lack of meaningful innovation in the election vendor industry and our democracy is paying the price.

*Letter to CEOs of Hart InterCivic, Inc., Election Systems & Software, LLC, and Dominion Voting*

*Systems*, at 3-4 (Mar. 27, 2019).[4]

27.     A report by NBC in 2020 raised additional alarms. Although Dominion has claimed

that its machines have no connection to the internet, the NBC report showed this to be false:

Dominion "acknowledged [it] put[s] modems in some of [its] tabulators and scanners. Those

modems connect to cell phone networks which in turn are connected to the internet."[5]

28.     The dangers of such internet connections were summarized by Senator Wyden

during an interview wherein he stated that "today you can have a voting machine with an open

connection to the internet, which is the equivalent of stashing American ballots in the Kremlin...

what we will see in terms of foreign interference in 2020 is going to make 2016 look like small

---

[4]     Available    at    https://www.klobuchar.senate.gov/public/index.cfm/2019/3/ranking-members-klobuchar-warner-reed-and-peters-press-election-equipment-manufacturers-on-security (last visited Sept. 24, 2021).

[5]     Available at https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436 (last visited Sept. 24, 2021).

potatoes." Mark Sullivan, *Senator Ron Wyden: The GOP is 'making a mockery' of election security*, FAST COMPANY (Feb. 19, 2020).[6]

29.     The vulnerabilities of Dominion's election voting machines, as well as those of other companies, were the subject of the 2020 HBO documentary *Kill Chain: The Cyber War on America's Elections*. Simon Ardizzome, Russell Michaels and Sarah Teale*, Kill Chain: the Cyber War on America's Elections,* HBO (Mar. 26, 2020).[7] In that broadcast, Harri Hursti, a data security expert, showed how he hacked a Dominion voting machine that was scheduled to be used in 20 states for the 2020 presidential election. Prof. Philip Stark derided Dominion in *Kill Chain*, concluding it was no better than hand-marked paper ballots: "It is far more expensive than hand marked paper ballots, it is a vehicle for disenfranchisement in a number of different ways. Other than feeding corporate profits and making it easier to manipulate election outcomes, I don't really see the point."

30.     Consistent with the concerns expressed in the media and by congressional leaders such as Senators Warren, Klobuchar, Warner, Reed, and Peters, complaints about Dominion and its voting systems continued up to, during and after the 2020 United States Presidential election. Complaints regarding and challenges to vote-counting and reporting were being raised even as the votes were being tabulated and before final results were announced.

31.     The relevant patents for—and history of—electronic voting systems support the widespread public concern about the possibility of hacking an election.

---

[6]     Available   at   https://www.fastcompany.com/90465001/senator-ron-wyden-the-gop-is-making-amockery-of-election-security (last visited Sept. 24, 2021).

[7]     Available                                                                                      at https://play.hbomax.com/feature/um:HBO:feature:GXkyd30AJHl7CZgEAACa0?reentered=true &userProfileType=liteUserProfile (last visited Sept. 24, 2021).

32.     Dominion's patents, contracts, and user guides demonstrate the truth of Ms. Powell's descriptions of Dominion's capability and conduct. The objective fact that Dominion could—and machines did—change votes is proved by the patents themselves, Dominion's own manuals, and the features it sold to various swing states.

33.     Dominion's patents have described and claimed the allegedly defamatory functions nearly verbatim; the user guides to the Dominion election equipment describe how these functions are implemented in the machines; the contracts Dominion has signed with the states show that these functions are employed in our elections; other patents show that physical ballot counts are not sufficient backstops.  Even a matching ballot count proves nothing.

34.     Dominion's U.S. Patent No. 9,202,113 protects software designed to "change one or more votes" through an adjudication process that occurs "locally or remotely." U.S. Patent No. 9,202,113 (filed Nov. 12, 2014, issued Dec. 1, 2015).[8] The patent's specification (or the description of the invention) describes adjudication as a method by which election officials "may confirm, correct, or appropriately change one or more votes recorded for the particular ballot" using "an adjudication system that is located either locally or remotely." *Id.* "Remote" access implies a networked device, and Figure 7 of the patent shows a network connection. *Id.* This adjudication function—and the risk if error occurs or bad actors get involved—was part of the reason Texas refused to license the technology:

> During adjudication of the ballots in the test election one of the Dominion representatives made a series of mistakes that caused the entire batch of adjudication results to be lost. . . . It's hard to argue that such a system is suitable for its intended purpose. Recommendation: Certification should be denied.

---

[8]     Available at https://perma.cc/PU6F-EUWH (last visited Sept. 24, 2021).

James Sneeringer, Ph.D. Designee of Attorney General: *Report to Texas Secretary of State, Voting System Examination Dominion Voting Systems Democracy Suite 5.5-A*, at 3 (Nov. 3, 2019).[9] For example, a Fulton County (Georgia) election official reported 106,000 adjudications out of 113,000 ballots in the 2020 election. This was an egregious and impermissible adjudication rate of 74%.

35.    On July 26, 2019, Arizona's Maricopa County contracted for an Election Tabulation System. Maricopa County, AZ, Elections Tabulation System, Contract 190265-RFP (July 26, 2019) [10] The contract leases the Adjudication hardware and includes a separate fee for the Adjudication software and the Adjudication license. *Id.* at 1-2 of section entitled Exhibit A: Contractor Information/Pricing (PDF page 19-20).

36.    In July 20219, Georgia's Secretary of State signed a $107 million contract with Dominion's CEO to provide the ImageCast system in Georgia. GA Sec. State, Master Solution Purchase And Services Agreement by and Between Dominion Voting Systems Inc. and Secretary of State of the State of Georgia (July 29, 2019).[11]   Georgia also bought one Adjudication Module Initial License, along with the Adjudication Annual Licensing Fee. *Id.* at 93-95. Pennsylvania's Luzerne County paid for the "Adjudication Application – Initial Licensing Fee"; the county paid a fee for the ImageCast Central Adjudication Application License, Luzerne County, PA, Contract

---

[9]    Available  at  https://www.sos.texas.gov/elections/forms/sysexam/oct2019-sneeringer.pdf (last visited Sept. 24, 2021).

[10]    Available at https://www.clerkofcourt.maricopa.gov/home/showpublisheddocument/2000/637441427327330 000 and https://perma.cc/T7RU-CUNS (last visited Sept. 24, 2021).

[11]    Available at  https://gaverifiedvoting.org/pdf/20190729-GA-Dominion-Contract.pdf and https://perma.cc/36DS-T2HB (last visited Sept. 24, 2021).

with Dominion Voting Systems, Luzerne County Voting System Purchase Agreement, 1-2 (Nov. 26, 2019);[12] Luzerne County, PA, Council, Resolution R-2019-123 (Dec. 3, 2019)[13], and a separate fee for the Adjudication Workstation Configuration Kit. *Id.* at 1.

37.     Dominion also patented the technology to run vote "simulation scripts" using a "wireless communication device" patented ostensibly to test voting machines using "pre-canned scanned ballot images or PDF images of ballots with machine generated marks." U.S. Patent No. 8,876,002 (filed Apr. 22, 2011, issued Nov. 4, 2014).[14] This 'Test Deck Generator Utility' can create physical ballots that can augment election results if they are not caught and carefully deleted. Such an outcome-altering "error" was just caught in the Democratic primary for mayor of New York City.  As reported: the race "was thrown into a state of confusion Tuesday when election officials retracted their latest report on the vote count after realizing it had been corrupted by test data never cleared from a computer system." Karen Matthews & Deepti Hajela, *Error mars vote count in NYC mayoral primary* ASSOCIATED PRESS (June 30, 2021).[15]

38.     The user guide to Dominion's ImageCast X describes the 'Vote Simulation' feature in detail. Democracy Suite ImageCast X User Guide: Version: 5.11-CO::9, Appendix B, 144 (June

---

[12]     Available at https://perma.cc/DXG2-7ASX and https://www.luzernecounty.org/AgendaCenter/ViewFile/Agenda/_11262019-1617 (last visited Sept. 24, 2021).

[13]     Available at https://www.luzernecounty.org/DocumentCenter/View/18691/R-2019-123-Proposed-Resolution---Voting-Machine-signed and https://perma.cc/4CLV-RX88 (last visited Sept. 24, 2021).

[14]     Available at https://perma.cc/D553-TV3M (last visited Sept. 24, 2021).

[15]     Available at https://apnews.com/article/eric-adams-lead-shrinks-nyc-democratic-mayor-primary-0c92450b5dbb57018e2f8e15d8471a97 (last visited Sept. 24, 2021).

5, 2019).[16] The simulation script is designed to produce ballots in accordance with an "XML file [which] can be edited manually" if "personalized data" is required. *Id.*, 144 (App. B). Furthermore, the XML file which is the source of the vote simulation script can be personalized, according to the User's Manual. *Id.*

39.     Pages 14 and 15 of the ImageCast X User Guide show that the Vote Simulator utilizes the Automated Test Deck file when operating the script. *Id.* at 14 ("Vote sim (Test deck file)"); *Id.* at 154 ("The available options are enabled depending on the Automated Test Deck file provided for the testing. If the View ballots being marked box is checked, the ballots will be marked on-screen, if the Test Deck file supports it."). The Test Deck Generator Utility uses "an Election Day database, a series of pre-marked ballots are generated based on a computer algorithm designed to provide the highest assurance of system accuracy." GA Sec. State, Contract: New Voting System Event number: 47800-SOS0000035, 59 (Aug. 2018).[17]

40.     The ImageCast X is used by most swing states, including, but not limited to, Arizona, Georgia, and Pennsylvania. The Automated Test Deck application was also used in Arizona, Georgia, and Pennsylvania.

41.     Assorted Dominion patents further illustrate the incorporation of precinct-specific algorithms utilized in vote tabulation process. Digital Image Processing algorithms. See U.S. Patent No. 8,864,026 (filed Apr. 22, 2011, issued Oct. 21, 2014).[18] The sixth claim of the patent

---

[16]     Available at https://www.sos.state.co.us/pubs/elections/VotingSystems/DVS-DemocracySuite511/documentation/UG-ICX-UserGuide-5-11-CO.pdf and https://perma.cc/333M-LYHV (last visited Sept. 24, 2021).

[17]     Available at https://sos.ga.gov/admin/files/Dominion%20RFI_No%20Redactions.pdf and https://perma.cc/S5AW-7YTR (last visited Sept. 24, 2021).

[18]     Available at https://perma.cc/4Y8P-W74J (last visited Sept. 24, 2021).

protects the DIP algorithm, which is programmed with precinct-specific ballot data to "correct for at least one of the speckling, dirt, smears, and bleed through." *Id.* at claim 6. According to U.S. Patent 9,202,113, these pixel levels are "defined by election officials" and are "loaded on each tabulation unit."[19]

42.     Dominion also patented the technology to run vote "simulation scripts" using a "wireless communication device" patented ostensibly to test voting machines using "pre-canned scanned ballot images or PDF images of ballots with machine generated marks." U.S. Patent No. 8,876,002 (filed Apr. 22, 2011, issued Nov. 4, 2014).[20] This 'Test Deck Generator Utility' can create physical ballots that can augment election results if they are not caught and carefully deleted: Such an outcome-altering "error" was just caught in the Democratic primary for mayor of New York City. As reported, the race "was thrown into a state of confusion Tuesday when election officials retracted their latest report on the vote count after realizing it had been corrupted by test data never cleared from a computer system." Karen Matthews & Deepti Hajela, *Error mars vote count in NYC mayoral primary* ASSOCIATED PRESS (June 30, 2021).[21]

### Dominion's Lawfare Campaign

43.     Against this backdrop of Dominion's concern about the attention directed to the

---

[19]     *Supra* note 8 at col. 6 ll. 30-39 ("The determination of a vote, non-vote, or ambiguous mark is made according to pixel levels *defined by election officials* at a given time prior to the election. According to some embodiments, election officials may define, in pixels, the minimum pixel count that is to be classified as a 'vote,' the maximum pixel count (if any) that is to be defined as a definite 'non vote,' and a range of pixels in between those values that will constitute an 'ambiguous mark.' *These pixel values are loaded on each tabulation unit*.") (emphasis added).

[20]     Available at https://perma.cc/D553-TV3M (last visited Sept. 24, 2021).

[21]     Available at https://apnews.com/article/eric-adams-lead-shrinks-nyc-democratic-mayor-primary-0c92450b5dbb57018e2f8e15d8471a97 (last visited Sept. 24, 2021).

vulnerabilities in its voting systems, Dominion launched high-profile litigation. Dominion initiated a public relations and suppression campaign designed to silence anyone and everyone who had dared or might date to question the reliability of Dominion's enterprise and—with regard to this particular lawsuit—to tarnish the reputations of Sidney Powell and Defending the Republic, Inc.

44.     To lead this campaign, Dominion retained a public relations firm—Hamilton Place Strategies ("Hamilton")—with a reputation for aggressive campaigns to devise a public relations strategy intended to silence those who had been or might be critical of Dominion and to help restore Dominion's increasingly negative public reputation.

45.     The use of litigation—known as lawfare—is a favorite public relations tactic of the Hamilton firm. In its website promoting its services, Hamilton touts its work for a former client where Hamilton "*hired and managed* outside legal counsel" and "[e]stablished clear workflow processes between legal, communications, and political advisory teams." Hamilton Place Strategies, "Managing a Reputational Crisis for Genetics Lab's COVID Testing Program" (2021) (emphasis added).[22]

46.     Dominion launched a barrage of cease-and-desist letters, which Dominion's website touts for the widespread nature of the campaign: "Dominion has also sent preservation request letters to Powell, Giuliani, Fox, OAN, and Newsmax, as well as more than 150 other individuals and news organizations. Stay tuned to this page for updates." Dominion Voting, *Legal Updates* (2021).[23] Through this page, Dominion directly links its 15 (fifteen) page demand letter

---

[22]     Available at https://hamiltonplacestrategies.com/case-study/advagenix-case-study/ (last visited Sept. 24, 2021).

[23]     Available at https://www.dominionvoting.com/legal-updates-learn-how-we-are-defending-dominion/ (last visited Sept. 24, 2021).

sent to Ms. Powell. *Id.*

47.     To start, Dominion targeted at least two attorneys whose signature blocks appeared on Ms. Powell's election lawsuits in November and December. Despite never once making a public statement regarding Dominion, these two attorneys received a letter demanding that they "cease and desist making defamatory claims against Dominion."

48.     Dominion also sent cease-and-desist letters to experts and witnesses whose sworn affidavits or work product appeared as exhibits to Ms. Powell's election complaints. Many of these experts and witnesses, upon information and belief, never once made public statements regarding Dominion aside from their sworn testimonies filed as court documents. Yet still, they were demanded to "cease and desist making defamatory claims against Dominion," as if their sworn testimonies—under penalty of perjury—warranted any grounds for litigation or the threat thereof.

49.     On information and belief, Dominion did not barrage the participants in *Kill Chain* with cease-and-desist letters, threaten them with massive litigation, or sue any of the speakers, producers, or experts associated with the documentary.

50.     Egregiously, Dominion targeted Ms. Powell's clients—those whom she represented in the election related litigation in November and December—despite *knowing* these clients were actively represented by counsel, Dominion and its counsel communicated directly with them through cease-and-desist letters. These letters demanded that the recipients "cease and desist taking part in defaming Dominion" and demanded that Ms. Powell's clients preserve all communications with their lawyer.

51.     As if the threat of litigation through these letters alone was not enough to silence its critics, Dominion launched a robust media campaign regarding the litigation. Through interviews with Dominion CEO John Poulos and Dominion litigation counsel Tom Clare,

Dominion reinforced to all who received a cease-and-desist letter that they too were a potential target for litigation.

52.     Dominion CEO John Poulos, when asked "is this the last lawsuit we are going to see from you or are there other people in your sights here?" replied, "this is definitely not the last lawsuit. As I have said many times before…we are not ruling anyone out." *Dominion Voting Systems CEO says company's intention is to get the facts on the table*, REUTERS (Feb. 23, 2021).[24]

53.     In a CNN interview, Poulos states, "our legal team is looking, frankly, at everyone…and we are not ruling anyone out." Chris Cuomo Primetime Interview, *'We have no choice' - Dominion CEO to Chris Cuomo on why the company is filing defamation lawsuits'*, CNN (Jan. 25, 2021).[25]

54.     Dominion counsel Tom Clare reemphasized this point to Reuters Legal, stating, "We're going to look at all the other individuals that played a role in spreading these falsehoods." David Thomas, *Q&A: Tom Clare vows 'more to come' as Dominion seeks billions over election fraud claims*, REUTERS LEGAL (Jan. 26, 2021).[26] He later promised there is "more to come" in the Dominion defamation cases. *Id.*

55.     Hamilton and Dominion implemented Hamilton's litigation strategy as part of Dominion's public relations campaign. Specifically, beginning in January 2021, Dominion

---

[24]     Available at https://www.cnbc.com/video/2021/02/23/dominion-voting-systems-ceo-our-intent-is-to-get-facts-on-the-table.html (last visited Sept. 24, 2021).

[25]     Available at https://www.youtube.com/watch?v=65qx-4g2bSc (last visited Sept. 24, 2021).

[26]     Available                                                                                          at https://today.westlaw.com/Document/I3efd5ed0602911ebabbbcc218bedca1f/View/FullText.html (last visited Sept. 24, 2021).

initiated a series of defamation lawsuits against individuals and entities who either expressed or permitted any criticism of Dominion or its voting systems. As indicated, the litigation was a coordinated intimidation of scores of regular Americans—whose only offenses were participating in electoral democracy or in First Amendment activity associated with speaking about elections or petitioning government—with threatening cease-and-desist letters. Dominion then staggered the lawsuits to benefit from separate and repeated media coverage for each suit thereby continuing its diversionary narrative through multiple press cycles.

56.    As noted in other litigation, this message was reinforced by Dominion's counsel sending at least 150 letters threatening legal action against individuals who spoke out about 2020 election irregularities, in some cases notwithstanding the fact that the recipients had not mentioned anything about Dominion or its voting systems. *Lindell v. U.S. Dominion Inc.,* Case No. 1:21-cv-02296-RBW (D.D.C.), Complaint at ¶ 112 (ECF- 1). At the same time, Dominion's public relations hired gun, Hamilton, distributed the cease-and-desist letters to major media outlets.

57.    The tone and content of the letters leave no doubt that Dominion intended for the correspondence to strike fear in the heart of anyone who might say anything negative about Dominion. For example, in a February 2, 2021, letter to an individual who had prepared a series of reports questioning the presidential election results, Dominion attorneys Clare Locke demanded that the individual issue a public apology and made a not-so-veiled threat that litigation would ensue if their demand were not met: "Dominion has already filed suits against Sidney Powell and Rudy Giuliani. More will follow…. Conduct yourself accordingly." Clare Locke letter to Benjamin Turner (Feb. 2, 2021). To ensure that the individual understood the scope and expense of the threatened litigation, Dominion's lawyers not only mentioned the pending litigation, but they also included with their letter copies of "***Dominion's complaints against Powell and Giuliani (and the***

***voluminous exhibits supporting those complaints) so that there is absolutely no doubt in the future that you are fully aware of the facts***." *Id.* (emphasis in original). On the advice of Hamilton and on their own, Dominion and its lawyers intended for their inordinately excessive filings to intimidate the recipients.

58.     Specifically, Dominion sued Ms. Powell in this Court on January 8, 2021, for the sensational sum of $1.3 billion. This generated widespread press coverage. *Dominion sues Trump lawyer Sidney Powell for defamation* ASSOCIATED PRESS (Jan. 8, 2021).[27] On January 25, 2021, Dominion sued Rudy Giuliani for $1.3 billion (also in this District); adding more press coverage. *Rudy Giuliani Sued by Dominion Voting Systems Over False Election Claims* N.Y. TIMES (Jan. 25, 2021).[28] On February 22, 2021, Dominion sued Michael Lindell and his company My Pillow Inc. in this district for $1.3 billion. This generated another round of publicity for Dominion. *Dominion Sues MyPillow, CEO Mike Lindell Over Election Claims*, WALL ST. J. (Feb. 22, 2021).[29] On March 26, 2021, Dominion sued Fox News in Delaware state court for $1.6 billion. This kept the narrative going in the press. *Dominion Voting Systems Files $1.6 Billion Defamation Lawsuit Against Fox News*, NPR (Mar. 26, 2021).[30] On August 10, 2021, Dominion sued Patrick Byrne (this district), OANN (this district) and Newsmax (Delaware) in three separate lawsuits, seeking

---

[27]     Available     at     https://apnews.com/article/dominion-lawsuit-sidney-powell-0031ce89ba24bdeae0402861e20ede69 (last visited Sept. 24, 2021).

[28]     Available at  https://www.nytimes.com/2021/01/25/us/politics/rudy-giuliani-dominion-trump.html (last visited Sept. 24, 2021).

[29]     Available at  https://www.wsj.com/articles/dominion-sues-mypillow-ceo-mike-lindell-over-election-claims-11613996104 (last visited Sept. 24, 2021).

[30]     Available at https://www.npr.org/2021/03/26/981515184/dominion-voting-systems-files-1-6-billion-defamation-lawsuit-against-fox-news (last visited Sept. 24, 2021).

$1.6 billion in each one. *Dominion Sues Newsmax, OANN And Ex-Overstock CEO Byrne In New Defamation Suits Over Election Conspiracy Theory* FORBES (Aug. 10, 2021).[31]

59.     Because Dominion's annual revenues are between $36 and $100 million, it is evident that Dominion does not expect to recover the grossly exaggerated damage amounts alleged in the lawsuit—without any attempt to plead special damages such as lost profits under the heightened pleading requirements of FED. R. CIV. P. 9(g)—against Defendants or any other parties Dominion has sued. There is simply no plausible way Dominion can prove—much less collect—the cumulative $10.6 billion in damages it seeks from all the parties it has separately sued. Far from serious litigation, this suit and the others are part of public relations strategy designed to burnish Dominion's image with press and to staunch criticism with actual and implied threats of scorched-earth litigation.

60.     Dominion thus has an ulterior purpose in filing the lawsuits it brought against Ms. Powell, her co-Defendants, and other parties Dominion has sued. Dominion CEO John Poulos conceded one such purpose in an interview with National Public Radio on January 12, 2021. In that interview, NPR noted that it was highly unlikely that Dominion could recover $1.3 billion "from Sidney Powell, a private citizen who, as far as we know is not a billionaire. That suggests to me that there is something else you want from this lawsuit. What is the purpose?" *Dominion Voting Systems sue ex-Trump Lawyer over False Claims*, NPR (January 12, 2021).[32]

61.     In response, Poulos made clear that that "the purpose" of the litigation was not to

---

[31]     Available     at     https://www.forbes.com/sites/alisondurkee/2021/08/10/dominion-sues-newsmax-oann-and-ex-overstock-ceo-byrne-in-new-defamation-suits-over-election-conspiracy-theory/?sh=66c1682b5440 (last visited Sept. 24, 2021).

[32]     Available at https://www.npr.org/2021/01/12/955938741/dominion-voting-systems-sues-ex-trump-lawyer-over-false-claims (last visited Sept. 24, 2021).

recover $1.3 billion, as the NPR interviewer had surmised, but instead it was "to restore our good names." Poulos explained that the negative publicity surrounding Dominion has resulted in "irreparable damage ... to our company. If we could trade our situation today and go back to our reputation of November 1 ... we would do so in a minute."[33] Dominion intends its litigation campaign to combat not only the negative attention and reputation it acquired since November 1, 2020, but also to erase or change the subject from the prior negative attention and reputation described earlier in paragraphs 18-42 above and to silence future criticism.

62.     Public statements made by Dominion announcing the filing of the suit against Defendants confirmed Dominion's true purpose in initiating the litigation. For example, at the time of the filing, Dominion announced that "Today is the first step to restore our good name," *Dominion Voting Sues Sidney Powell for Defamation over Election Conspiracy – and Others May Be Next*, Forbes (January 8, 2021) (hereinafter. "*Dominion Sues Powell*"),[34] and that "Dominion is taking steps to defend our good name and reputation." *Id*. These statements were made after the issuance of process at issue in order to further Dominion's public relations campaign.

63.     In addition to using the litigation as a public relations tool, Dominion also intended to use the litigation to punish those who had spoken out and to intimidate anyone else who might dare speak out against Dominion. The clear message was that if you criticize Dominion, you too will suffer the pain, expense, harassment, and public disparagement dished out by Hamilton's media tools and lengthy of lengthy and costly federal litigation.

---

[33]     Available as described in note 32, *supra*.

[34]     Available at https://www.forbes.com/sites/alisondurkee/2021/01/08/dominion-voting-sues-sidney-powell-for-defamation-over-election-conspiracy-theory/?sh=4cbf76a620f2     (last visited Sept. 24, 2021).

64.     Dominion CEO Poulos likewise made clear to the public at large that anyone making negative comments about Dominion was not safe from its tactics. Appearing on the national news network CNBC, Mr. Poulos proclaimed that Dominion had its sights on, well, just about everyone: "Our legal team is looking at frankly everyone, and we're not ruling anybody out." *Dominion is Going to Unleash Legal Armageddon on Trump Election Truthers,* Vice News (Feb. 24, 2021).

65.     Similarly, after filing suit against Defendants and the issuance of the process at issue, Dominion lawyer Thomas Clare told Forbes magazine that the Defendants lawsuit was just "the first in a series of legal actions that Dominion will be taking" against those who spoke ill of his client's operations. *See Dominion Sues Powell*, *supra*.[35]

66.     Dominion intended for the substantial expense of defending litigation in defamation lawsuits to have the chilling effect of discouraging critics of Dominion from speaking out. That is precisely the purpose of Dominion's lawsuit against Defendants. As Dominion's Mr. Poulos has admitted, this and other actions have not been for the purpose of obtaining monetary relief. Rather, Dominion seeks to use the justice system to advance its public relations campaign and to intimidate other critics from exercising their First Amendment rights and stepping forward to express concerns about Dominion's systems. These are not appropriate uses of the judicial process.

## COUNT I—ABUSE OF PROCESS

67.     Counterclaim Plaintiffs incorporates by reference herein the foregoing paragraphs as if fully set forth herein.

68.     To establish a claim for abuse of process in this District, a plaintiff must show that

---

[35]     Available as described in note 34, *supra*.

the alleged abuser of process had an ulterior purpose in bringing the legal proceedings and that maintenance of the proceedings sought to pervert the judicial process by achieving an improper end not contemplated by the regular prosecution of the charge.

69. Dominion's motive in suing Defendants was not to obtain the ludicrous amount of over $1 billion in damages, but instead to use the judicial system to obtain the improper ends of not only tarnishing Ms. Powell's reputation with allegations that would be defamatory if not protected by the litigation privilege, diverting attention from the failings of its election equipment, trying to change the "narrative" that was exposing Dominion's serious flaws and wrongdoing, and avoiding post-election inquiry into voting irregularities in the 2020 election, but also silencing those who have been or may in the future be critical about the flaws in Dominion's voting systems to bolster Dominion's badly tarnished public image.

70. Since the 2020 election, Dominion has worked to erase or destroy evidence related to the results of the 2020 election. Spoliation of evidence undermines the likelihood—and even the possibility—that Dominion can prevail on its claims related to alleged defamation of Dominion around the 2020 election, which demonstrates that Dominion brought these defamation cases as a public-relations campaign and not as a *bona fide* attempt to win damages for its alleged injuries.

71. The amount of Dominion's alleged damages—$1.3 *billion*—not only bears no conceivable connection to any possible harm suffered from the public exposure of their flawed machines but also is many multiples of Dominion's gross revenues from their voting machines that were the subject of the statements of Ms. Powell that are at issue. Such allegations, having no basis in fact, are instead meant to grab sensational headlines and promote a false impression of Dominion's size and financial capabilities so as to intimidate and silence Defendants and anyone else with the courage to speak out against Dominion.

72.     Dominion's actions were and are characterized by improper motive, willful, wanton, and malicious conduct, and were intentionally designed to injure Ms. Powell and the other Defendants.

73.     Dominion's initiation and maintenance of its lawsuit against Defendants constitutes an abuse of process. As a result of Dominion's tortious conduct, Ms. Powell, her law firm, and the nonprofit Defending the Republic, Inc., have suffered personal and business-related damages and have incurred and continue to incur costs to defend the abusive litigation Dominion has brought against them.

## **PRAYER FOR RELIEF**

WHEREFORE, defendants and counterclaim plaintiffs Sidney Powell, Sidney Powell, P.C., and Defending the Republic, Inc., demand judgment against plaintiffs and counterclaim defendants US Dominion, Inc. Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation, jointly and severally, for the following relief:

A.     A declaration that Plaintiffs take nothing on their claims asserted in the Complaint;

B.     An award of damages on Counterclaim Plaintiffs' Counterclaim in an amount to be proved at trial, but not less than $10 million, and punitive damages as allowed by law;

C.     An award of costs, expenses, and attorneys' fees in defending this action; and

D.     Such other and further relief as this Court deems proper.

## **JURY DEMAND**

Counterclaim Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: September 24, 2021

Respectfully submitted,

  /s/ Howard Kleinhendler

Howard Kleinhendler
N.Y. Bar No. 2657120, admitted *pro hac vice*
HOWARD KLEINHENDLER ESQUIRE
369 Lexington Ave. 12th Floor
New York, New York 10017
Tel: (917) 793-1188
Email: howard@kleinhendler.com

*Counsel for Sidney Powell, Sidney Powell, P.C.*

  /s/ Lawrence J. Joseph

Lawrence J. Joseph
D.C. Bar No. 464777
LAW OFFICE OF LAWRENCE J. JOSEPH
1250 Connecticut Av NW Suite 700-1A
Washington, DC 20036
Tel: (202) 355-9452
Fax: (202) 318-2254
ljoseph@larryjoseph.com

*Local Counsel for All Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of September 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which I understand to have caused service of the counsel for the parties.

/s/ Lawrence J. Joseph
Lawrence J. Joseph