# Exhibit E

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3    U.S. Dominion, Inc., et al.,    )  Civil Action
                                      )  No. 21-cv-445
 4                    Plaintiffs,     )
                                      )  Telephonic Status
 5    vs.                             )  Conference
                                      )
 6    My Pillow, Inc., et al.,        )  Washington, DC
                                      )  September 21, 2023
 7                    Defendants.     )  Time:  11:00 a.m.
      _____
 8
                   TRANSCRIPT OF STATUS CONFERENCE
 9                         HELD BEFORE
                 THE HONORABLE JUDGE CARL J. NICHOLS
10                  UNITED STATES DISTRICT JUDGE
      _____
11
                      A P P E A R A N C E S
12
      For Plaintiffs:        Davida Brook
13                           Susman Godfrey LLP
                             1900 Avenue of the Stars
14                           Suite 1400
                             Los Angeles, CA  90067
15                           (310) 789-3100
                             Email:  Dbrook@susmangodfrey.com
16
                             Stephen Shackelford, Jr.
17                           Susman Godfrey LLP
                             1301 Avenue of the Americas
18                           32nd Floor
                             New York, NY  10019
19                           (212) 729-2012

20                           Mary Kathryn Sammons
                             Susman Godfrey LLP
21                           1000 Louisiana Street
                             Suite 5100
22                           Houston, TX  77002
                             (713) 653-7864
23                           Email:  Ksammons@susmangodfrey.com

24

25
```

```
 1     For Defendant
         My Pillow &          Andrew Parker
 2       Lindell              Joseph Pull
                              Parker Daniels Kibort LLC
 3                            123 North 3rd Street
                              Suite 888
 4                            Minneapolis, MN  55401
                              (612) 355-4101
 5                            Email:  Parker@parkerdk.com
                              Email:  Pull@parkerdk.com
 6
       For Defendant
 7       Powell              Teresa Cinnamond
                             Daniel Marvin
 8                           Kennedy CMK LLP
                             120 Mountainview Boulevard
 9                           Basking Ridge, NJ  07920
                             (908) 848-6307
10                           Email:  Teresa.cinnamond@kennedyslaw.com
                             Email:  Daniel.marving@kennedyslaw.com
11
       For Defendant
12       DTR                 Marc Eisenstein
                             Coburn & Greenbaum PLLC
13                           1710 Rhode Island Avenue, NW
                             Second Floor
14                           Washington, DC  20036
                             (202) 470-2695
15                           Email:  Marc@coburngreenbaum.com
       For Defendant
16       Herring             Charles L. Babcock
                             Trenton McCotter
17                           Jonathan Neerman
                             Minoo Blaesche
18                           Jackson Walker LLP
                             1401 McKinney
19                           Suite 1900
                             Houston, TX  77010
20                           (713) 752-2410
                             Email:  Cbabcock@jw.com
21
       _____
22
       Court Reporter:      Janice E. Dickman, RMR, CRR, CRC
23                          Official Court Reporter
                            United States Courthouse, Room 6523
24                          333 Constitution Avenue, NW
                            Washington, DC  20001
25                          202-354-3267
```

```
1        *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

2              THE COURT:  Good morning.  This is Judge Nichols

3    joining.  Could you please call the case.

4              THE COURTROOM DEPUTY:  Yes.  This is civil matter

5    21-445, Dominion, Incorporated, et al. versus My Pillow,

6    Incorporated, et al.

7              Will counsel please state your appearance for the

8    record, beginning with the plaintiff.

9              MS. BROOK:  Good morning, Your Honor.  This is Davida

10   Brook of Susman Godfrey on behalf of the Dominion plaintiffs.

11   And with me today are my partners Stephen Shackelford, Katie

12   Sammons, and Jonathan Ross, all of Susman Godfrey, on behalf of

13   the Dominion plaintiffs.

14             THE COURT:  Good morning, everyone.

15             Why don't we start with the Powell parties.

16             Anyone on representing any of the Powell parties?

17             MS. CINNAMOND:  Good morning, Your Honor.  This is

18   Teresa Cinnamond, I'm a partner with the law firm Kennedys, and

19   we represent Ms. Powell and Powell, P.C.  And I have with me my

20   partner, Dan Marvin.

21             THE COURT:  Good morning, Counsel.

22             Is anyone on for Defending the Republic?

23             MR. EISENSTEIN:  Yes, Your Honor.  Good morning.

24   This is Mark Eisenstein, counsel for Defending the Republic.

25             THE COURT:  Good morning, Mr. Eisenstein.  Anyone
```

1    else on for any Powell or DTR entities?

2         All right.  Anyone on for Mr. Giuliani?

3         Anyone on for Mr. Giuliani?  Okay.

4         (No response.)

5         THE COURT:  Anyone on for My Pillow or Lindell?

6         MR. PARKER:  Yes, Your Honor.  This is Andrew Parker,

7    representing My Pillow and Mike Lindell.  With me is my partner

8    Joe Pull.

9         THE COURT:  Good morning, Counsel.

10        MR. PARKER:  Good morning, Your Honor.

11        THE COURT:  And then turning to the OAN Herring

12   defendants, is anyone on?

13        MR. BABCOCK:  Yes, Your Honor.  This is Charles

14   Babcock.  I go by Chip.  I'm in the law firm of Jackson Walker.

15   Trenton McCotter is also with us and my partners Jonathan

16   Neerman and Minoo Blaesche, and perhaps others, but there at

17   least those.

18        THE COURT:  Good morning, Mr. Babcock.  I probably

19   won't be referring to you as Chip.

20        MR. BABCOCK:  You're welcome to if you want, Your

21   Honor.  I will defer to Your Honor.

22        THE COURT:  That all sounds fine to me.  Is anyone

23   else on from the -- from your side, Mr. Babcock, your team?

24        MR. BABCOCK:  I did not hear anybody else announce,

25   but somebody might have come in late, I don't know.

 1          THE COURT:  Okay.  Thank you all.  Let's get going.

 2          MR. SINGER:  So, Your Honor, this is Greg Singer.

 3     I'm also in this litigation, the Herring litigation, but

 4     representing Christina Bobb, the individual case.

 5          THE COURT:  My apologies.  I think we spoke over one

 6     another.  Can you just say your name again?

 7          MR. SINGER:  Gregory Singer, representing Christina

 8     Bobb.

 9          THE COURT:  Oh, yes.  Good morning, Mr. Singer.

10          MR. CARRY:  I'm sorry.  Good morning, Judge.  This is

11     Alfred Carry.  I'm here on behalf of Patrick Byrne.  That

12     matter has not formally been consolidated, although we have

13     agreed to voluntarily coordinate with the consolidated cases,

14     which has been working well.

15          The particular discovery dispute before the Court

16     today also does not involve Mr. Byrne.  That said, because we

17     were voluntarily coordinating with the consolidated cases, and

18     because we were on the email distribution, it was unclear

19     whether or not Your Honor had a preference for someone from the

20     Patrick Byrne matter to participate today.  But I know when I'm

21     not invited and happy to show myself to the door, if Your Honor

22     wishes.  So, I would defer to you.

23          THE COURT:  No, no, I think you should stick around,

24     Mr. Carry.  Thank you for that.  I understand that there are

25     different cases and different parties and different procedural

1       postures.  There may be at least notionally some issues that

2       could be broad enough that could have some effect on Mr. Byrne,

3       so it makes sense for you to stick around.

4                As everyone I hope knows, this is a call -- I'm going

5       to go through in a second what I've reviewed in preparation for

6       this matter.  This is a call to -- as required by my standing

7       order, to discuss issues and to get permission as appropriate

8       before the filing of discovery motions.

9                And to prepare for this call, I have reviewed various

10      emails submitted to chambers by Dominion and other parties, of

11      course, defendants who submitted emails.  And then also, I've

12      reviewed the Dominion-proposed stipulation regarding discovery

13      matters, it was an attachment to an email, as well as the

14      Dominion September 13th, 2023 letter to various counsel

15      regarding deposition coordination.

16               It seems to me that there are some bigger issues and

17      then some small and relativity discrete discovery questions

18      that may or may not be resolved if and when we resolve the

19      bigger questions.

20               How I would like to proceed here is I would like to

21      start with Dominion.  I would like Dominion to walk me through

22      its position on all of the issues that it believes are ripe or

23      becoming ripe in the near future, and then -- and I want to do

24      that just to be efficient here.  I don't want to go issue by

25      issue with the number of counsel that we have on the call.

1          Then I want to, once we categorize those questions, I

2     will then go to defense counsel and ask for whatever you would

3     like to mention in the most efficient way.  Hopefully we can

4     have clarity around the specific topics we're discussing, and

5     then defense counsel can talk about Topic Three or whatever, so

6     we know what we're talking about.

7          Let's go start with Dominion.  Ms. Brook, will you be

8     taking the lead?

9          MS. BROOK:  Yes, Your Honor, I will.

10         THE COURT:  So can you walk me through all of the

11    issues, from Dominion's perspective, that are ripe or soon to

12    be ripe, or you would like either my thoughts or permission to

13    file a motion.

14         MS. BROOK:  Thank you, Your Honor.  And thank you for

15    making the time to hear us this morning.  The first issue that

16    Dominion would like to raise is the larger issue that Your

17    Honor already referenced in his opening remarks.  We would like

18    a process by which to efficiently coordinate discovery between

19    these cases.

20         As far back as, I believe, November of 2021, this

21    Court indicated its desire that the first three filed cases,

22    those were the ones against Guiliani, Lindell and My Pillow,

23    and the Powell defendants, be consolidated for purposes of

24    discovery, given the many overlapping issues and witnesses.

25    And Dominion got to work trying to do just that, and spent the

1    better part of the year trying to negotiate really very basic

2    discovery protocols, such has hit counts and search terms and

3    custodians and the like.

4           Unfortunately, Your Honor, that process proved very

5    difficult, including because the various defendants, including

6    defendants within the same case, would at times not all be

7    willing to respond to emails or join the same calls.  And there

8    also was a pattern that, unfortunately, has only gotten worse,

9    of refusing to commit positions to writing, and when Dominion

10   took it upon itself to do so for defendants, saying that we had

11   gotten it wrong.

12          So Dominion first sought, sort of, this hearing and

13   the circumstance really coming to the Court with dozens of

14   small, little discovery disputes, and tried to come up with a

15   way to avoid that.

16          And our solution for how to avoid that was back in

17   June of this year, to send the draft discovery stipulation that

18   Your Honor mentioned he took the time to review -- and again,

19   we thank you for that -- which covered, we thought, a very wide

20   range of discovery issues that could be resolved across all the

21   cases once and for all.

22          We sent that to the defendants who were then

23   consolidated, which included the original three that I

24   mentioned before, and asked them to review it, agree where they

25   could, disagree where they couldn't.  But simply return a red

1    line of that document with their positions in writing so we

2    could clearly see where everyone stood and know what issues, if

3    any, we needed to further meet and confer on.  And to the

4    extent we couldn't resolve them, request input from the Court.

5          Some of the defendants rejected the notion of the

6    discovery stipulation outright, others emailed us their

7    positions as to some issues but not others.  But no one would

8    provide us with the red line of the stipulations.

9          A few weeks later we asked these same defendants to

10   meet and confer with us about the proposed discovery

11   stipulation.  We walked through the entire document, point by

12   point, trying to understand each party's position.  But even

13   after all that, we still couldn't get clear positions on many

14   of these issues, let alone in writing.

15         So, we've made some progress, Your Honor, but there's

16   still much to be done on these cases.  And we're here today

17   principally because we would like the Court's help to put in

18   place a clear process to move things forward fairly and

19   efficiently for all.  And we think the most fair and efficient

20   process is the discovery protocol that we've suggested.  And by

21   that I mean, we've already sent that discovery stipulation

22   months ago to three of the parties.  All of the parties now

23   have it by virtue of the notice to this Court.

24         We would like to put a date certain on the calendar

25   by which all of the defendants are given an opportunity to

1    respond to that discovery protocol, in writing, with their

2    positions.  We obviously understand everyone is not going to

3    agree with us on all places.  There can then be a set period of

4    time, a week or so, for us to meet and confer and negotiate to

5    try to reduce the number of issues in dispute as much as

6    possible, and then a set date again to bring this issue back to

7    the Court and have any remaining disputes presented to the

8    Court in one simple document that's just a red line; here's

9    what Dominion thinks should happen, here's what any of the

10   other defendants think should happen, and have a hearing where

11   we can march through any of the remaining issues, to the extent

12   there are any.

13          That's the first and the biggest issue that we think,

14   Your Honor, would take care of a lot of the more specific

15   issues that we highlighted in our email.

16          Unless the Court has any questions on that point, I

17   will now, pursuant to the Court's instructions, move through to

18   discuss the specific issues that we laid out.

19          THE COURT:  Well, let me -- do you think that the

20   same process is ripe yet with respect to a deposition protocol?

21   I just don't recall whether the proposed stipulation that

22   you've been referring to, the one that you sent to the

23   defendant, or at least certain defendants, back in June covers

24   the same deposition topics as the letter?  Or do you think that

25   the proposed stipulation should be on an earlier track because

1     it will primarily, if not entirely, deal with documents and

2     document production and the like, and then when we get to

3     depositions we deal with the deposition protocol, if any?

4            MS. BROOK:  Thank you, Your Honor.  I think -- they

5     are two separate stipulations, in answer to Your Honor's

6     question.

7            THE COURT:  Agreed.  Okay.

8            MS. BROOK:  The discovery stipulation that I am

9     referring to did not relate to deposition issues; those issues

10    are contained in a separate deposition stipulation.  But we do

11    believe that both are ripe for this similar process.  So, we

12    think that a similar process as a set period of time in which

13    everyone can weigh-in on what I'll call the deposition

14    stipulation also makes sense, if that trails the document one

15    by a week or two, just so that folks can be focused on one or

16    the other.  I can see that being a good sequence.

17           But both of them, I think, are ready to go.  We've

18    made huge productions already in these cases and there's no

19    reason why depositions can't start to be noticed under the

20    Court's order.  We would like to start doing that and, indeed,

21    some of the defendants have already started noticing

22    third-party depositions.  And I think it would make sense to

23    all be on the same page there as well, sooner rather than

24    later.

25           THE COURT:  Very well.  Okay.  Thank you.  So let's

1   turn now to the specific -- the more concrete, or not -- or,

2   perhaps, more limited discovery issues that have been teed up

3   by either party.

4          MS. BROOK:  Thank you, Your Honor.  And just a global

5   comment while I go through these more specific issues.  What I

6   don't want to do is give the Court the wrong impression.  What

7   I mean by that is this -- so, the first one I'm talking about

8   is the dispute regarding Dominion's proposed search terms and

9   custodians with regard to My Pillow and Mike Lindell.

10          But just because we're only talking about My Pillow

11   and Lindell here, doesn't mean that there aren't outstanding

12   disputes as to search terms and custodians with other of the

13   defendants at issue.  The problem is we don't yet have clarity

14   from all of the defendants on what their positions are, so we

15   couldn't tee it up for this hearing, which, again, gets us back

16   to why I think the global process makes sense, because I

17   believe the global process covers every single one of the

18   specific disputes that I'm about to go through.  So with

19   that --

20          THE COURT:  Yes, I understood that.  Thank you.

21          MS. BROOK:  Great.  Thank you, Your Honor.  Then the

22   first one is the dispute regarding Dominion's proposed search

23   terms and custodians that relates specifically to the My Pillow

24   and Lindell defendants.  At bottom, they are not agreeing to

25   use the search terms and custodians that we sent to them.

1    Instead of coming back to us and saying:  We'll agree to these

2    but not those, or these custodians but not those, they simply

3    ran their own searches.  I believe it was just six or seven

4    strings across a handful of custodians that they selected.  No

5    communication, no negotiation with that whatsoever of what

6    those search terms should be or who those custodians should be,

7    and then produced.

8          We don't think that's the proper process.  We're

9    asking the Court to order that our search terms and custodians,

10   which again are attached to the global stipulation, be run and

11   used.

12         A larger issue looming here seems to be My Pillow's

13   belief -- and this affects a variety of the disputes with My

14   Pillow -- that the Dominion's fight is just with Lindell and My

15   Pillow shouldn't have to produce much discovery.  Respectfully,

16   Dominion believes that's really just a regurgitation of My

17   Pillow's motion to dismiss which, of course, this Court denied,

18   and it is part of these cases and needs to be prepared to

19   produce documents accordingly.

20         THE COURT:  And here --

21         MS. BROOK:  Second --

22         THE COURT:  Let me just pause you here.  If there

23   wasn't this effort perhaps to have a, you know, a stipulation

24   for all discovery matters, if we just had this issue, it seems

25   to me that I would have a discussion with My Pillow about their

1    position, but the net of this call would be to authorize,

2    assuming I think it's the right thing, a motion to compel by

3    you that would have me potentially order My Pillow/Lindell to

4    take further steps.

5          Just to be very clear, I'm not -- I'm very unlikely,

6    at the end of this call, to order anyone to do anything.  This

7    would only be to authorize the filing of the motion to compel.

8          MS. BROOK:  Correct, Your Honor.  We stand ready to

9    file a motion to compel.  But we understood the Court's

10   procedures that we could not bring that motion to compel

11   without first going through this process.

12         THE COURT:  Fantastic.  Thank you.  Okay.  Topic two.

13         MS. BROOK:  I would say, on the first global one, we

14   would request, if it's the way the Court wants to do it,

15   permission to file a motion to put that in place, too.

16         THE COURT:  Motion granted.

17         MS. BROOK:  Specific topic No. 2 is the dispute, Your

18   Honor, regarding hit counts.  We know that at least Powell and

19   Powell, P.C., are refusing to provide hit counts.  I read

20   counsel for Powell's response to our email to the Court.  I did

21   not see any explanation for why they will not provide the

22   simple hit counts that is customary and common to exchange in

23   civil discovery.

24         We would simply like to confirm that they have indeed

25   done what they said they were going to do, which is produce all

15

1    of the documents that hit on our search terms and custodians.

2    And since they say that they've agreed to produce literally all

3    of the documents that hit on our search terms and custodians,

4    we don't understand why this would be at all burdensome or

5    objectionable.

6         And, again, there are other defendants who are

7    refusing to provide hit counts, whether they have agreed to

8    produce everything or not, and we think this is a pretty

9    standard ask.  We, of course, are happy to do the same.  And it

10   should be ordered as part of a global stipulation or,

11   specifically, we should be given leave to move to compel for

12   hit counts.

13        THE COURT:  Got it.  Topic three.

14        MS. BROOK:  Topic three is the dispute regarding

15   custodian interviews and production of texts and related

16   messages.  This one relates to DTR, as well as My Pillow and

17   Lindell defendants.  As part of the negotiations, Your Honor,

18   over what should be done in these cases, we tried to engage in

19   a conversation about how the defendants were going about

20   interviewing their custodians to make sure that they were

21   search collecting and searching all of the relevant sources of

22   information, whether it be company email or text messages or

23   Signal messages or whatever it is that the various individuals

24   used to communicate about the information relevant to these

25   cases.

1              And, again, we're just being -- we're finding a wall

2     with defendants being willing to conduct those custodial

3     interviews, give us transparency into how they are doing those

4     custodian interviews, and then, of course, agreeing to collect,

5     search, and produce from the sources of information that the

6     custodians have indicated they did use to communicate about

7     information relevant to this case.

8              It is another one of the issues that is taken up in

9     the global order, but the more specific request would be for

10    leave to file a motion to compel against the Powell defendants

11    and the My Pillow and Lindell defendants to take on this work.

12             And then separately, Your Honor, with My Pillow and

13    Lindell specifically -- this doesn't apply to the Powell

14    defendants -- there are several other entities where we've just

15    asked for clarity as to whether or not they control them or

16    whether or not we should be issuing individual subpoenas, and

17    we can't get that clarity.  That, for example, is Lindell

18    Management and Lindell, PD.  And so we ask for, simply, clarity

19    as to how we should be going about getting discovery from those

20    entities.

21             THE COURT:  Understood.  Okay.

22             MS. BROOK:  Great.  The next one is dispute regarding

23    the interim substantial completion deadlines.  Again, this is

24    one that we specifically teed up with the Defending the

25    Republic defendants.  I'm sure it applies to others as well, to

1    the extent we knew everyone's position.  And that is simply --

2    a lot of the discovery requests in this case, Your Honor, from

3    both sides, from defendants and from plaintiffs, as you can

4    imagine were served many, many moons ago.

5            And what we said -- and, again, in order to try to

6    ensure an orderly process in these cases -- is just let us

7    know, let's agree to an interim deadline by which the requests

8    that were served a while back, we're all going to finish our

9    production, substantially complete our production.  We

10   understand there are always straggler documents that come in

11   here and there.

12           We had proposed a variety of different dates, all of

13   which have come and passed.  So with DTR, in particular, we've

14   been unable to get them to agree to a date certain or to

15   provide an alternative date certain for the ones that we've

16   been proposing.

17           And here I'll just pause to highlight a conversation

18   I had with DTR over email yesterday that, again, I think still

19   just highlights the problem.  As the Court knows, DTR

20   originally felt like it didn't have notice of this proceeding.

21   We pointed out that they were included.  They then privately

22   reached out to us to say:  We think we can further narrow the

23   issues in dispute.  We responded right away to say:  Great,

24   tell us your positions in writing and let us know where we're

25   wrong, where we're seeing past each other, what's the

 1    difference?  And instead, they responded with a request to have

 2    a phone call next week.

 3          It has just become untenable to keep on having these

 4    phone calls without written positions that indicate what the

 5    parties are or are not willing to do.  So that's that one, Your

 6    Honor.

 7          THE COURT:  Thank you.

 8          MS. BROOK:  The last specific issue that we raised in

 9    our email is the -- some request for production.  We did even

10    include the request for production disputes in our discovery

11    stipulation.  So I will admit they are a little bit of a

12    different kind, but here there are three requests relating to

13    My Pillow and two requests -- excuse me -- I'm on week three of

14    this cough -- that relate to Mr. Lindell where we've been able

15    to, through negotiations and back and forth, get on the same

16    page as the defendants on many of the other requests that have

17    been served.  But we still think that there are some that they

18    should be required to produce in response to these five

19    requests, and we would be requesting permission from the Court

20    to move to compel on those.

21          And I will say, to the extent Your Honor has more

22    specific questions about those RPs, I will call on my partner,

23    Mr. Schackelford, to provide more color there.

24          THE COURT:  Sure.  I reviewed the topics here.  I

25    think it's fair to say I can both imagine why Dominion believed

1    these are discoverable topics, and I can imagine the arguments

2    that the My Pillow and Lindell defendants would have as to why

3    they shouldn't be.

4         Although, I suppose it would probably be helpful just

5    for the -- staying specific with the order, Mr. Schackelford,

6    could you just walk me through briefly on each topic what

7    Dominion's view of the relevant/discoverability of each topic

8    is, just so I don't have to come back to you.

9         MR. SCHACKELFORD:  Absolutely.

10        THE COURT:  Thank you.

11        MR. SCHACKELFORD:  Absolutely, Your Honor.  Good

12   morning.  So two of the five topics concern joint defense

13   agreements.  Obviously, they're going to be -- there are

14   privilege claims, every party is going to withhold some

15   documents on privilege claims, including some documents they

16   claim to be from the joint defense privilege.

17        As Your Honor well knows, that sometimes defense

18   agreements are privileged, considered work product, and

19   sometimes they're not.  For the most part, what we want to

20   ensure is that everyone's joint defense agreements are treated

21   the same.  So here we would request to compel production.  We

22   expect the defendants to rely on joint defense agreements to

23   withhold certain communications they've had with each other.

24   Whatever the outcome of that is, obviously, the outcome of that

25   will affect all of the parties who are asserting joint defense

1    agreements, depending on the circumstances.

2          We're also seeking documents and communications with

3    or concerning a gentleman named Kurt Olsen.  Mr. Olsen is an

4    attorney.  He first came into the limelight when his name was

5    cc'd on some documents that Mr. Lindell was carrying into the

6    White House in January of 2021.  He has been reported that he's

7    been -- he's deeply involved in some of the efforts to figure

8    out ways to overturn the election results.

9          I believe Mr. Lindell is claiming Mr. Olson at some

10   point became an attorney for him.  If there are legitimate

11   privilege claims, we would expect them to be asserted in a

12   privilege log so we can evaluate both the time and nature of

13   those claims.  But we also believe from what we've seen

14   publicly that Mr. Olsen had some involvement before he was an

15   attorney for Mr. Lindell or My Pillow, and those documents go

16   to the heart of the defamatory statements Mr. Lindell is making

17   and continued to make after January of 2021.  So we would ask

18   for those to be produced or logged.

19         There is a request for My Pillow's revenue each week

20   from January of 2018 to the present.  We -- to our knowledge,

21   there's not a significant -- there's not a significant burden,

22   if My Pillow tracks their revenue and can produce that on a

23   weekly basis.

24         The relevance of it is to show the impact that

25   Mr. Lindell, as he was identifying himself as My Pillow CEO

1   while making his defamatory statements, and he was using

2   promotion codes on My Pillow to promote his defamatory campaign

3   at the same time he's promoting My Pillow products.  We think

4   the impacts that Mr. Lindell's defamatory statements had on My

5   Pillow's revenue over that time period, including specifically

6   in connection with the timing of specific statements, we think

7   that's relevant to our claims.

8        And we also understand that Mr. Lindell is likely to

9   claim that he's been hurt by -- he's admitted that he was hurt

10  by the responses to his defamatory campaign.  But this is

11  exactly the kind of evidence that will show one way or the

12  other the impact that the defamatory statements had on My

13  Pillow's revenues.

14       And the last -- the last request is a request seeking

15  documents and communications concerning Mike Lindell's removal

16  from social media accounts.  As Your Honor may remember,

17  Mr. Lindell was removed from some social media accounts because

18  of his defamatory statements.  So his communications about

19  those removals go directly to the issues in this case,

20  including Mr. Lindell's responses to the removal and any

21  requests to make the change -- to retract the statements or to

22  remain on social media accounts and so forth.  This is directly

23  related to the claims at issue in our case against Mr. Lindell.

24       THE COURT:  Thank you for that, Mr. Schackelford.  I

25  wanted to make sure -- I know these are all issues we've just

1    gone through, the general ones and the specific ones that

2    Dominion raised, but while I have Dominion starting here, it

3    seems to me that there's at least one issue that's raised by My

4    Pillow, which is the production of discovery materials from the

5    Delaware litigation against Fox.

6          Could we start -- rather than joining with My Pillow,

7    just staying with Dominion on this question.  Ms. Brook, will

8    you be addressing that?

9          MS. BROOK:  No, Your Honor, it will be

10   Mr. Schackelford.

11         THE COURT:  Mr. Schackelford, can you briefly tell me

12   what the current dispute is on that question?

13         MR. SCHACKELFORD:  Yes, Your Honor.  The request is a

14   very broad request for all materials from that litigation.

15   We've already produced all Dominion -- all depositions of

16   Dominion people from that -- from that litigation.  We've

17   produced, I think -- I believe we've made the same productions

18   from the Fox case, productions from the Fox case and the

19   consolidated cases.

20         And the additional source of materials that I

21   understand My Pillow to be seeking include depositions of Fox

22   people which have been marked confidential by Fox.  We have no

23   problem producing those.  Obviously, Fox has an interest in

24   keeping those confidential about producing those in another

25   litigation.  So we think if that's something -- if that's going

1    to be pressed by My Pillow, Fox needs to have a say in whether

2    those are produced; whether they're relevant, whether they're

3    produced, the conditions under which they are produced.

4           I think there's also been some discussion of expert

5    reports.  A number of our expert reports, again, address Fox

6    confidential and AEO information, so those would have to be

7    handled with Fox's input.  Fox should have a seat at the table

8    if they generally want to have production of reports that

9    address Fox confidential material, for instance.

10          That, I believe, is the gist of the disputes.  Again,

11   documents in our own depositions I think we produced.  There's

12   been some request for things like exhibit lists, and I think

13   we're perfectly willing to do things like produce exhibit lists

14   and so forth, or exhibits that weren't publicly filed on the

15   docket as long as My Pillow, Mr. Lindell, and others in the

16   defense group are willing to do the same for the

17   election-related litigation that they're involved with.

18          But we think they should do the same for their

19   deposition transcripts that they're involved with -- other

20   cases they're involved with.  But we've gone ahead and produced

21   all our Dominion deposition transcripts from the Fox case

22   anyway.

23          If there are other issues that I'm unaware of, I'm

24   sure Mr. Lindell and My Pillow's counsel will raise them.

25          THE COURT:  Yes.  We'll pick it up then.  Thank you

1    very much.

2          Any other topics that Dominion is aware of that may

3    be discussed today?  I know there are some that My Pillow

4    indicated that aren't quite ripe.  I want to put those to the

5    side for now.

6          Any other topics Dominion wants to raise before I

7    turn it to the defendants?

8          MS. BROOK:  This is Davida Brook on behalf of

9    Dominion.  In short, Your Honor, no.  Just to briefly

10   reiterate, we would request the ability, in whatever form Your

11   Honor sees most prudent, to bring some sort of joint sense to

12   the Court's attention so that we can get a global discovery

13   process in order, whether that would be as sort of a red line

14   filing that Dominion contemplated after meet and confer, or

15   some other form of filing that the Court would prefer.  And

16   then after the specific issues, we request leave to move to

17   compel on them to the extent the Court does not plan on taking

18   those up as part of the global documents.

19         THE COURT:  Thank you very much.  So let's go back

20   now to the defendants and go through these issues.  Who wants

21   to first address the question of whether there should be a

22   discovery protocol along the lines of that proposed by Dominion

23   back in June and/or whether I should order at least a process

24   for teeing up and adjudicating whether there should be such an

25   order?  Because, really, that's -- it seems to me that's the

25

1    primary question here.

2              I'm not, of course -- I'm not forcing anyone to agree

3    to a discovery protocol, but I do want to ensure that we have a

4    process for deciding whether there's going to be one and what

5    it might say.

6              So who wants to speak first from the defense side on

7    this question?

8              MR. PARKER:  Your Honor, Andrew Parker, My Pillow and

9    Lindell.  We don't have a problem and we were responsive, I

10   think, right away to Dominion on this.  We believe that federal

11   rules cover most, if not all of the issues that have been

12   raised, but we do not have a problem with a protocol to

13   streamline the practical issues that are faced when so many

14   different cases are coming together in discovery.

15             One thing that I just want to comment on very briefly

16   is this notion that My Pillow and Lindell have not been

17   responsive to discovery stipulation.  If that was directed at

18   My Pillow and Lindell, the discovery stipulation was issued in

19   June of 2023, and within ten days we provided a lengthy written

20   response with our position regarding the discovery stipulation,

21   responding point-by-point to each provision and agreeing to

22   many of the provisions.

23             So, you know, I think throughout this discovery

24   process we have attempted, and I think succeeded, in being

25   extremely responsive to Dominion.  You know, I don't want to

1    get into a tit for tat, the Court doesn't need to hear that,

2    but we certainly do not feel we have received the same

3    responsiveness from Dominion.

4          But in terms of the discovery stipulation, we

5    certainly have laid out our position on it and are prepared to,

6    you know, go through a process, if the Court thinks that would

7    be helpful.  I think it should be grounded in the foundation of

8    it all in the federal rules.

9          THE COURT:  Very well.  Mr. Parker, since we have

10   you, why don't we walk through all of the issues that Dominion

11   raised that touch on My Pillow questions.  So I can hear from

12   you and then I can go to the other defendants to ask their

13   positions in the same way.

14         Is your position the same with respect to a

15   deposition stipulation?  That is to say, that it makes sense to

16   at least attempt to figure out a way to have a protocol to

17   streamline the somewhat potentially complicated issues in a

18   coordinated case like this?

19         MR. PARKER:  You know, I think as it relates to

20   depositions, I would say, first, that Dominion decided to sue

21   out the case in the manner that they did, that is, with five or

22   six different cases completely separate.  And so long as

23   defendants are not prejudiced in their ability to do discovery

24   in their own individual single case in a manner consistent with

25   the federal rules, I don't have a problem with a deposition

```
 1    stipulation either.

 2              THE COURT:  Okay.  Shall we then turn to the -- and I

 3    realize -- Dominion's position, of course, is that some or all

 4    of these more specific issues could be resolved potentially

 5    through negotiation around the discovery protocol and the like.

 6    But since they teed them up, I thought it would be helpful to

 7    discuss them today.

 8              What is your response on the search term custodian

 9    issues that Dominion raised?  I'll call that specific topic 1.

10              MR. PARKER:  Yes.  Thank you, Your Honor.  We went

11    back and reviewed the history as it relates to search terms

12    because I know, having been personally involved, but other

13    counsel in our office even more directly so, that we have spent

14    an extraordinary amount of time on trying to coordinate search

15    terms with Dominion.

16              It is true that we did not agree to all of the search

17    terms, many of which have absolutely no relation to this case.

18    But we did agree with many of them.  Just for a bit of

19    background, the requests for production were in early 2022 and

20    it wasn't until June of '23 that Dominion made its first list

21    of proposed search terms request on us.

22              And within the same month, we had discussions back

23    and forth and we informed Dominion that we were going to go

24    through a process.  I don't think that we have had or been in

25    the middle of difficulties with Dominion in terms of getting
```

1    back to them and coordinating.  Certainly on hit counts, we

2    have been very responsive.  We do have a disagreement as it

3    relates to search terms.

4         We have made a long list of search terms and we have

5    done a search in regard to that.  And just some of the search

6    terms -- not many, but some of the search terms that Dominion

7    had we just thought were, you know, not related to the case,

8    noting that we have hits on these search terms; not just

9    turning it over to Dominion, we need to go through and review

10   all of them.  It was in the millions because these search terms

11   were so broad.

12        But through the months leading up to June, even

13   before we received the search terms from Dominion, we had made

14   a number of passes with about 60, 70 different keywords, search

15   terms, as we weren't going to continue to wait to get search

16   terms from Dominion, and we went over those with Dominion.

17   Again, there is some disagreement as it relates to that.

18        Just to quote -- I sent a letter in April of 2023,

19   and stated that:  Dominion stated in its correspondence that it

20   believed the search terms used by My Pillow and Lindell were

21   inadequate and that Dominion will propose search terms.  I

22   responded:  We are willing to consider running additional

23   search terms that you provide, let us know what those are.

24        And that's when I got, on June 2nd, those search

25   terms from Dominion.  And on June 5th we immediate responded

1    and started to engage in the discussions.  Later in the summer

2    we gave them hit counts, which were well in excess of a million

3    documents.  And until very recently, days, we did not know

4    whether they wanted us to produce all of those documents based

5    upon the search terms.

6              I think it was on the 12th of September when they

7    brought this issue to the Court, and the issue was listed

8    there, but they did so without contacting us and coordinating.

9              So it may well be possible that we can resolve the

10   issue of search terms and hit counts.  I don't think the hit

11   count issue is really a significant one, for us at least; maybe

12   for other defendants.  We may be able to resolve it, but there

13   may be some search terms that we're not able to resolve and

14   would need to go to the Court.

15             In terms of custodial interviews, we have done

16   extensive work on this.  Dominion requested dozens of people be

17   interviewed.  We have been working over the last several weeks

18   to do that.  We are just about completed with that.  We thought

19   that Dominion was aware of the fact that we were doing that.

20             We don't know why this is an issue, other than the

21   fact that Dominion gave us a script that they wanted us to ask

22   of these custodial witnesses, and we used our own script

23   because we're following the federal rules as to our obligations

24   and requirements.  And the script that Dominion gave us was

25   somewhat of a deposition set of questions of each person.  And

1    so I think that we certainly are meeting our obligation and

2    then some, and we're nearly completed with that process.

3              THE COURT:  Let's turn to the -- either the materials

4    from the Delaware litigation questions or the specific requests

5    for production identified by Dominion.

6              MR. PARKER:  Okay.  Certainly, Your Honor.  I'll

7    start with the request for production, just to complete the

8    Dominion demands.

9              Counsel for Dominion accurately identified the joint

10   defense agreement response, the privileged nature of that

11   request, and the same with respect to Kurt Olsen.  And so we --

12   you know, we believe that both of those requests are seeking

13   privileged information and will assert defenses related to

14   that.

15             In terms of revenue, we have been talking to Dominion

16   about this.  The objection here, really, is the broad nature of

17   the request, and we thought that we were working to narrow that

18   request.  And if we're able to achieve that, I think there

19   shouldn't be a problem getting that information over.

20             Lastly, in terms of the social media accounts, we

21   just believe that is beyond any relevance related to this case,

22   which is the basis for our objection there.

23             THE COURT:  The Delaware litigation.

24             MR. PARKER:  Yes.  We had requested a hearing like

25   this in June on the -- when this issue came to a head, and we

1    did not have any of -- we -- you know, we were -- it was a

2    brick wall in terms of getting the documents here.  I

3    understand the various objections referenced, but we had a

4    disagreement on that.

5          It was said that we now have the Dominion depositions

6    from that case, and we did just get them, I believe, on

7    Tuesday, two days ago.  So we have, you know, begun going

8    through that.  I can't say that I know personally what all is

9    included in the production that we now have.  But we will

10   certainly look at that.  I know that it's not fully responsive

11   to the request, which we believe we have a right to, and it may

12   well be necessary, due to protective orders, that this issue be

13   brought to the Court.

14          THE COURT:  Okay.  Thank you, Counsel.  Let's go back

15   to the top, so to speak, on the question about the discovery

16   protocol.  Would either someone for the Powell defendants or

17   the OAN defendants like to address this?

18          MR. MARVIN:  Your Honor, this is -- I'm sorry, this

19   is Daniel Marvin, for the Powell defendants.  May I start?

20          THE COURT:  Mr. Marvin, please.

21          MR. MARVIN:  Yeah.  So we don't have any general

22   issues with trying to work through a protocol, but we think

23   there is an inherent issue underlying the protocol which is

24   important for the Court to decide, and it's an issue we've

25   raised with Dominion for the better part of a year.

1          Dominion has been producing documents and running

2     search terms -- I'm sorry, running search terms and then

3     producing documents without doing any sort of relevancy review

4     as required by Rule 26.

5          Conversely, Dominion is taking the position that any

6     documents that hit on their search terms proposed to Powell

7     must be produced and that they are entitled to them.  We've

8     gone back to Dominion and said:  That's not what Rule 26

9     requires.  We'll run your search terms, we'll then do our own

10    review within the confines of Rule 26 and then produce those

11    documents with our responses.

12         One of the issues we put in our email reflects how

13    Dominion's proposal leads to absurd results.  We know that just

14    one of probably thousands of examples were legal briefs in

15    Ms. Powell's emails in 2018.  There's a case citation where the

16    surname of the plaintiff is Fox.  Clearly, not only doesn't

17    this matter, but under Dominion's theory of relevance in this

18    case, Powell is required to produce those documents.

19         So what we think makes sense is for the Court to

20    determine if Dominion's suggested way of proceeding in just

21    running search terms and haphazardly producing the documents is

22    an efficient way to proceed.  What we've been faced with are

23    essentially Dominion producing volumes upon volumes upon

24    volumes of documents to us without having performed a relevance

25    review.  And that's compounded with the fact that the manner in

1    which these documents are being produced aren't delineating, A,

2    whether or not they're being produced in response to Powell's

3    demands or other defendants' demands; and, B, which of the

4    Powell demands the documents relate to.

5         So essentially the Powell defendants are faced with

6    millions of documents with no reasonable way to determine what

7    specific demands they relate to, and whether or not they're

8    even relevant to this case.

9         So, before we would agree to enter into a protocol,

10   we want Dominion to only produce documents to Powell that are

11   relevant within Rule 26 -- relevant within Rule 26, which is

12   not what they have been doing.  So that's really an

13   overarching, core issue that we face with Dominion.

14        And I've also -- when we first got -- when we first

15   got the demands back in early '22, which Mr. Parker just

16   mentioned that date, we reviewed Dominion's demands, we

17   understood them, we developed a procedure to review and produce

18   responsive documents.  We hired a massive team of outside

19   attorneys to undertake that process.  Then a year later, when

20   we were wrapping up that process, Dominion gave us these search

21   terms.

22        Ultimately, it was just so frustrating dealing with

23   Dominion with these search terms that, A, many of them were

24   irrelevant to this case; but, B, were also yielding documents

25   that had no relevance to this case.  We basically acquiesced

1    and said:  If you want all of these documents, subject to a

2    privilege review, we'll give them to you.

3           So out of the 152 search strings that were initially

4    provided, Dominion withdrew one, and we agreed to produce

5    documents related to the 151 that remained.  And that still

6    wasn't good enough for Dominion.  And they came back, well, now

7    we want to know your head counts.  So I don't know what basis

8    Dominion believed that the Powell defendants are not complying

9    with their obligations under the federal rules or counsel, its

10   attorneys, aren't complying with their ethical obligations to

11   produce responsive documents.  But we are essentially giving

12   Dominion everything it asked for, with the exception of,

13   obviously, privileged documents.

14           And, by the way, our privilege log now is going to

15   contain entries for privileged documents that aren't even

16   linked to this case because Ms. Powell, as you all know, is an

17   attorney.  But within her documents -- they may be documents

18   that hit on the term "Fox" or hit on the term "Trump" or any of

19   the other 152 search strings which aren't related to this case

20   but are still privileged.

21           Again, under Dominion's theory of relevancy, if it

22   hits on a search term, they get it.  If it hits on a search

23   term, they produce it.  That really is an essential issue that

24   needs to be decided.  But notwithstanding that, we certainly

25   agree that if we can come up with a protocol to streamline

1    discovery, it makes sense.

2              THE COURT:  Let me just pause -- Mr. Marvin, can I

3    pause you there?  It seems to me that the parties could agree

4    on a process whereby a party produces all documents that hit on

5    particular search terms, whether or not they would otherwise be

6    viewed as responsive in the sense contemplated by the federal

7    rules.  Parties sometimes do that to relieve themselves from

8    the obligation of doing a further responsiveness review for

9    cost or other purposes.

10             I take it what you're saying here is that no such

11   agreement has been reached between, at least, the Powell

12   defendants and Dominion, and that absent such an agreement --

13   on the one hand, you have your own, either obligation or

14   entitlement, to conduct your responsiveness review consistent

15   with your ethical obligations and only produce documents that

16   are actually responsive, to not include a brief that's actually

17   unrelated in this case, on the one hand.  And on the other, but

18   Dominion, in your view, has to comply with its obligations to

19   not simply produce documents that hit on search terms, but that

20   are actually responsive to your requests.  All fair?

21             MR. MARVIN:  That is fair.  I know Mr. Parker and his

22   clients have undertaken a responsiveness review.  The Powell

23   defendants have undertaken a responsiveness review.  It's not

24   even so much that Dominion has not undertaken that review, they

25   represent that they don't think they have to under Rule 26,

1    it's not a requirement, notwithstanding they could agree -- the

2    parties could agree to waive that requirement.  But Dominion

3    doesn't think -- at least they represented to us on more than

4    one occasion, they don't think they have that obligation under

5    Rule 26.

6              THE COURT:  Okay.  So can we just now -- we've,

7    obviously, been at this for almost an hour.  Let's go through

8    the rest of the issues that at least uniquely relate to

9    Ms. Powell and are related to kind of -- although, I suppose --

10   let me just get your view on deposition protocol.  At least

11   notionally do you agree it would be a good thing here to have

12   some rules around how depositions will work?

13             MR. MARVIN:  Absolutely.  You know, as long as it

14   doesn't prejudice any particular defendant's right to complete

15   their questioning of any particular witness, it certainly makes

16   sense, as in most cases, to do what we can to streamline the

17   process and not burden the parties or witnesses.

18             THE COURT:  And then, obviously, you addressed the

19   hit counts.  It seems to me that you probably addressed all of

20   the issues that are most ripe.  But is there anything else you

21   would like to address this morning?

22             MR. MARVIN:  Not from my end, no.  Thank you.

23             THE COURT:  Okay.  Thank you very much.  Should we go

24   back up to the top again, I suppose, Mr. Babcock?

25             MR. BABCOCK:  Yes, Your Honor.  Can you hear me all

1   right?

2            THE COURT:  I can hear you well.

3            MR. BABCOCK:  Thank you very much.  As the Court

4   knows, we've only been involved in this since July 24th, when

5   we were consolidated.  But we haven't dealt with Ms. Brook, who

6   I know is the lead counsel, but one of her more junior

7   partners, Mr. Ross.  And I think we've made a lot of progress

8   on a lot of the issues that are encompassed in the discovery

9   protocol that is proposed, and we're in favor of a discovery

10  protocol.

11            In the email to the Court Ms. Brook suggested that

12  there be a deadline of eight days.  That may be a little

13  aggressive, given all of the lawyers involved in this, but if

14  that's what the Court thinks is appropriate, then that's what

15  we will do.

16            We also think that a deposition protocol is

17  appropriate.  We don't particularly think the initial proposal,

18  which we received midweek last week, as proposed by Dominion,

19  is terribly fair.  They get seven hours per witness and we get

20  1.4, and then for other very important witnesses they get ten

21  hours and we get two.  But that's a matter of the mechanics and

22  we'll work that out with them.

23            We do think that Ms. Brook's proposal about taking

24  the -- both the discovery protocol and the deposition protocol,

25  and marking what we agree and then having each side's position

1    where we disagree is an efficient way for the Court to deal

2    with these issues.  So I hate to be in agreement, but there we

3    are.

4         I will also agree, strenuously, with Mr. Marvin's

5    comments about hit reports and search terms and everything he

6    just said.  I think that that is an issue that, at least for my

7    clients, you're going to have to deal with because, as

8    Ms. Brook said, it's fairly commonplace for the parties to

9    exchange search terms, and in some cases, although not very

10   many, frankly, hit reports.  But that was because they were

11   being put to a laudatory purpose.

12        They were allowing a party, typically a corporate

13   defendant that had reams of information, to give a term that

14   would cull that relevant information and responsive information

15   out of this whole large morass of documents, principally

16   electronically stored information.

17        But that laudatory thing for search terms has now

18   been turned into a weapon.  And now, on the offensive side, a

19   party like Dominion will dump 3 million or 4 million or

20   5 million documents on us.  They're not responsive.  And

21   they're quite up front about, hey, we're not checking for

22   responsiveness, we're giving you everything on your search

23   terms.  And that requires a, frankly, smaller company like ours

24   to devote massive research trying to find the needle in that

25   haystack of millions of documents.

1         There is case law that says that these documents are

2    not an appropriate tactic under the rules.  So when it's being

3    used offensively that way, it's -- we don't think it's

4    appropriate.  When it's being used a second offensive way, when

5    they demand that we produce everything responsive to their --

6    to the search terms, of course that's not contemplated by Rule

7    26.  But then they take the hit counts, the hit report counts,

8    and they say -- let's say a search term hit on a million

9    documents and we reviewed it and we produced 10,000 documents.

10   Then they say:  Oh, something is wrong here.  You hit a million

11   but you only gave us 10,000.

12         So the motion to compel is -- give us all million,

13   even though, you know, many of them don't have a thing to do

14   with anything in the case.  So I foreshadow that as an issue

15   that is undoubtedly going to be presented to the Court.

16         Is there any other specific things that the Court is

17   interested in?  Of course, I can respond.

18         I will say one thing about the Delaware litigation.

19   For our part, we don't need to see the Fox depositions.  But on

20   the expert reports, it is certainly true that the experts that

21   Dominion hired to inquire into Fox's business and their

22   practices and their revenues, whatever it may have been, we

23   don't want that and we don't need that.

24         However, Fox had experts that reviewed Dominion's

25   financial situation and its technical -- its technology and its

1    system -- electronic voting systems, and we think that would be

2    appropriate to be provided in this case.

3            So that's everything I have to say about everything

4    that has been said so far, Your Honor.  Thank you for the time.

5            THE COURT:  Thank you, Mr. Babcock, very much.

6            Who would like to speak next?  I just want to make

7    sure I give every defense counsel an opportunity to comment on

8    any issues we've addressed.

9            MR. SINGER:  Yes, Your Honor, this is Greg Singer on

10   behalf of Christina Bobb individually.

11           THE COURT:  Yes.

12           MR. SINGER:  I would just like to indicate, first of

13   all, that I echo what Mr. Babcock said.  And in particular with

14   respect to Ms. Bobb, unlike some of the other cases, we had not

15   seen the proposed discovery stipulations until yesterday when,

16   actually, Mr. Babcock's firm forwarded it to us.  It was not

17   sent to us directly.

18           So, although I don't have any disagreement regarding

19   the concept of a discovery and deposition protocol in a general

20   sense, in terms of timing, we're going to be pretty

21   hard-pressed to look at that, provide comments, and confer with

22   Dominion to determine what we would potentially agree to and

23   what we wouldn't.

24           Kind of emphasizing that point, Your Honor, we've had

25   very little contact with Dominion.  So a lot of these issues

1    that have been raised in terms of efforts to confer aren't

2    directed between Dominion's counsel and our firm representing

3    Ms. Bobb.  So I just wanted to make that clear.

4           And then additionally, Your Honor, I think we're

5    largely in agreement with what Mr. Babcock said regarding

6    search terms and the process by which those would be

7    implemented.  I think that with respect to an individual

8    defendant with limited resources, it's not reasonable to dump

9    large volumes of documents on us or expect that we'll be able

10   to look through millions of potentially irrelevant documents.

11          For that reason, we anticipate serving a pretty

12   narrow request for production that concerns Ms. Bobb

13   individually.  And we think, consistent with Rule 26, the

14   production would not just be all of the documents that might be

15   responsive to what you've asked for are contained within these

16   millions of documents, but, rather, that Dominion would produce

17   the documents that actually are responsive to the requests that

18   we serve.

19          And, likewise, Your Honor, I echo Mr. Babcock's

20   thought that I don't believe that we have an interest in seeing

21   the deposition transcripts of Fox witnesses discussing Fox and

22   their particular issues.  But to the extent that there are

23   depositions from Fox's experts that concern Dominion's

24   financial situation, Dominion's technology, its systems and so

25   forth, those would be, I think, relevant to this case and,

1    therefore, should be produced.

2              THE COURT:  Very well.  Thank you.  Would --

3    Mr. Carry, would you like to address any of these issues?

4              MR. CARY:  Yes.  Thank you.  Good afternoon to you

5    now.

6              Regarding the discovery protocol and listening to

7    Ms. Brook, I had two -- in broad strokes -- two reactions.  One

8    is proportionality.  Patrick Byrne is an individual.  The

9    discovery protocol that was shared with us is a 14-page

10   document that references nine different exhibits, one of which

11   is a complicated, technical ESI protocol, another is a document

12   regarding how we would handle expert discovery.

13             While I could think and certainly envision a scenario

14   where those kinds of multilayered documents would be

15   appropriate with mega publicly-traded companies or

16   billion-dollar privately held companies, I want to be mindful

17   that some of the defendants in this case are just individuals

18   and don't have the resources to be able to navigate those kinds

19   of voluminous discovery protocols.

20             But in large part, I share the view that all of my

21   other brothers and sisters have mentioned today, that having

22   some sort of system would make sense.  In the same breath, I

23   also want to be mindful that I don't want to create a

24   "solution," and I'm putting that word in quotes, to a problem

25   that may not exist.

1          I think that the Federal Rules of Civil Procedure do

2     a really good job at how -- at telling us how do we handle

3     these discovery disputes when they come up.  And at least in

4     the case with Patrick Byrne, Dominion requested that we send

5     them head count reports; we sent them.  They asked us to use

6     their search terms; we used their search terms and explained

7     how we used them.

8          They gave us a list of names of custodians that they

9     wanted us to apply those search terms to; we did that.  They

10    asked us to give them a narrative on how we went about getting

11    everything so they can ensure that we are -- that we are

12    reaching the end of the bottom of the barrel, if you will, the

13    universe of documents that may exist; we gave them that

14    narrative.

15         So if you were to ask me, do I think that it's an

16    appropriate time for the Court to perhaps direct the parties to

17    submit what their positions would be on a discovery protocol, I

18    suppose that Your Honor certainly could do that, and maybe now

19    is the time for us to do that.  But in the same breath, I don't

20    know if you necessarily have to because as it relates to, at

21    least Patrick Byrne, we don't have that many disputes.

22         On the question of a deposition protocol, this is

23    something that I've been thinking about myself, and I'm pleased

24    that Ms. Walker, who represents Dominion, took some time to put

25    pen to paper in getting her ideas out there for us to consider.

1    She just sent that letter to us last week, and I haven't quite

2    fully formed my thoughts to the point where I can materialize

3    them in writing.  But I do intend to send a red line of her

4    comments to that letter.

5              But if you were to ask me:  Should the Court do

6    anything or take that issue up at this time?  My response would

7    be:  No.  After all, Dominion's letter was just sent last week.

8    I think it raises more questions than answers, at least for

9    now.

10             For instance, does this apply to nonparty, nonexpert

11   depositions, or does it only apply to -- or does it apply to

12   all depositions?  Are we talking about common witness

13   depositions or, again, all of them?  And then Rule 30 sets a

14   presumptive limit of ten depositions.  Is it Dominion's

15   position that all defendants, including Guiliani, Powell,

16   Byrne, Herring, are going to be confined as a group to ten

17   depositions total?  Or will each set of defendants have the

18   ability to notice ten nonparty, nonexpert depositions?

19             And then as far as the duration of a deposition, I

20   share Mr. Babcock's view that I don't think that the current

21   proposal is particularly fair.  But that kind of gets into the

22   mechanics of it.  I think maybe we just need more time among

23   ourselves to kind of figure out what we think would be

24   appropriate.

25             THE COURT:  Thank you for that.  Anything else?

1          MR. SINGER:  That's all I had to share.  Oh, I guess

2    one other point.  I do share the same view of the Powell

3    defense counsel, Herring's defense counsel about issues with

4    finding needles in haystacks.

5          THE COURT:  Yes.  Understood.  Thank you.

6          Anyone else want to say anything?  I guess, counsel

7    for Defending the Republic.

8          MR. EISENSTEIN:  Yes, Your Honor.  Thank you.  Mark

9    Eisenstein, counsel for Defending the Republic.  With respect

10   to the issue of a potential discovery protocol or deposition

11   protocol, we agree and are happy to discuss that and tee up any

12   issues that can't be resolved between the parties.  DTR has no

13   issue with that protocol.

14         With respect to the larger issues that were raised, I

15   believe in the email to the Court and just now, I'm having a

16   hard time understanding why Dominion seeks at this point to

17   seek permission from the Court to file a motion to compel, for

18   a number of reasons.

19         One, I believe it's premature.  I've never met

20   Ms. Brook until -- via email until a few days ago.  I've been

21   working with her colleagues, Ms. Walker and Ms. Sammons, about

22   issues that were raised in her email and other issues, and I

23   thought we were productively moving forward.  Unfortunately,

24   sometimes I get an email with a two-day turnaround, which,

25   unfortunately, given other obligations, I'm unable to respond

1       to.  But we've been engaged and trying to work with them on

2       issues related to custodians and search terms and a number of

3       matters.  So I think it's premature and I don't think we need

4       to burden the Court with that at this juncture.

5              And, two, as the Court has been listening to these

6       issues for the last -- more than 60 minutes, there's a lot of

7       uncertainty and a lot of questions that hopefully can be

8       resolved by the parties, but, unfortunately, may require

9       intervention of the Court.  So I believe Dominion's asking the

10      Court to set a deadline in less than two weeks of a substantial

11      completion by Defending the Republic of discovery when issues

12      about whether we can do a relevance review is still subject to

13      questions.  So, I don't believe at this juncture it would be --

14      this is the right time for the Court to entertain any potential

15      motions to compel.

16             With respect to the custodian -- I believe they

17      raised two issues.  One is the substantial completion deadline

18      that they are seeking potentially permission from the Court to

19      seek a motion to compel; and, two, with respect to something

20      related to the custodians.

21             With respect to the substantial completion, as I just

22      mentioned, there's a number of issues that have not been

23      resolved -- relevance, ESI protocols, search terms -- there's a

24      number of things that are still up in the air and uncertain.

25      So I believe if the Court were to allow them to seek a motion

1    to compel, or even if we agreed to a substantial completion

2    deadline of 30 days, I believe there's just too much

3    uncertainty that wouldn't mean anything, it would just be a

4    waste of the resources of the parties because we would have to

5    redo everything once an agreement is reached.

6         And a particular issue -- I know this issue has come

7    up in terms of search terms and custodians.  We're hoping and

8    waiting to hear back from Dominion about the search terms.  I

9    believe one of the search terms Dominion proposed to Defending

10   the Republic was "Defending the Republic."  We complied, we ran

11   the search terms on the email accounts that we have for

12   Defending the Republic employees.  As you can imagine, there

13   are a substantial number of hits.

14        We were waiting to and we were hoping to talk to

15   Dominion about trying to resolve the search term issues with

16   respect to that and others.  So we're happy to do that, and I

17   think I -- as Ms. Brook mentioned, we proposed a call with

18   Dominion to try to resolve that and other issues, and we're

19   open to do that whenever they're available.

20        With respect to the custodians, I think they

21   proposed -- I think about 15 custodians.  I think one of them

22   being, initially, Mr. Byrne, who is now a defendant.  And we

23   identified and we responded with nine proposed custodians.  I

24   don't think we received an answer about whether those

25   custodians were appropriate.

1          We also understood that we were going to receive a

2     script that it sounds like Dominion provided or some criteria

3     that Dominion provided to other defendants, I believe

4     Mr. Parker said they received information or a proposal for

5     them to use with their proposed custodians.  We're waiting to

6     receive that guidance or those suggestions from Dominion, and

7     we were going to talk to the nine custodians that we

8     identified.

9          In the interim, Dominion decided to issue a subpoena

10    to three, I believe, of our proposed custodians.  I just say

11    that to say that there's a lot more negotiations and there's a

12    lot more progress that can be made.

13         We believe granting their request for a motion to

14    compel at this point would be premature.  And we're happy to

15    work with Dominion to try to resolve these issues and other

16    issues.

17         We have -- and I believe -- I think I mentioned this,

18    we did provide a hit count and we were continuing to discuss

19    that.  I think one issue that can be discussed off line with

20    Dominion, I think in terms of the volume, we don't have --

21    Defending the Republic doesn't have the volume of material that

22    maybe Dominion thinks it has.  So that's, hopefully, something

23    that can -- hopefully be resolved and discussed among the

24    parties.

25         But for all those reasons, we would ask the Court to

1    deny the request for Dominion to be granted leave to file a

2    motion to compel for the reasons I just stated.

3            THE COURT:  Thank you very much.  What I want to do

4    is I want to just go back very briefly to Ms. Brook.  I want to

5    understand Dominion's position with respect to the use of

6    search terms.  So, in its own review by gathering, review, and

7    production of documents, and then what it expects defendants to

8    be doing.  So, Ms. Brook, can you just give me Dominion's view

9    of how this should be working?

10           MS. BROOK:  Yes, Your Honor.  Thank you for the

11   opportunity to respond.  I'll start by saying, it's

12   particularly confusing to have Dominion's approach of doing a

13   relevance review by virtue of applying search terms,

14   custodians, and timeframe to just -- this is just for ESI, Your

15   Honor, for emails and such where there are necessarily going to

16   be a large number of documents.

17           It's confusing to have that process be objected to in

18   the first instance by the Powell defendants, Your Honor, and

19   that's for this simple reason:  The Powell defendants, like

20   some of the other defendants, issued the following RFP, it's

21   RFP No. 1 in their second request for production, and it asks

22   for all of the documents that Dominion has produced in these

23   related cases and in the Fox case.  And, so, on the one hand,

24   Your Honor, they sent us formal --

25           THE COURT:  Wait.  Hold on.  Just hold on a second.

1    What's the inconsistency there?  Those documents may have been

2    responsive in a more specific and particularized way than

3    documents that just hit on certain search terms for certain

4    custodians and certain dates?

5         MS. BROOK:  So I guess the confusion, Your Honor, is

6    the background of what happened in Fox, which is where I wanted

7    to go to next.  I believe the Court is aware of this, but to

8    the extent it is not, so Mr. Babcock and his team from Jackson

9    Walker were originally counsel for Fox in the Dominion case.

10   We had the exact two disputes that we're having now,

11   apparently, about whether or not Dominion needed to do an

12   additional relevance review on top of applying search terms,

13   custodians, and timeframes to ESI.  We also had the dispute

14   around hit counts, as he sort of referenced in his remarks.

15        And the way those disputes worked out were as

16   follows, Your Honor:  We brought them to not just the special

17   master in that case, but to Judge Davis, because it was Fox's

18   position, as related by the same counsel they now have

19   representing OAN, was what they just told us.  It was that

20   Dominion should have to go -- after applying the very broad

21   search terms that OAN demanded -- that Fox, now OAN, demanded

22   that Dominion run, and after serving very broad RFPs on

23   Dominion in a case where Judge Davis rightfully recognized the

24   bulk of the discovery should really be coming from defendants

25   and not Dominion, so having made those choices, having

1    served -- having demanded lots of search terms, having served

2    lots of RFPs, they can't now complain that Dominion is

3    producing those documents when the Court found --

4        THE COURT:  Hold on a second.  It is not persuasive

5    to me at all to try to equate a lawyer with a party who is not

6    here.  I don't think -- I have no idea what Fox -- what its

7    interest in the Fox litigation was for advocating for a

8    particular reason.

9        I don't think that Mr. Babcock, having represented

10   that party there, is somehow bound or stopped from taking a

11   different position for a different party here.  That is not

12   persuasive to me.

13       MS. BROOK:  Understood, Your Honor.  And my

14   apologies, that was not what I was trying to convey.  What I

15   was trying to convey is this:  That counsel in these cases have

16   served collectively more than 600 requests for production on

17   Dominion at this stage of the litigation alone; more than 600.

18       OAN alone has served 245 requests for production at

19   this stage of the litigation, including very, very broad

20   requests that essentially ask for anything Dominion does.  For

21   example, one of the requests is, quote, Documents and

22   communications relating to any Dominion entity's involvement in

23   the U.S. 2020 local, state, and federal election.

24       THE COURT:  All right.  Hold on a second.  Let's

25   speed this up.  So there's very broad discovery requests, I get

1    it.  Dominion's view here is that when it's responding to those

2    discovery requests, at least the broad ones, it is either

3    entitled or obligated to do what?  Run search terms that it

4    believes are appropriate and then just produce the records?

5    That's what I'm trying to get to.

6          MS. BROOK:  Understood, Your Honor.  For ESI, for

7    emails, Dominion's view is that it should run negotiated search

8    terms with the other side, agreed to by the other side, or

9    ordered by order of this Court on the custodians, again, agreed

10   to with the other side or by order of this Court over the

11   timeframe, again, agreed to with the other side or by order of

12   this Court on some ESI documents and can then produce them.

13         And then under the federal rules, at that point,

14   frankly, any of the defendants are in a better position to

15   determine what exactly is responsive to their request than

16   Dominion is.  That is what Dominion believes for ESI.  Separate

17   and apart from that, Dominion has an additional burden, which

18   it is undertaking in these cases to search for, and

19   specifically identify and review and produce, noncustodial

20   documents, Your Honor.

21         So we've gone through and looked for the contracts

22   they've asked for, or damages spreadsheets they've asked for,

23   et cetera, et cetera.  So for ESI, I think where the parties

24   really have this dispute, Dominion's position is that under the

25   federal rules it is complying with them to the full extent that

1      it needs to by running the agreed-to or Court-ordered search

2      terms, custodians, and timeframes over the ESI requested and

3      making those productions.

4             And Dominion understands, in turn, that defendants

5      may adopt the same approach and, therefore, provide documents

6      to Dominion in that same way.

7             THE COURT:  Agreed.  So now here's my question:  For

8      Dominion, does it have negotiated and agreed-upon or

9      Court-ordered search terms that it is running with respect to

10     each of the defendants that we're talking about?

11            MS. BROOK:  For some of the defendants there has been

12     an agreement as to search terms, for others of the defendants

13     there are ongoing negotiations, some of which are the specific

14     requests that were teed up for the Court today.  If you go back

15     to that joint stipulation, Your Honor, we attached to that

16     joint stipulation unique specified search terms for each of the

17     defendants that were then involved in the process.

18            We have since sent the same idea, unique set of

19     search terms to OAN for negotiation with them, as well as a

20     unique set of custodians to them for negotiation with them.  So

21     we are somewhere in that process, Your Honor, with all of the

22     defendants.

23            THE COURT:  All right.  And so --

24            MR. MARVIN:  Your Honor, I hate to jump in.  This is

25     Daniel Marvin for --

```
1              THE COURT:  Hold on a second.  No, no, not yet.

2              MR. MARVIN:  Oh, sorry, I apologize.  I apologize.

3              THE COURT:  Not yet.  So, Ms. Brook, let me just flip

4    it.  And then, obviously -- so, in an ideal world, at least

5    from Dominion's perspective, I take it -- I should say, I don't

6    have a problem with it.  I want to make sure I understand it.

7              In Dominion's view, at least ideally, there would be

8    for each defendant -- and it might be the same, of course, but

9    for each defendant there would be a negotiated set of search

10   terms, custodians, date ranges (audio interruption) here as to

11   Dominion's responses to the discovery requests.  And then the

12   flip would be true, that for each individualized defendant's

13   ESI review, there would be a bespoke set of custodians, date

14   ranges, and search terms.  And then, assuming that those are

15   agreed upon or assuming that I order a particular outcome with

16   respect to a particular defendant, and whether we're talking

17   about Dominion productions or defense productions, that when

18   those are nailed down, that there need not be additional

19   responsiveness review because that would basically be defining

20   the universe of responsive documents through the ESI protocol.

21   Fair?

22             MS. BROOK:  Yes, Your Honor, that is very fair.  I

23   think there is one additional point I would make there, but you

24   more or less hit the nail on the head, which is Dominion's view

25   would be -- while Lindell might provide Dominion with a set of
```

1    bespoke search terms, which it has and which we have run, Your

2    Honor, and produced, and Powell might provide a different --

3    our obligation is to produce to all of the defendants in these

4    consolidated cases the documents we are producing to any of the

5    defendants.  They, of course, can run their search terms on the

6    documents if they want to narrow them in some way further.

7           When we make those productions on all the defendants,

8    Your Honor, which is what we are doing, we are providing them

9    with a written notice like:  This is what we're producing in

10   this set.

11          THE COURT:  Do you agree that if, say, Ms. Bobb or

12   Mr. Byrne had a very, very discrete document request or set of

13   document requests, that either there should be negotiated a

14   very, very targeted and bespoke protocol for producing ESI or,

15   at a minimum, an identification by Dominion of the subset of

16   already produced documents that would be responsive to the

17   narrowed -- again, in my hypothetical, very narrow document

18   request?

19          MS. BROOK:  We have been doing that, Your Honor, in

20   the sense that when we've been making those productions, we

21   will say:  These are documents responsive to Mr. Lindell's

22   search terms, or what have you.  But what I go back to, Your

23   Honor, and why this is very -- why it's a little confusing,

24   what the defendant is arguing, nobody has issued a very narrow

25   set of discovery requests.

```
 1              While it's true that the Powell defendants issued far

 2      fewer RFPs than the OAN defendants -- I think it's a difference

 3      of like 25 to 245 to date -- they requested all of the

 4      documents produced to everybody else, as well as all of the

 5      documents produced in Fox.  I'm sorry, again, if I got down the

 6      wrong path.  The reason that was significant is because this is

 7      how we did it in Fox, exactly as the Court just said.  So

 8      that's what they asked for and so that's what we gave them.

 9              But, yes, we basically think that everyone should

10      negotiate search terms and custodians -- that's what we've been

11      trying to do for months, if not years -- and we should run

12      those terms and we should produce those documents.  And the

13      receiving party, including Dominion, right, who is going to be

14      getting productions from all sorts of different defendants, has

15      the power on -- you know, via basic ESI tools, to then say:

16      Well, I was most interested in the documents that hit on my

17      search terms, so I'm going to, after loading those documents

18      onto my platform, just focus on the ones that hit on my search

19      terms.  And that's something that can easily be done with basic

20      document hosting platforms.

21              THE COURT:  Understood.  Now, one last question

22      before I turn to Mr. Marvin.  From your perspective, does

23      Dominion have agreed-upon ESI protocols, search term custodian

24      date ranges with Powell defendants represented by Mr. Marvin?

25              MS. BROOK:  No, we do not, Your Honor.  I believe
```

1    that we sent them -- I know we sent them our proposed search

2    terms and custodians.  And my colleagues will correct me if I'm

3    wrong, but I believe what happened there is there was just sort

4    of a period of nonresponsiveness.  And they -- and then -- and

5    that's why we're here.

6         On the proposed search terms for Dominion, despite

7    repeated offers from Dominion to consider a set of narrow

8    search terms from Powell, they've refused to provide us with

9    that.  They've said we are not going to provide you with search

10   terms.  And, again, my colleague will correct me if I have that

11   wrong, but I don't believe I do.  But, instead, said:

12   Dominion, we gave you our RFPs, it's your job to determine what

13   is responsive, not our job to provide you with search terms.

14        THE COURT:  Thank you.  Mr. Marvin?

15        MR. MARVIN:  Judge, I was just going to essentially

16   just say what Ms. Brook and Your Honor just highlighted.  We

17   didn't provide search terms.  We did just ask that responsive

18   documents be produced.  And part of our concern was that search

19   terms wouldn't necessarily capture all responsive documents,

20   which is why when the Powell defendants did our review, we used

21   our internal processes and search terms, we produced those

22   documents.  And now we're willing to use Dominion's search

23   terms that they believe will yield responsive results.

24        We're just asking for that same process to be

25   undertaken by Dominion, which we believe is what Rule 26

1    requires.  And as Your Honor alluded to earlier, there was no

2    agreement by anyone to sort of waive any of the requirements

3    under Rule 26 and replace it with a substitute protocol amongst

4    the parties.  That's all I wanted to add at this point.

5           THE COURT:  It sounds to me that -- I think Dominion

6    was very clear that responsive -- quote, unquote,

7    responsiveness review can be done or substituted with an ESI

8    protocol that reflects an agreed-upon set of search terms and

9    custodians, date ranges, or a Court-ordered set of search

10   terms, custodians, and date ranges.  Potentially it is not a

11   unilaterally chosen set of custodians, date ranges, and search

12   terms because that could either be way over or way under

13   inclusive and would not be consistent with counsel's

14   obligations under Rule 26.

15          But be that as it may, I know we've been at this for

16   a long time, but this has been very helpful for me to

17   understand the respective positions and also the state of play.

18   I'm going to walk through my views on what should happen.

19          I remain very much of the view that these matters

20   should be coordinated in an efficient way to the maximum extent

21   possible.  It seems to me that there is enough agreement that a

22   discovery protocol of the kind contained in the draft that

23   Dominion circulated to at least some parties in June makes

24   sense.  In any event, I think something like that makes sense.

25          That -- what I'm going to order as to that

1    document -- again, this is the proposed stipulation regarding

2    discovery matters.  I am ordering the parties to meet and

3    confer and to see if they can reach agreement on the matters or

4    some of the matters contained therein within two weeks.  So, by

5    October -- well, I'll just call it October 6th, which is a

6    Friday; 15 days.

7            To the extent that there are areas of disagreement,

8    any party is free, as a result of this call, to file a motion

9    for the entry of its preferred paragraph, protocol, whatever,

10   just whatever issue they would like -- the party would like to

11   address that is not resolved through the negotiation over that

12   protocol.

13           I think it is very important, given the discussion we

14   just had, that the parties try to reach agreement.  And I

15   recognize, as Dominion said, that this is embedded in some of

16   the subsidiary documents here, or at least could be.  The

17   parties should reach agreement around the ESI protocols that

18   will apply to each defendant's request to Dominion, on the one

19   hand, and Dominion's request to the individual defendants,

20   recognizing, I think, that one size does not fit all as it

21   relates to ESI.

22           It seems to me that ESI protocol for My Pillow may be

23   very different protocol than for Christine Bobb.  But I'm not

24   going to resolve that question here.  I just think that needs

25   to be part of the parties' discussions.  So, I don't know

1    whether there has to be an exchange of red lines, as counsel

2    are suggesting.  I leave that all to you.

3         But in the first instance, I'm ordering the parties

4    to meet and confer and conclude those discussions by October

5    6th.  After which, again, any party that wishes to move for a

6    particular result, either Dominion saying this proposal should

7    include this paragraph that people don't agree on, someone

8    saying, no, it should not, whatever, the parties are then free

9    to -- any party is free to move thereafter for a particular

10   outcome.

11        What I would ask is that those motions, if any, be

12   filed no later than October 17th.  And then depending on the

13   nature of the motions, and after I've reviewed them, I may set

14   a briefing schedule.  I may hold another hearing soon

15   thereafter, I'll decide -- depending on whether there are any

16   lingering disputes and the like -- how to deal with them after

17   October 17th.

18        If, of course, there are no disputes and the parties

19   have reached full agreement after October 6th, what I would

20   expect is a filing of a joint submission/stipulation that would

21   be full agreement, and I would just enter it thereafter,

22   assuming it otherwise looks good to me.

23        That's the broad discovery coordination point.

24        Again, we've had a lot of discussion about ESI

25   protocols.  A note on that, it seems to me clear, or at least I

1    would be willing to hold that it is an appropriate methodology

2    here for the parties to agree, of course, on a set of

3    custodians, search terms, and dates; or, if not that, to come

4    to me through a motion asking for the entry of a particular

5    ESI -- excuse me, particular search terms, custodian, and date

6    ranges.  And if I bless that motion, then that would govern.

7            Absent those two things, it seems to me that the

8    parties have the background principles of the Federal Rules of

9    Civil Procedure, and that needs to govern their conduct of

10   discovery.  I would hope, in the first instance, that agreement

11   could be reached.  And again, if there's a strenuous desire to

12   have me resolve disputes over custodians and/or search terms, I

13   will do that because I think that could be more efficient than

14   having future disputes over parties' somewhat unilateral

15   efforts to comply with their discovery obligations.

16           Again, I think this topic, this broad topic should

17   be, ideally, folded into the parties' efforts to reach

18   agreement by October 6th, and if not agreement, to tee up the

19   issues thereafter.

20           As to the deposition protocol, it seems to me that

21   that also makes very good sense.  I don't hear anybody object

22   to the entry of a protocol.  I get that there will be issues

23   that may arise where there are disagreements.  On this,

24   especially because the deadline to serve document requests

25   isn't until October 26th, which means that in theory these

1     depositions could wait some period of time.

2          I think the proper schedule here is to have the

3     deposition protocol discussion happen in parallel, to some

4     extent, but slightly later than the -- I'll call this document

5     protocol -- but I would like for the parties to meet and confer

6     and to see if agreement can be reached by October 20th on the

7     deposition questions.

8          If so, an agreement is reached, then please propose a

9     stipulation to me.  If not, again, whatever party would like to

10    file a motion with respect to depositions, do so.  And I would

11    like those motions, if any, to be filed by November 1st, and I

12    will treat them the same way.  That is to say, that once I

13    receive the motions, I'll determine whether I want to have a

14    hearing or perhaps ask for responses and the like.

15         What I'm hoping is that those negotiations,

16    submissions, and motions will obviate many, if not all, of the

17    next level down in terms of specificity disputes that we've

18    been discussing.

19         But there are a couple as to which I would like to

20    state my view.  It seems to me that on the requests for

21    production from Lindell and My Pillow that we discussed

22    relating to the defense agreement, communications with Olsen,

23    revenue questions, and Lindell removal from social media, that

24    those are really not likely to be covered by the broader

25    protocols we're talking about.

1          What I want to have happen on those is for the

2     parties -- and again, this is really something Lindell, on the

3     one hand, and My Pillow on the other -- to discuss whether

4     there are any areas around revenue where they can reach

5     agreement.  Failing that, for Dominion to file, October 13th,

6     any motion to compel it wishes to file.

7          And since I think we're likely to be briefing that

8     motion in any event, the Lindell and My Pillow oppositions to

9     that motion or those motions should be filed October 27th.

10         Again, if for whatever reason the parties can reach

11    agreement, obviating some or all of that motion to compel,

12    terrific.  But I'm assuming that that's unlikely, given the

13    positions I heard today.  But Dominion is authorized,

14    consistent with my standing order, to file a motion to those

15    issues now.

16         Finally, on the materials from the Delaware

17    litigation, it seems to me that the Fox expert report about

18    Dominion -- I'm just going to put it that way, in the most

19    general sense -- are very likely discoverable here.  I can see

20    why they would be relevant to the issues in this litigation.

21    But, they at least potentially raise protective order issues in

22    the Fox case that should be worked through.

23         A document created by an expert for a party that's

24    not a party here and produced pursuant to a protective order in

25    a case that's not mine seems to me, in the first instance, that

1    the parties should be bringing Fox into the conversation to see

2    whether Fox would agree that those materials can be produced

3    here by Dominion.  Absent Fox's agreement to that, or a --

4    perhaps a negotiation around the protective order in Delaware,

5    the parties can come back to me on that question.

6         But in the first instance, I think more needs to be

7    done in a -- at least a three-way, multi -- at least three-way

8    negotiation around protective questions there.  I'm not

9    authorizing a motion to compel yet.  I am telling the parties

10   that my view is that that seems like the kind of thing that

11   should be worked out, that requires parties beyond the parties

12   on this call, and perhaps a judicial officer beyond this one to

13   work through those issues.

14        I think -- just going back through my notes, the

15   question around the search terms and custodians with My Pillow

16   and Mr. Lindell that was Subtopic One, I hope gets folded into

17   the negotiations around the discovery protocol.  The Topic Two

18   about the hit counts for the Powell defendants, same thing.

19        The third question around custodial interviews,

20   productions of texts and messages, and I guess even personal

21   phones, again, could be folded into that, if there's agreement

22   reached on the custodians or the way in which the review will

23   occur.

24        As to the interim substantial completion deadline, I

25   agree with DTR that we're not quite there yet.  Ideally, we

1    will have either an agreement or, very soon, even if there is

2    an agreement entered on discovery protocol, so to speak, and

3    that will then -- that needs to happen before I'm ready to

4    enter an interim substantial deadline for completion of

5    production.

6              But, as with all things, if the parties can agree on

7    such a date in connection with their negotiation around that

8    document, all the better.

9              From my perspective, those are either the reactions I

10   had or the prophecies I would like the parties to follow from

11   here.

12             Why don't we start with Dominion?  I don't want to go

13   over any of the issues that we either haven't physically

14   addressed or arguments, but, Ms. Brook, do you have any

15   questions about where I want the parties to be heading?

16             MS. BROOK:  Just one, Your Honor.  Thank you again

17   for all of this guidance, it's incredibly helpful.  The one

18   question I had, and it relates to the procedure Your Honor set

19   forth for the two stipulations, both discovery and depositions.

20   It seems to me that in the event the parties arrive at a

21   situation where they agree on nine issues but not on one, it

22   would make sense for the parties to, in conjunction with

23   bringing any motions that either side decide to bring on the

24   October 17th or -- I believe it was October 31st date, file the

25   joint stipulation as to the pieces we agree to already, so that

1    the Court has that as well.  But I wanted to --

2              THE COURT:  Yes.

3              MS. BROOK:  -- get clarity from the Court there.

4              THE COURT:  I agree with that, so as long as, I

5    suppose, everyone agrees that perhaps those items are agreed

6    upon, regardless of my resolution of the unagreed-upon

7    portions.

8              MS. BROOK:  Correct.  Understood, Your Honor.

9              THE COURT:  Yes, I agree with that wholeheartedly.

10   Thank you for noting that.  That was implicit in my view.

11             MS. BROOK:  Great.

12             THE COURT:  Would any defense counsel like to raise a

13   question, or is this at least sufficiently clear for present

14   purposes?

15             MR. BABCOCK:  Your Honor, this is Charles Babcock --

16   it feels funny to call myself Charles; people are going to ask

17   for my father.

18             But in any event, Chip Babcock for OAN.  Is it --

19   should we go into these negotiations thinking that if the

20   custodian, date, and search term is either agreed or ordered,

21   that will be a substitute for a responsiveness or relevance

22   review?

23             In other words, the parties would be relieved from

24   that obligation and, in fact, required to produce documents

25   that met a search term, date, and custodian?

1          THE COURT:  Well, let me put it this way:  If the

2     parties agree on that, then yes.  The parties, in my view, can

3     essentially agree on anything.  The parties could agree on

4     search terms, custodians, and dates, and agree that there will

5     be further responsiveness review.

6          I'm hearing, at least Dominion and some of the other

7     defendants, to suggest that they wouldn't want that second

8     part, but the parties can agree on whatever they want, from my

9     perspective, as long as it is -- so either of those two

10    options, it seems to me, would be fine.

11         If, on the other hand, the parties don't agree and

12    Dominion, for example, comes to the Court and says:  We think

13    you should enter the following search terms, custodian, and

14    dates, and that defendants take the position that I shouldn't

15    do that for whatever reason, including because there should be

16    further responsiveness review, then I will address that

17    question in my order resolving the case.

18         So I don't think you should assume that I will

19    necessarily order an outcome over the defendant's objection

20    that doesn't include responsiveness review on the back end, if

21    the defendants make a good case for it.

22         MR. BABCOCK:  Thank you, Your Honor.  That is very

23    helpful and clears up my question.  Thank you, sir.

24         THE COURT:  Okay.  Very well.  Any other questions

25    from any defendants?

1          (Pause.)

2          THE COURT:  Okay.  Hearing none, thank you all for

3     your time.  I know this has been a long call, and at least

4     clarifies some issues for me and we now have a way forward.

5          I look forward to what I hope is a full agreement on

6     all issues.  I know that hope springs eternal, so we'll see.

7     Thank you all.

8                                    *   *   *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5    foregoing constitutes a true and accurate transcript of my

6    stenographic notes and is a full, true and complete transcript

7    of the proceedings to the best of my ability.

8                         Dated this 4th day of November, 2023

9

10

11                    _____

12                         Janice E. Dickman, CRR, CMR, CCR
                           Official Court Reporter
13                         Room 6523
                           333 Constitution Avenue, N.W.
14                         Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25